# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

BETTY T. FERGUSON, THOMAS JONES, JR.,    )
BOBBY WOODEN, HOWARD DUPREE,             )
DAVID DYKES, ANNE DYKES, JANICE          )
SMITH, SUSAN SMITH, SYLVIA PORTER        )
PERKINS, GLORIA TAYLOR, JOSETTE          )
ELYSEE, SALLIE HOLMES, LAKE LUCERNE      )
CIVIC ASSOCIATION, INC., ROLLING OAKS     )
HOMEOWNERS ASSOCIATION, INC., and        )
MIAMI GARDENS CRESTVIEW                   )
HOMEOWNERS ASSOCIATION, INC.             )
                                          )
                        Plaintiffs,       )
v.                                        )          Case No:
                                          )
MIAMI DOLPHINS, MIAMI DOLPHINS, LTD.,    )
SOUTH FLORIDA STADIUM, LLC, SOUTH.       )
FLORIDA RACING, LLC, FORMULA ONE.        )
MANAGEMENT, LIMITED, FORMULA ONE.        )
WORLD CHAMPIONSHIP LIMITED,              )
FORMULA ONE, MIAMI, FORMULA              )
ONE MIAMI GRAND PRIX RACING,             )
LIBERTY MEDIA CORPORATION,               )
MIAMI-DADE COUNTY, FLORIDA, RSE          )
VENTURES, LLC; and                        )
MAYOR CARLOS GIMENEZ, in his official     )
capacity as Mayor of Miami- Dade County,  )
                                          )
                                          )
                                          )
                        Defendants.       )

1

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiffs, Betty T. Ferguson, Thomas Jones, Jr., Bobby Wooden, Howard Dupree, Sharon Dupree, David Dykes, Anne Dykes, Janice Smith, Susan Smith, Sylvia Porter Perkins, Gloria Taylor, Josette Elysee, Sallie Holmes, the Lake Lucerne Civic Association, Inc., the Rolling Oaks Homeowners Association, Inc., and Miami Gardens Crestview Homeowners Association, Inc., bring this action against Defendants, Miami Dolphins; Miami Dolphins Ltd.; South Florida Stadium, LLC;  RSE Ventures, LLC  ("Dolphins" or "Dolphin Defendants"); Formula One Management, Limited; Formula One World Championship Limited; Formula One Grand Prix; Formula One Miami; Liberty Media Corporation; South Florida Racing, LLC,    ("Formula One" or "Formula One Defendants" or "F-1"), Miami-Dade County, Florida ("the County" or "Dade County") and Miami-Dade County Mayor Carlos Gimenez ("Mayor Gimenez"), in his official capacity, and state:

## <u>STATEMENT OF THE CASE</u>

1.    Plaintiffs, Black citizens who reside in the City of Miami Gardens in neighborhoods surrounding the Hard Rock Stadium, bring this civil rights action to (1) challenge the intentional discriminatory acts and omissions of Defendants Miami-Dade County, Mayor Gimenez, the Dolphins, and Formula One to bring high-speed automobile racing ("Miami Grand Prix" or "Formula One Races" or "the race") to the City of Miami Gardens, Florida on the grounds that the Defendants'

acts violate the Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and (2) enforce the Defendants' constitutional and common law public trust obligations to protect Plaintiffs' inalienable and fundamental rights secured by Florida common law and Article I, Section 1; Article II, Section 7(a); and Article X, Sections 11 and 16 of the Florida Constitution.

2.      Defendants engaged in a pattern of intentional discrimination and conspiracy against Plaintiffs on the basis of race, color, or national origin, depriving them of rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

3.      Plaintiffs seek (1) an order declaring that Defendant Miami-Dade County and Defendant Mayor Gimenez intentionally discriminated against the Plaintiffs on the basis of race, color, or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §1983; (2) an order declaring that Defendants conspired to bring Formula One to the Hard Rock Stadium in violation of Plaintiffs' constitutional rights; (3) a permanent injunction to prevent the Dolphins and Formula One from proceeding with high-speed automobile races in the City of Miami Gardens; (4) a declaration that the Formula One races at Hard Rock Stadium in the City of Miami Gardens, Florida, planned by Defendants to begin in May 2021 would violate Section 21-28 of the Miami-Dade County Code and Section 16-24 of the City of Miami Gardens Code of Ordinances;

(5) an award of attorney's fees pursuant to 42 U.S.C. §1988; and (6) an order requiring that Defendants pay Plaintiffs' reasonable expert and attorney's fees and Plaintiffs' costs.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Count I and II pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This Court has supplemental jurisdiction over Counts III, IV, and V pursuant to 28 U.S.C. § 1367(a) as those claims form part of the same case or controversy as the federal questions asserted herein. This Court has personal jurisdiction over Defendant Liberty Media Corporation, which engages in continuous, systematic, substantial, and non-isolated business activity in the State of Florida and has appointed a registered agent for service of process in Florida pursuant to Section 47.011, Florida Statutes. This Court has personal jurisdiction over Defendants Liberty Media Corporation, Formula One Management, Limited, Formula One World Championship, Limited, Formula One, Formula One Miami, and Formula One Grand Prix Racing, and RSE Ventures, LLC, because they carried on a business venture within the State and also committed tortious acts within the State, i.e. including but not limited to: conspiring to violate Plaintiffs' rights to equal protection of the laws, and violating or threatening to violate the Miami-Dade County and Miami Gardens noise ordinances.

5.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65. The federal rights asserted by Plaintiffs are enforceable under 42 U.S.C. § 1983 and § 1985.

6.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

### *Plaintiffs*

7.     Plaintiff, Betty T. Ferguson is a former Miami-Dade County Commissioner. At all times relevant herein, she has resided within two (2) miles from the boundary of Hard Rock Stadium in Miami Gardens, Florida. She is opposed to the Formula One races in her community because she fears the effects of air pollution and noise. She also fears that emergency vehicles will be unable to access homes in the area because of the traffic generated by the Formula One races. She describes how the Formula One races would impact her as follows:

> "Formula One racing in my community will certainly interfere with my quality of life.  I will not be able to enjoy sitting on my patio without wearing ear plugs and worrying about my blood pressure rising because of the noise.  I will not be able to go to the grocery store, drug store, mall, recreation or fitness center without getting caught up in massive traffic jams."

8.     Plaintiff, Thomas Jones, Jr., who resides at 1723 N.W. 192nd Street, Miami Gardens, Florida, has been a resident of Miami Gardens since 1981.  He

states: "I am against this race because of the air pollution, road closures, noise pollution, which will seriously harm my family and me."

9.      Plaintiff, Bobby Wooden, who resides at 1634 N.W. 188th Terrace, Miami Gardens, Florida, states:  "My family and I have been living here since 1980, and will be severely negatively impacted by the air pollution, traffic congestion, closure of roads in the community, and the noise pollution."

10.     Plaintiff, Susan Smith, has resided at 20533 N.W. 22nd Place, Miami Gardens, Florida, for 35 years and in the Lake Lucerne Community for approximately 40 years. She is the President of the Lake Lucerne Civic Association, Inc.  She states:

> "I am vehemently opposed to Formula One racing at Hard Rock Stadium because of the dangerous effects from the noise and air pollution, which studies have indicated! This racing would have grave effects on the elderly and children in Lake Lucerne.  We are already prisoners of our homes with the myriad of events at the stadium.  Any more events would wreak havoc on our neighborhood!  I, along with my neighbors, are against Formula One Racing! The noise and congestion is unbearable during games and other venues already held at Hard Rock. My windows, as well as others in our community, experience windows vibrating during some of these events! Now more noise pollution from Formula One – No! If F-1 comes to our neighborhoods, this would be a classic case of environmental injustice and racism!"

11.     Plaintiffs, David Dykes and Anne Dykes, reside at 20513 N.W. 22nd Place, Miami Gardens, Florida, and state: "We have been residents for 40 years.  We

oppose Formula 1 Racing in our neighborhood because of noise pollution, environmental health, and the harm the races will cause to the value of our property."

12.    Plaintiff, Josette Elysee, who resides at 2240 N.W. 190th Terrace, Miami Gardens, Florida, states:

> "I oppose the Formula One racing event to be held in my community. The ill effects from this event will be extremely harmful to myself and my family and to thousands of other residents, as well as to the environment of the entire community. To name a few: pollution, traffic congestion, high levels of noise that will disrupt our lives and even threaten hearing loss."

13.    Plaintiff, Sallie Holmes, who resides at 18515 N.W. 22nd Place, Miami Gardens, Florida, states: "I have been a resident of Miami Gardens for 45 years and I oppose Formula One being held in my community for health and damage it will do to the community."

14.    Plaintiff, Gloria Taylor, who resides at 2330 N.W. 181st Street, Miami Gardens, Florida, states: "I have been a resident for 45 years. I am totally against Formula 1 racing because of several reasons: health, air pollution, traffic crime, normal daily travel, hearing, depreciation of home. I think another area is much more suitable for Formula One Racing, but not in Miami Gardens."

15.    Plaintiff, Janice Smith, resides at 20525 N.W. 21st Avenue, Miami Gardens, Florida. She opposes Formula One Racing in Miami Gardens because she is apprehensive about the devastating permanent health risks that it poses. In addition, she states:

> "I oppose F-1 because of my experiences being stuck in traffic for long periods, blocked intersections by fans going to or leaving the stadium, fireworks noise causing my windows to vibrate as if they would shatter. 3-4 days of F-1 racing will cause pollution of the air we breathe, changes in regular routines, damage to me and my family's hearing (tinnitus), and respiratory problems."

16.    Plaintiff, Sylvia Porter Perkins, resides at 2301 N.W. 186th Street, Miami Gardens, Florida. She states:

> "I am against the Miami Dolphins and Formula One racing as a resident of Miami Gardens since 1980, now totaling 40 years. The noise and the environmental effect on the residents will be devastating. I will not be able to move freely within my community and my day to day life will be disrupted beyond explanation. Enough is absolutely enough! This is environmental racism at its highest degree. I will again be a prisoner in my own home!"

17.    Plaintiffs, Howard Dupree and Sharon Dupree, have resided at 1734 N.W. 192nd Street in Miami Gardens, Florida, since 1982. Mr. Dupree states:

> "I am very apprehensive that Formula-1 racing at Hard Rock Stadium will further deprive me of the peace and quality of life that homeowners expect. I fear the documented noise decibels that Formula cars emit will cause me and my family hearing damage. Also, I have concerns about other environmental health issues including air pollutants from the car engines and tires, excessive traffic, and the effect on students in nearby schools."

18.    Plaintiff, the Lake Lucerne Civic Association, Inc., is the association of homeowners residing in the Lake Lucerne subdivision of Miami Gardens, who would be harmed by Formula One Racing in the manner described above.

19.    Plaintiff, the Rolling Oaks Homeowners Association, Inc., is the association of homeowners residing in the Rolling Oaks subdivision of Miami

Gardens, who would be harmed by Formula One Racing in the manner described above.

20.     Plaintiff, the Miami Gardens Crestview Homeowners Association, Inc., is the association of homeowners residing in the Crestview subdivision of Miami Gardens, who would be harmed by Formula One Racing in the manner described above.

### *Defendants*[1]

21.     Defendant, Miami Dolphins, Ltd., is a National Football League team that plays its home games in the Hard Rock Stadium, which is located in Miami Gardens, Florida. The Dolphins have negotiated and entered into an agreement with some or all of the other defendants named herein to host the "Miami Grand Prix," an annual multi-day spectator racing event in and around the Hard Rock Stadium on stadium property.

22.     Defendant, Miami-Dade County, is a county in South Florida that includes the City of Miami Gardens and the City of Miami. The County has publicly supported the Miami Grand Prix and, according to Defendant South Florida Stadium LLC, issued permits for "construction required to stage the race." The County has

---

[1] The Defendants' public correspondence pertaining to plans for Formula One racing in Miami Gardens makes it impossible to differentiate among the Dolphins and Formula One entities that are responsible for the negotiations, agreement, and anticipated consummation of proposed Formula One races in Miami Gardens.   In many cases, the Dolphins and Formula one official correspondence appears to avoid specifying the actual responsible entities, and relies on "trade" or common usage names.

also defeated efforts by Plaintiffs' elected representatives to prevent a high-speed motor vehicle racing in Miami Gardens.

23.     Defendant, Mayor Carlos Gimenez, is the Mayor of Miami-Dade County and is sued in his official capacity.

24.     Defendant, South Florida Stadium, LLC, operates the Hard Rock Stadium, located in Miami Gardens, Florida. It has negotiated and entered into an agreement with some or all of the other defendants named herein to host the "Miami Grand Prix," an annual multi-day spectator racing event in and around the Hard Rock Stadium on stadium property.  South Florida Stadium, LLC, has stated publicly that it has obtained permits and is expending funds to build a Formula One track and seating capacity for Formula One races at Hard Rock Stadium.

25.     Defendant, RSE Ventures, LLC ("RSE"), is "a private investment firm that focuses on sports and entertainment" whose principal business address is 423 West 55th Street, New York, New York. RSE retained lobbyists who regularly interacted with Miami-Dade County government officials to obtain approval for the Miami Grand Prix in Miami Gardens, and also lobbied City of Miami officials to obtain approval for a F-1 race in Downtown Miami in 2018. On information and belief, RSE is wholly or principally owned by Stephen Ross, the owner of the Miami Dolphins, and either RSE or Stephen Ross personally has the exclusive franchise to promote Formula One racing in South Florida. Defendant, South Florida Racing,

LLC, has negotiated and entered into an agreement with some or all of the other defendants named herein to host the "Miami Grand Prix," an annual multi-day spectator racing event in and around the Hard Rock Stadium on stadium property.

26.    Defendant, Formula One Management Limited, is headquartered in London, England. Through its President, Sean Bratches, and others, Formula One Management Limited negotiated and entered into an agreement with some or all of the other defendants named herein to host the "Miami Grand Prix," an annual multi-day spectator racing event in and around the Hard Rock Stadium on stadium property.  Defendant, Formula One World Championship Limited, is headquartered in London, England, and lobbied the Miami-Dade County government officials to obtain approval for the Miami Grand Prix in Miami Gardens, represented by its President, Sean Bratches, as well as Marcus Bach-Armas, Senior Director of Legal & Government Affairs for the Defendant Miami Dolphins.

27.    Defendants, "Formula One Miami," "Formula One," and "Formula One Miami Grand Prix Racing," conducted marketing, solicitation, and other business activities in Miami-Dade County in connection with bringing a Formula One race. They have coordinated with other defendants for the purpose of organizing the Miami Grand Prix. Formula One lobbied the City of Miami government in 2018 for approval of a F-1 race in Downtown Miami, represented

by, among others, Sean Bratches and Carlos Gimenez, Jr., the son of Defendant Mayor Carlos Gimenez.

28.    Defendant, Liberty Media Corporation ("Liberty"), owns and controls Formula One and the entities operating under the Formula One name, including the entities negotiating with the other defendants named herein to host and coordinate the Miami Grand Prix. Liberty has provided $1.4 billion in cash and an additional $1.3 billion in debt relief to its Formula One subsidiaries for operating capital in the past eighteen (18) months. On information and belief, Liberty directs commercial policies for Formula One racing, such as speed and noise levels and racing venue, and was directly involved in obtaining approval from (or eliminating opposition to) Miami-Dade County government officials for the Miami Grand Prix in Miami Gardens, and the negotiations for agreements with some or all of the Defendants herein.

## STATEMENT OF THE FACTS

### SUMMARY

29.    Miami-Dade County intentionally formalized, and continues to formalize, customs, policies, and practices to disadvantage Black people, including Plaintiffs, residents of Miami Gardens.

30.     These racist acts—racial zoning, inequitable development, disinvestment, neglect, police brutality—further inequalities in education, housing, employment, wealth, health care, and representation in leadership positions.

31.     The acts and omissions of all Defendants to secure the Miami Grand Prix in Miami Gardens despite Plaintiffs' continued objection serve as the most recent example of Miami-Dade County's customs and practices that routinely harm the rights and interests of and discriminate against Plaintiffs and other residents of Miami Gardens, a predominantly Black city.

## HISTORY OF SYSTEMIC RACISM BY MIAMI-DADE COUNTY

32.     In the early 1930s, most of Dade County's Black population of about 30,000 lived in the overcrowded neighborhood called "Colored Town," today known as "Overtown," just northwest of the Miami business district.

33.     Due to racial zoning implemented by Dade County, Black people were only allowed to live in Overtown and a few other small segregated areas in Dade County.

34.     Wanting to expand the central business district into Overtown, the Dade County Commission adopted a "negro resettlement plan" in 1936 to remove Overtown's residents to more distant communities outside Miami city limits.

35.     In 1937, with federal funding from New Deal housing programs, Dade County built an exclusively Black public housing project in Liberty City, about five miles north of downtown Miami.

36.     The Home Owners Loan Corporation ("HOLC"), a federal agency established in 1933 to grant mortgages to homeowners who could not obtain regular mortgages, created a map of Dade County in 1938 that marked large areas of undeveloped land in the northwest section of the county with the lowest rating possible, categorizing the neighborhoods as "least desirable."  The "least desirable" designation resulted in higher interest rates and diminished borrowing ability for the area's residents.

37.     Raymond Mohl, one of the nation's most influential urban historians, wrote, "There can be only one explanation for the decision to assign the lowest D rating to an area that as yet had no particular character: the fact that Dade County was building the Liberty Square public housing project for African Americans in that area and intended African Americans to move to that part of the county."[2]

38.     Because banks and mortgage lenders were less likely to invest in low-rated neighborhoods, HOLC's redlining led to future housing deterioration and intensified racial segregation in such areas.

---

[2] Raymond Mohl, Whitening Miami: Race, Housing, and Government Policy in Twentieth-Century Dade County 320 (2001).

39.     Although the Supreme Court outlawed racially based zoning in 1917, Dade County continued to implement racial zoning laws into the 1940s and 1950s which resulted in more Black residents being forced out of the City of Miami and Central Dade County into northwest Unincorporated Dade County.[3]

40.     In 1943, the Dade County Commission set aside two areas of Opa-locka, Bunche Park (one of the neighborhoods that formed what is now Miami Gardens) and Magnolia Gardens, for Black residency.

41.     The largest private development for Black residents in the area was Bunche Park, containing about 1,000 single-family units.

42.     By the mid 1950s, Dade County had not yet fully achieved its 1930s goal to eliminate Overtown and move Black people outside Miami city limits.

43.     The construction of Interstate 95 ("I-95") provided the County with the opportunity to achieve such goals, destroying 5,000 housing units in Overtown and displacing 12,000 people, mostly Black residents.

44.     Generally, Black residents displaced by I-95 moved to Liberty City and more distant communities like Opa-locka and Carol City (now part of Miami Gardens) in northwest Dade County. By 1960, most of Dade County's Black

---

[3] *Meek v. Metropolitan Dade County*, 805 F. Supp. 967, 979 (S.D. Fla. 1992).

population lived in this northwestern section. As Mohl explained, "The plans of those who carried out racial zoning in the 1930s and 1940s had come to fruition."[4]

45.     As described by U.S. District Judge Donald Graham in 1992: "As a result of this controlled expansion of Black residential areas, between 1940 and 1960, Dade County suffered from the highest degree of racial segregation in housing of over 100 large cities throughout the country."[5]

46.     With the influx of Overtown residents displaced by I-95, Liberty City became more densely crowded, as multilevel apartment complexes replaced open spaces and single-family homes.

47.     In the 50s and 60s, apartment complexes in northwestern Dade County were built hurriedly for profit and often had no open or recreational areas. During this time, Black neighborhoods in this northwestern corridor often lacked proper municipal services, such as frequent garbage collection.

48.     Carol City, one of the neighborhoods in northwestern Dade County that formed what is now Miami Gardens, was originally created as a white subdivision in 1955.

---

[4] Mohl, *supra*, at 325-26.
[5] *Meek*, 805 F. Supp. at 979.

49.     Once Florida's fastest growing suburb, Carol City experienced a housing foreclosure crisis in the late 1950s, as a recession in the building market affected the many residents employed in the building trades.

50.     After a third of the houses went into foreclosure, Carol City was described in 1963 as a "ghost town of abandoned homes, failing businesses and unkept trash piles."

51.     Many Black residents displaced by I-95 were able to find housing in Carol City, especially as the Federal Housing Administration waived the down payment on foreclosed homes.

52.     Developers offered incentives to prominent Black professionals to encourage them to move into the area that is now Miami Gardens.

53.     A 1971 *Miami News* article reported that the Metro Commission (the former name for the Miami-Dade County Commission) "allows neighborhoods like Carol City to turn into ghettos by haphazard zoning, large scale construction when schools were already crowded, and when trash pick-ups are made only once every two or three months."

54.     White people fled the area and left behind Black residents isolated in deteriorating neighborhoods such as Opa-locka and Carol City.

55.     Several studies have shown that, of more than hundred large American cities, Miami had the highest degree of residential segregation by race in 1940, 1950,

and 1960. In 1970, ninety-two (92) percent of Black people in Miami lived in segregated neighborhoods.

56.     In 1980, Miami still had one of the greatest degrees of Black residential segregation in a list of sixty metropolitan areas.

57.     During the mid-1960s, numerous Black residents alleged that the Miami Housing Authority ("MHA"), which controlled Dade County's public housing until 1968, acted upon racial bias to locate new public housing projects in existing Black neighborhoods, exacerbating patterns of racial segregation.

58.     In 1966, state and local chapters of the NAACP charged the MHA with "failing to follow available programs that could bring about integration . . . and of killing the possibility of integration by locating new public housing in already segregated areas."

59.     A study by University of Miami sociologists in 1969 reported a pattern of "rapidly spreading [B]lack ghettos" in the northwestern section of Miami and Dade County (where Miami Gardens is located).

60.     In addition to racial zoning, inequitable development, disinvestment, and neglect, Miami-Dade County formalized discriminatory customs, policies, and practices that resulted in the violent policing of Black neighborhoods.

61.     In 1967, Miami's police chief since the 1940s, Walter Headley, "declared war" on crime in Miami's Black neighborhoods, vowing to use "shotguns

and dogs" to carry out this purpose. He openly admitted that such campaign targeted Black male youths.

62.     Chief Headley ordered his officers to enforce the city's "stop and frisk" ordinance, resulting in daily confrontations between police and Black people, in which officer patrols often broke up curbside gatherings and entered recreational spaces in Black communities to search and question youths.

63.     As the Miami Study Team of the National Commission on the Causes and Prevention of Violence noted in 1969, Chief Headley attempted to keep "an underprivileged and restless minority cowed and orderly by a constant visual display of force."

64.     Poverty, high unemployment, segregated housing, police harassment, inequitable education, along with general disinvestment and neglect by Dade County, all contributed to the frustration in Miami's Black community that manifested itself in the Liberty City Riot of 1968. On August 7, 1968, when the Republican Convention took place in Miami Beach, organizers planned a Black-empowerment rally in Liberty City, and tensions led to a three-day riot where protestors took to the streets to set fire to the institutions that oppressed them. In response, police staked out corners in the Black neighborhood, dispersing tear gas and shooting wildly into alley ways.  By the end, three people were killed by the police, 18 were wounded, and 222 were arrested.

65.     Twelve (12) years later, Liberty City burned again. In May 1980, riots occurred in Liberty City after the acquittal of five white Metro Dade County police officers who chased Black insurance executive and former U.S. Marine Arthur McDuffie on his motorcycle for an alleged traffic infraction, and then beat him with Kel-Lites, heavy-duty aluminum bodied flashlights, and nightsticks so violently that the medical examiner said Mr. McDuffie's skull had been "shattered like an egg," resulting in his death a few days later.

66.     In what is known as the Miami Riot of 1980, ten Black people and eight white people died, 800 people were arrested, and huge swaths of Black neighborhoods, including businesses, automobiles, and other personal property, were destroyed.

67.     In February 2020, forty years after his father was killed in an act of racial violence, Mr. McDuffie's son Marc Patrick McDuffie spoke at a Black History Month ceremony in Miami, and said: "I still look at the news and I see Black men like myself being mistreated, still being killed, still being beaten, and not seeing the right hand of justice."

68.     Discrimination in zoning, housing, business, and community development against Dade County's Black community did not end after the 1968 and 1980 riots.

69.     In 1984, after learning of secret plans to construct Joe Robbie Stadium, a sports complex, office buildings, shopping centers and hotels in the Lake Lucerne area of North Dade (where the Hard Rock Stadium sits in the City of Miami Gardens), Black homeowners, remembering how large-scale developers economically and socially destroyed Overtown, Allapattah, and other neighborhoods, filed suit to stop further "intense" development. Dade County, despite an overwhelming "no" vote from homeowners, steamrolled over the objections of the homeowner groups, all of them Black, and approved stadium construction against the wishes of the community. After a nine-year legal battle, the homeowners reluctantly signed a "Settlement Agreement" that obligated the developers to do several things to mitigate the harmful impact of the (by then already constructed) Joe Robbie Stadium.

70.     In 1987, Dade County created a map that projected Black residential areas in 1990, and it showed the persistence of such segregation, as the map mirrored the 1938 HOLC map as alleged *supra* [Paragraph 36]. An investigation conducted by the Washington law firm Jenner & Block found that the County knowingly established a two-tier housing system in which Black residents were packed into deteriorating conventional public housing while white and Latino residents received Section 8 vouchers for subsidized housing. The report cites three acts of the County that furthered segregation: (1) building a de jure segregated housing system between

1937 and 1964, (2) replicating segregation by building projects for Black residents in segregated, black neighborhoods while placing non-Black residents in predominantly white and Latino neighborhoods, and (3) engaging in "racial steering" by encouraging Black applicants to apply for public housing. "There were no doubts in our mind that the county had created this unfair system," said Bruce V. Spiva, of Jenner & Block. "What was even more alarming is that this system continued to exist well after the Supreme Court ruled such practices are unconstitutional."

71. Black businesses were also harmed by the County's discriminatory business practices. In 1992, the nine-member Metro Dade County Commission approved a resolution endorsing the findings contained in two independent studies conducted at the request of the County. The two studies by Dr. Andrew Brimmer of Brimmer and Co., a key economic aide in the Jimmy Carter administration, and Dr. Joe R. Feagin of Race Relations Consulting Services and a sociology professor at the University of Florida, titled "Black Vendors in Dade County: A Complex Portrait of Discrimination" and "Black Contractors and Sub-contractors in the Dade County Construction Industry: A Portrait of Racial Discrimination," detail evidence of a historical pattern of racial discrimination against Black businesses in the award of County contracts. Feagin selected by random sampling 336 Black business vendors and contractors in Dade County. Feagin found a "buddy-buddy" system of formal

and informal relationships deeply entrenched in the construction and vendor businesses, totally dominated by whites, and which, he said, worked to the exclusion of Black contractors. Other barriers to Black participation, Feagin noted, include non-payment or late payment for work done, harassment, runaround, sabotage, inability to get bonding or secure a bank line of credit, and "fronting"—using Black firms as "fronts" for whites so as to obtain set-aside contracts.

72.     The County also discriminated against Black voters. In 1990 and 1993, the Eleventh Circuit Court of Appeals held that Miami-Dade County's election system violated Section 2 of the Voting Rights Act, discriminating against voters on the basis of race.  In particular, the Court held the County diluted the votes of Black voters in Miami Gardens.  *Meek v. Metro. Dade County*, 908 F.2d 1540 (11th Cir. 1990); *Meek v. Metro. Dade County*, 985 F.2d 1471 (11th Cir. 1993), *abrogated on other grounds* by *Dillard v. Chilton County Comm'n*, 495 F.3d 1324 (11th Cir. 2007).   The district court wrote:

> A history of discrimination may manifest itself in present-day disadvantages in areas such as housing, socio-economic status, education, and employment, which in turn can result in decreased participation and influence in the democratic process. Although some gains have been made, there is no dispute that Blacks in Dade County continue to suffer from lower income levels, lower job classifications, lower education levels, higher poverty rates and higher unemployment rates than do Non–Blacks.

73.     The district court noted that in the six most recent County Commission elections, the Black candidate who received a majority of the Black vote lost in every instance except one. More specifically, the district court explained, "in 1986 and again in 1990, candidate Betty Ferguson sought a seat in the Dade County Commission. She was a candidate with overwhelming support among Black voters. All of the experts who testified estimated that she received virtually 100% of the Black votes cast in her election. Nonetheless, she was defeated by two different candidates."

74.     The district court specifically identified the extensive discrimination that Black residents of Dade County had suffered and its consequences:

> As stipulated by Black Plaintiffs and the County, as late as 1989, of 25 major metropolitan areas, Dade County was among the three worst in terms of housing discrimination against Blacks. Past discrimination has also displayed itself in socio-economic disadvantages.  For example, the 1980 Census showed that Black families were poorer than others when measured in terms of average family income in 1979. The median income of Black families in 1979 was only 63% of the median income of White families. With annual incomes of less than $10,000, 40% of all Black families were living in poverty, three times more than the percentage of White families living in poverty. Almost half of that number had annual incomes of less than $5,000.
>
> Although Blacks have made significant strides toward closing the gap between Black and White educational attainment, these encouraging statistics do not conceal the fact that large numbers of Blacks continue to fail to complete high school. In 1980, for example, 21% of Dade County's Black adults, almost twice the percentage of Whites, had failed to complete high school.
>
> Blacks have historically suffered disadvantages relative to White

> citizens in employment, due partly to inadequate education. Blacks in
> Dade County are unemployed at rates almost twice those of Whites.
> Not only is the current unemployment rate for Blacks higher than that
> of Non–Blacks, but also the number of unemployed Blacks increased
> between 1970 and 1980.

*Meek*, 805 F. Supp. at 979-980. The federal courts held the County Commission at-large election system discriminated against Black citizens in violation of Section 2 of the Voting Rights Act and enjoined the County from conducting elections under that system.

75.     Even today, racial disparities continue in the voting process, as seen in the November 3, 2020 election. According to data analyzed by Dan Smith, a political science professor and election expert at the University of Florida, for a *Miami Herald* article published on October 23, 2020, the rates at which mail-in ballots casts by Black voters in Miami-Dade County are being flagged for possible rejection are substantially higher than among voters overall.

76.     In the 1990s and early 2000s, many South Florida residents coalesced in political movements to incorporate their neighborhoods in order to improve local government service delivery and the quality of life in their communities, exercise local control over police and other services, make sure tax dollars were spent wisely, and impose greater accountability through city councils or commissions that make decisions at a more local level than county officials.  During that period, nine neighborhoods in Dade County formed their own local governments.

77.     In the late 1990s, the residents of North Dade attempted to incorporate into the City of Miami Gardens, not only because of the residents' perception that the County had abused its power in approving the Joe Robbie Stadium in the mid-1980s over the residents' objections, but also because many other facets of the County government had failed the residents, the majority of whom were Black. Residents cited to the County's inability to operate and maintain basic municipal services and explained why incorporating would bolster basic services to the area. "We need more recreational facilities for our children. We have lots of parks, but they are not equipped and staffed properly. Some facilities have been there for 40 years, and sometimes we have 75 kids packed in one small building. It's ridiculous. These are the things that a smaller city government would be able to address immediately," said Shirley Gibson, former chair of the North Dade Municipal Advisory Committee.

78.     Miami-Dade County and the Miami Dolphins organization openly and aggressively opposed the residents' desire for incorporation and self-government and succeeded in defeating the residents' first effort to incorporate in 1995.  In 2003, however, the community overcame the opposition from the County and Miami Dolphins and became incorporated as a city in Miami-Dade County.

79.     Even after incorporation, the Black residents of Miami-Dade continued to feel the impacts of Miami-Dade County discriminatory customs and policies.

80.     After studying the Miami-Dade County's criminal justice system, a 2018 American Civil Liberties Union Report, <u>Unequal Treatment: Racial and Ethic Disparities in Miami-Dade Criminal Justice</u>, found "disparities at every decision point that, regardless of ethnicity, result in disadvantages for Black defendants and neighborhoods while resulting in advantages for White defendants and neighborhoods," including the neighborhood of Miami Gardens.

81.     The median income for Black households in Miami-Dade in 2018 was $38,015, compared with $56,527 for households identifying as white, including white Hispanics. Nearly a quarter of Miami's Black population is impoverished, compared with the county-wide rate of 16%. And there is substantial racial and ethnic disparity among those who experience homelessness in Miami-Dade. While 18% of the general population is Black, 57% of all persons experiencing homelessness are Black, a 2019 study by the Miami-Dade Homeless Trust found.

82.     Miami Gardens has a poverty rate of 21.7%, compared to the national rate of 10.5% in 2019; the 2018 Median Household Income in Miami Gardens was about $42,000, while the 2018 National Median Household Income was about $63,000.

83.     The *Miami Herald* series, *Separate and Unequal*, published on August 20, 2020, outlines the ongoing impacts of racism in Miami-Dade County. H.T. Smith, a prominent Black attorney and activist, was quoted as saying "Miami is not

a diverse community. That's the biggest lie ever told. Miami is a confederation like the Soviet Union was. We are forced together, but there is no real diversity in terms of freedom and interaction between Hialeah and Homestead and Liberty City. Miami Gardens and Aventura share a border. But they have very little to do with each other. Miami is about shared spaces but separate lives."

84.     The Defendants' planning and implementation of plans to secure the Formula One Miami Grand Prix in Miami Gardens despite the continued objection of its residents is the most recent example of the Miami-Dade County's customs and practices that routinely disregard and discriminate against Plaintiffs, the residents of Miami Gardens.

## FORMULA ONE IN SOUTH FLORIDA

85.     In 2016, Stephen Ross ("Ross"), Owner of the Miami Dolphins and the Hard Rock Stadium, and Liberty Media Corporation, who owns and controls Formula One and the entities operating under the Formula One name, were the two competitors to acquire Formula One from its previous owner.

86.     Ross bowed out of the competition, but emerged with the exclusive franchising rights to Formula One races in South Florida. Unlike other venues throughout the world where the local governments pay extremely high "sanctioning fees" for the right to stage a Formula One race, Liberty Media Corporation agreed

to allow Ross to stage a race in Miami without having to pay a sanctioning fee—a sweetheart deal.

## COUNTY AND FORMULA ONE
## DOWNTOWN PLAN

87.     As early as September 2016, Liberty Media Corporation announced its goal of expanding F-1 racing to Miami.  The original public plans for a "Miami Grand Prix" ("the race") anticipated a long weekend of racing in 2019 through Downtown Miami in Bayfront Park and the Port of Miami near the city's restaurants, shops, and residential districts.

88.     All Defendants, as well as Ross, are and have been actively involved in strategizing, planning, and lobbying to bring Formula One to Miami.

89.     On May 2, 2018, Formula One published a statement that included the following statement of support from Ross: "In cooperation with the City of Miami and Miami-Dade County, I am confident we can deliver yet another global event that will be a destination for people from around the world and drive economic value to South Florida."

90.     On May 10, 2018, the City of Miami Commission unanimously authorized the City Manager to negotiate a 10-year agreement to bring a Formula One race to Downtown Miami and present the agreement to the Commission no later than July 1, 2018. In a published statement, Formula One asserted that the combined

decisions of Miami Dade County and the City of Miami Commission constituted preliminary approval towards bringing the F-1 Grand Prix to Miami.

91.     On May 14, 2018, Miami-Dade County Mayor Gimenez announced that he would recuse from Formula One matters because his son, Carlos Gimenez, Jr., was a paid lobbyist for the Dolphins and Formula One to help make the Miami Grand Prix possible.

92.     In response, Downtown Miami residents mobilized a grassroots effort to persuade their elected officials to reject Formula One in their neighborhood due to the excessive noise and other harms that Formula One racing would necessarily cause.  *See* Joey Flechas, "Downtown Miami residents want to block Formula One and kick out Ultra Music Festival," *Miami Herald*, June 20, 2018 ("A group of downtown Miami residents is trying to block the city from hosting a Formula One Grand Prix on city streets. . . . An attorney representing 11 downtown residents sent a cease-and-desist letter to City Hall on Wednesday demanding the city halt negotiations to bring Formula One to Miami in 2019 . . . .").

93.     The Downtown residents reminded their elected officials that 10,000 residents lived in the immediate area of Bayfront Park, i.e. the location of the proposed race, and not only paid taxes, but were entitled to the full benefits of home ownership, and would suffer very serious harm to their health and quiet enjoyment of their homes from F-1 racing downtown:

"[T]he City and the [Bayfront Park Management] Trust have an obligation to the Residents not to allow such harmful activity on public land in the middle of a heavily populated residential community"

"Based on publicly available medical, scientific, and industry publications, Formula One race cars produce continuous noise, between 125-148 dB, that far exceed the 70-75 dB level recognized as the high end of the safe noise level, and pose a substantial risk of damage to the hearing, not to mention the peace and quiet of the homes, of residents."

Letter from Downtown Miami Residents to City of Miami Mayor and City Commissioners, June 20, 2018.

94.     During this time period, the Miami-Dade County Commission passed a resolution [No. R-518-18, May 15, 2018, attached as Exhibit 1], encouraging Formula One to "coordinate with any hosting municipality and with other municipalities within Miami-Dade County to bring a Formula 1 race to the County."

"This Board directs the County Mayor or County Mayor's designee to negotiate an agreement with the appropriate entity for the hosting of Formula one racing events in Miami-Dade County and to coordinate with any hosting municipality and other municipalities on such events, provided, however, that the site commonly referred to as Parcel B and located behind the American Airlines Arena will not be considered or used as a site for hosting the Formula one racing events."

"This Board directs the County Mayor or County Mayor's designee to present said agreement to this Board on or before July 1, 2018, or, if such agreement is not ready by such date, to present a written report to this Board by said date on the status of the negotiations."

95.     The Downtown residents continued to express their concerns that the race would result in extreme noise constituting a legal nuisance, pollution of heavily

populated residential communities, and a decrease in property values. The residents explained how the race would ultimately deny them the use and quiet enjoyment of their living spaces and municipal amenities.

96.     After hearing residents' concerns, City Commissioners acknowledged the severely harmful impacts that mega-events, like the Miami Grand Prix, have on the rights and interests of residents and their immediate communities and amenities.

97.     City Commissioner Joe Carollo remarked at a June 14, 2018 Commission meeting:

> "We have to make a decision on whether this is going to be a park or it's not going to be a park, and it's going to be an entertainment place, so you're going to have concerts, car races, or what have you...
>
> And at times, I've been feeling that because of some of the events -- in particular, one event there -- there's a gun that wants to be placed to my head, and let me say this publicly. I'm not the guy that anyone's going to put a gun to my head, anyone is going to extort me or blackmail me, or intimidate me. I'm going to do what's right.
>
> ...the City -- because their -- for our financial situation -- needed that money; for me to bring all that we could into Bayfront Park Trust so that we could divert monies back into the City, but I had to take into account several thousands of our residents also. Yeah, there they're a small part of our community, but you know what? If any of us lived there and had to go through what -- there's no doubt in my mind, because it's confirmed -- the noise level that they're going through, we'd be, you know, pretty upset also."

98.     Residents of the Bayfront Park area then sent a cease-and-desist letter to the Mayor and City Commissioners on June 20, 2018, which again outlined their objections to a Formula One race in and around their residences in Downtown,

Bayfront Park, and Biscayne Boulevard, and detailed the negative effects of the various mega-events held at Bayfront Park. On or about June 21, 2018, Formula One announced that it would no longer be possible to host the Miami Grand Prix in 2019. The statement expressed the hope that the event would be possible in 2020. A statement from Sean Bratches, Managing Director of Commercial Operations at Defendant Formula One Management Limited, read:

> "In the last few months we have worked diligently alongside our promoter Stephen Ross of RSE Ventures, the City of Miami and Miami Dade County, to realize our ambition to bring a Formula One Grand Prix to Miami, and we have made significant progress: however, these are complicated negotiations."

99.     After several months of public opposition and the City of Miami's inability to address the massive negative impacts on Downtown residents, the negotiations faltered. Ultimately, the plan to have Downtown Miami's Bayfront Park area host the Miami Grand prix was abandoned.

## FORMULA ONE IN MIAMI GARDENS

100.   As noted, County Commission Resolution R-518-18 directed the Mayor or his designee to present an agreement to the Board "with the appropriate entity for the hosting of Formula One racing events in Miami-Dade County or present a written report to the Board" on the status of the negotiations no later than July 1, 2018, and "to coordinate with any hosting municipality and other municipalities on such events."  Nevertheless, Defendant Mayor Gimenez did not

present an agreement to the Board before July 1, 2018, about the possibility of holding Formula One Racing in Miami Gardens, present a written report to the Board, or coordinate with Miami Gardens officials about hosing such an event. However, in the summer of 2019,  the Miami Dolphins discussed with senior aides of the County Mayor about holding Formula One races in and around Hard Rock Stadium in Miami Gardens, and later announced the completion of an agreement with Formula One to hold races in Miami Gardens on the public street (NW 199th Street) next to the stadium and on the stadium grounds as well, over a 10-year period, beginning in May 2021.

101.    In addition to planning the race on a public road, NW 199th Street, the Hard Rock Stadium property on which the Dolphins and Formula One proposed to hold the race is owned by Miami-Dade County, and leased to the Dolphins organization [Defendant South Florida Stadium, LLC] at a rate of  $1 per year for 99 years.

102.  Acting against the express mandate of a unanimous County Commission and Resolution 8-518-18, the Defendants, neither Mayor Gimenez nor any designee, coordinated with the proposed "hosting" community, Miami Gardens, to hold races within the city limits, near hundreds of Miami Gardens residences, churches, and schools.

103.   Despite Mayor Gimenez having publicly recused himself from matters related to Formula One, public records disclosed that senior officials who report to Mayor Gimenez reviewed and supported the proposal by the Dolphins and Formula One for several months before the proposal was announced.

104.   Records uncovered by the *Miami Herald* revealed draft negotiations in which the County, courtesy of Mayor Gimenez, offered the Miami Dolphins financial incentives to bring a Formula One event to the Hard Rock Stadium.

105.   One draft proposal stated that the County would give the Miami Dolphins an annual seven (7) million-dollar subsidy, a twenty (20) percent increase over subsidies to the Dolphins for hosting revenue-generating large events.

106.   In an e-mail from July 12, 2019, uncovered by the *Miami Herald*, the Dolphins executive in charge of lobbying, Marcus Bach-Armas, described "the F1 grant amendment being spearheaded by the Mayor's Office." Throughout this period of negotiation, the Mayor, the Miami Dolphins, and Formula One took no steps to notify the residents of Miami Gardens or their elected representatives in the City Council of their intention to host Formula One races in their community.

107.   On September 17, 2019, acoustics expert Colby Leider attended a public meeting and described research showing that the noise levels inside of homes in Miami Gardens near the stadium and NW 199th Street would reach 120 decibels. [Rolling Crest Homeowners Association report].

108.   On September 17, 2019, the County Commission Auditor, Yinka Majekodunmi, issued a report, [County report], analyzing the potential effects of hosting Formula One races in the Hard Rock Stadium. The report highlighted key concerns, including noise, air, and light pollution and traffic congestion. The report indicated that a typical Formula One race weekend attracts 195,000 visitors, which is significantly more than the 65,560 visitors that attend an average home game for the Miami Dolphins.

109.   The County report cited a 2013 acoustical engineering study, which found that noise level on a Formula One track could reach 140 decibels, a level that poses immediate danger to hearing and is comparable to a jet engine taking off. According to the report, 120 decibels are loud enough to cause hearing damage in eight seconds.

110.   The County report also indicated that the tires of race cars shred into tiny, invisible particles over the course of a race, producing poisonous dust.

111.   The County report noted that residents could face difficulty accessing emergency services and connecting to major roadways and highways during the three weeks prior to the races. It also mapped various parks, daycares, schools, libraries, group homes, assisted living facilities, grocery stores, and drug stores in the area surrounding the stadium.

112.   On September 17, 2019, County Commissioner Barbara Jordan, whose district includes Miami Gardens and all of Plaintiffs' homes, hosted a forum at Miami Norland Senior High School in Miami Gardens, where over 200 residents expressed their anger and frustration that, as a working class bedroom community with mostly Black residents, they were being discriminated against and treated differently than more affluent communities and other cities without such a high proportion of racial minorities.

113.   Marcus Bach-Armas, Senior Director of Legal and Government Affairs for the Dolphins, told the community that hosting Formula One races is "equivalent to having a Super Bowl that comes back every year."

114.   After the forum, Commissioner Jordan announced that hearing from residents "solidified [her] position as a no," because the event is "something this community does not want."

115.   A *Miami Herald* article published on September 18, 2019 detailed the community's fierce opposition to a Formula One race in their community and highlighted a report that compared the potential noise that would be generated to a jet engine takeoff or firecrackers going off inside a home, and could lead to permanent hearing damage.

116.   On October 2, 2019, Dolphins President Tom Garfinkel, referring to Commissioner Jordan's legislative proposals, wrote a letter to the County

Commissioners stating: "[We] must vehemently object to this effort ... to preempt the citizens of Miami-Dade County from even having a conversation about one of the most prestigious and significant sporting events in the world."

117.   On October 3, 2019, County Commissioner Jordan's proposal—which would require noise and traffic studies for auto races involving road closures, require Commission approval of the race, and prohibit road closures for races that go through residential areas (later amended to prohibit street racing in Miami Gardens)—was added to the Commission's agenda for the next Commission meeting, scheduled for October 29, 2019.

118.   Commissioner Jordan also proposed a zoning ordinance that would require the Dolphins to acquire special events permits from both the City of Miami Gardens and the County, even if road closures were not involved, subject to approval by the full County Commission, which was set for first reading on October 29, 2019,

119.   On October 15, 2019, Formula One and the Miami Dolphins issued a joint statement that they had "reached an agreement in principle to host the first-ever Formula One Miami Grand Prix at Hard Rock Stadium."

120.   On October 16, 2019, Formula One published minor details about the agreement, including the fact that the Miami Grand Prix would occur annually beginning in 2021, and that the agreement required approval by the County.  County officials, including Mayor Gimenez, declared in private and in public that they were

not in possession of any copies of the Dolphins-Formula One "agreement in principle," and had not even reviewed a copy of any agreement between the Dolphins and Formula One.

121.   Only two days before the City of Miami Gardens City Council meeting, on October 21, 2019, public records show that Mayor Gimenez had a meeting scheduled with Ross, Owner of the Miami Dolphins and the Hard Rock Stadium.

122.   On October 23, 2019, the City of Miami Gardens City Council, after a public meeting attended by some 200 people, adopted a resolution objecting to the proposal of Formula One racing at Hard Rock Stadium, citing concerns about unsafe air quality, dangerous noise levels, and traffic congestion. The City Council cited several reasons why Formula One races would cause harm to Miami Gardens residents and institutions, including the fact that it is the third largest city in Miami-Dade County with 113,000 residents;  home to 22 public schools, several private schools, and two universities;  that Hard Rock Stadium in Miami Gardens is surrounded by and located in close proximity to, a plethora of single family homes and some small businesses; that Formula One races take place over three days, with a series of practice and qualifying sessions prior to the race days; that racing occurs up to 200 miles an hour ; and that the event generates "days of deafening engine noise [and] a disruption of the regular flow of traffic and [compromises] the air quality . . . because of engine fumes."

123.   The Miami Gardens City Council pointedly noted that in another area of the County, a proposal for a Formula One race was scrapped because of citizen opposition to the severe harm they would suffer with races in their neighborhood: "these burdensome effects were a concern to Miami-Dade County and the City of Miami, and as such they've rejected the proposal in their communities."

124.   At least 30 residents spoke out in support of the proposed City of Miami Gardens resolution objecting to Formula One races in Miami Gardens, including Plaintiff Betty Ferguson and Sybrina Fulton, the mother of Trayvon Martin.

125.   Vice-Mayor Erhabor Ighodaro also expressed concerns about the Dolphins' failure to involve the community and the City Council of Miami Gardens in the conversation. He stated that he was not aware of the Dolphins' plan to host the Formula One races at the Hard Rock Stadium until Commissioner Barbara Jordan hosted a public forum on the matter one month earlier. He stated: "As a matter of good public policy and civic engagement, I would have expected that, for a project as monumental as this, there should have been better communication and coordination between community groups, elected officials and, most importantly, our residents."

126.   The Dolphins' representative who attended the meeting responded as follows: "We've offered a very attractive package of internships, [education]

programs [and] tickets . . . This resolution frankly is premature, and we'd like to continue a dialogue."

127.   The Miami Gardens City Council Agenda Cover Memo for the October 23, 2019 meeting cited the community meeting at which over two hundred Miami Gardens residents who "clearly exhibited their disapproval of Formula One in the neighborhood."

> "The residents have the fundamental right to disdain the idea of Formula (One) 1 in their residential area. This is their home, a place where they live, sleep, breathe fresh air and work. Formula One (1) is a misfit for any residential area. Too often corporate America focuses on profit over people's lives. There is no showing of a positive impact that Formula One (1) races will benefit the residents and the environment."

128.   The Miami Gardens City Council unanimously passed a Resolution stating: "The City Council of the City of Miami Gardens hereby objects to the proposal of Formula One ( 1) racing at the Hard Rock Stadium."  Exhibit 2.

129.   Commissioner Jordan's legislative proposals to protect the residents of Miami Gardens were scheduled for discussion and a vote at the County Commission meeting on October 29, 2019.

130.    The day before the meeting, on October 28, 2019, Mayor Gimenez informed the Commission on Ethics and Public Trust that he wished to participate in the legislative process and requested review of his former recusal. Within a day of his request, Mayor Gimenez also threatened to veto Commissioner Jordan's

proposals, passed by the County Commission to restrict Formula One's ability to hold their race at the Hard Rock Stadium.

131.  At the Commission meeting on October 29, 2019, reflecting the will of her constituents, Commissioner Jordan, introduced the resolution that would give effect to the Miami Gardens' elected leaders' position and would have prohibited high-speed street racing in Miami Gardens.   (No. 192689).

132.  Close to 100 Miami Gardens residents attended the Commission meeting on the day of the vote, October 29, 2019, and expressed their strong opposition to F-1 racing in their neighborhood, explaining how the races would cause catastrophic health impacts and disrupt their daily lives and the lives of their children and elderly parents.  They pointedly noted that the Downtown Miami residents were able to persuade their public officials to reject Formula One for the Bayfront Park/Biscayne Boulevard/Port of Miami route, yet could not comprehend why the County Government would allow these terrible impacts on their bedroom community.

133.  At the County Commission meeting on October 29, 2019, Plaintiff, Betty Ferguson, spoke in support of Commissioner Jordan's proposals, stating that a Formula One race would be devastating to her community, causing hearing damage and air pollution.  Former Commissioner Ferguson spoke on the health impacts that the Formula One races could have on generations to come, specifically

hearing damage and potential hearing loss. She highlighted the fact that those who most adamantly support the race do not live in Miami Gardens, and criticized the Dolphins' lack of effort to involve the community, stating that activists found out about the plan to hold Formula One races in Miami Gardens "by happenstance." She stated that, given the community's historical lack of adequate representation in the County, the least the County could do would be to require the Commissioners to vote on all decisions about Formula One racing in Miami Gardens.

134.   Other residents voiced their concerns about the long-term impacts on their children and grandchildren and expressed their fears about the potential for permanent hearing loss, citing the expert reports.

135.   State Representative Barbara Watson, who lives in Miami Gardens and represents the city in the Legislature, expressed fears about the impacts on children's health and anticipated not being able to access her home during the Formula One events.

136.   The Mayor of Miami Gardens, Oliver Gilbert, spoke passionately in defense of his community.  He said:

> "This has to be a good place to live is not just visit...Formula one will bring in people, but the people who live here matter…. [This is] not an action against the stadium. It's an action for the residents and their quality of life…. Miami gardens isn't a place for the County to dump events that are toxic to other people....[Ask the county] to respect the will of the residents and the city."

137.    Miami Gardens City Councilwoman Lily Q. Odom raised concerns about the noise and air quality effects on residents, as well as the routine traffic congestion that comes with every stadium event. She said: "How much more can this community endure?"

138.    Miami Gardens Vice-Mayor Erhabor Ighodaro described Formula One as an asteroid hurtling toward the community. Channeling his background as a civics teacher at Norland Middle school, he said: "The people have spoken and must respect the will of the people . . . It's a double standard … If it was rejected by the people in the City of Miami, why is it good for the city of Miami Gardens?"

139.    David  Williams, Jr., who has been on the Miami Gardens City Council for nine years, said he has never seen a public outcry like this one.

140.    The County Commission approved Commissioner Jordan's resolution (No. 192689) by a vote of 8-5 on October 29, 2019 to require noise and traffic studies for auto races involving road closures, require Commission approval of the race, and prohibit road closures in races that go through residential areas.   The Commission approved Commissioner Jordan's proposed ordinance (No. 192543) on first reading by a vote of 7-6.

141.    Wanting the County, Formula One, and the Dolphins to hear their objections in another forum, Plaintiffs, and other residents of Miami Gardens, took to  the  streets  to  assert  their  First  Amendment  Right  to  peacefully  protest.

Unrepresented People's Positive Action Council (UP-PAC), a political awareness group founded by Betty Ferguson in 1987, organized rallies that gathered residents who opposed Formula One racing. At one rally, Plaintiff, Gloria Taylor said some people in the community simply do not want it.

> "Would you do this if it was Aventura? Would you do this if it was South Beach?" said Taylor. "So why would you think it's alright to come to Miami Gardens? Enough is enough."

142. Between October 29, 2019 and November 19, 2019, the Miami Dolphins, Ltd., spent at least $41,659 on Facebook and Instagram Ads targeting residents of Miami-Dade County. The ads criticized each County Commissioner – by name -- who voted to support the residents of Miami Gardens. The Dolphins directed residents to contact their County Commissioner and share the Dolphins' [alternative] facts: that "air quality standards would not be exceeded," that "residents will not be exposed to 'extreme' or 'damaging' levels of sound," and the race would not be located in a bedroom community. The Dolphins' ads did not provide links to any independent sources to help viewers corroborate the alleged facts, or any sources at all. Instead they urged the following warning:

> "We are all entitled to our own opinions, but not our own facts. When the stakes are this high - $400MM in economic impact, 35,000 room nights, and 4,000 new jobs – Miami-Dade residents deserve to know the truth. Complete the form below to urge your elected officials to make decisions based on facts, not misinformation."

143.   On November 8, 2019, Mayor Gimenez vetoed the County's resolution to prohibit street closures connected to Formula One racing in Miami Gardens and require the County to conduct an impact study before permitting street closures for a Formula One race in other parts of the County.

144.   The Mayor, who has no background in audiology or audiological engineering, cited his disagreement with the County auditor's reports that the noise from Formula One engines could cause hearing damage in less than eight seconds.

145.   The Mayor's stated reason for overriding the will of the County Commission, the residents of Miami Gardens, and the Miami Gardens City Council, was that he sought more time to negotiate with all parties. Parroting the language of earlier comments issued by a Dolphins lobbyist, the Mayor stated:

> "I believe it premature to attempt to block an event of the magnitude of Formula One outright. I respectfully urge the board to uphold my veto and allow my office more time to continue this dialogue with all parties."

According to Commissioner Jordan, the veto was only Mayor Gimenez's fourth veto of his entire tenure at the time -- and three of his vetoes were against her legislative items.  Commissioner Jordan introduced a veto override at the next meeting, on November 19, 2019.

146.   On November 19, Mayor Gimenez urged the Board of Commissioners to sustain his veto, issuing the following tweet:

The #Formula1 Race isn't until 2021. Sustaining my veto buys three to six months so that the parties involved can continue to work toward a solution for #MiamiGardens, Stephen Ross and the @MiamiDolphins, as well as racing fans. @MiamiDadeBCC @barbarajordan1

147.   On November 19, 2019, Commissioner Jordan's bid to have the Board of Commissioners override the Mayor's veto failed.  Commissioner Jordan needed only eight (8) votes to override the Mayor's veto, but the Mayor was able to convince a former supporter of Commissioner Jordan's resolution to vote against overriding the veto, defeating the Miami Gardens' community and giving Formula One a victory, at least on that issue.

148.   On Tuesday, January 22, 2020, the County Commission was scheduled to vote on second reading on County Commissioner Barbara Jordan's proposed zoning ordinance that would have stripped Hard Rock Stadium of its permitted use to allow racing on stadium property. The ordinance would have required the Dolphins to acquire special events permits from both the City of Miami Gardens and the County, even if road closures were not involved.  (No. 192543).

149.   Plaintiff Betty Ferguson, quoted in the PR Newswire on January 30, 2020, stated, "While we welcome major events, it should be clear that unlike Super Bowl LIV, which will be played in our community for the first time in a decade, Mr. Ross' Formula One race would occur every year. The negative impact on Miami Gardens would be like having a Super Bowl every year for four consecutive days, with menacing noise 4-8 hours each day."

150.   Hours before the scheduled vote, the Miami Dolphins and Formula One (in the name of "Formula One Miami Grand Prix") issued a press release announcing a new track design and schedule, effectively delaying the vote to give Commissioners time to consider the changes. The announced changes included dropping Northwest 199th Street from the track layout, effectively eliminating the need for a formal street closure for the race, as well as delaying the start of racing until 3:00 PM on Friday of the race weekend ostensibly to not have races during school hours.

151.   During the time that the County Commission was considering voting on second reading on Commissioner Jordan's proposed ordinance establishing additional public approval processes for a F-1 race,  Miami Dolphins owner Stephen Ross offered free Super Bowl tickets valued at $3,000 each to any County Commissioner who cared to attend a ceremony supporting the Hard Rock Stadium. At least one County Commissioner took him up on the offer.

152.   During the time that Mayor Gimenez was publicly threatening to veto any action by the County Commission relating to F-1 racing in Miami Gardens, Mayor Gimenez accepted two Super Bowl tickets from Stephen Ross worth $8,000. Aside from the cost, these tickets would have been difficult for the average person to obtain without the connection to Ross.  Mayor Gimenez later reimbursed Ross for one of the tickets, worth $4,000. This information did not become public until a

County Ethics Commission Memo was published in *el Nuevo Herald* on February 3, 2020. Hours later, Gimenez's office disputed the language in the Ethics Commission Memo, saying "the Mayor did not accept the tickets prior to the issuance of the ethics opinion."

153.   On January 28, 2020, the Dolphins published and circulated a study (hereinafter Dolphins Study) by its acoustical engineering consultant stating: "Hard Rock Stadium is proposing a Formula 1 event that would take place over three days in May annually. The track will be contained on the Hard Rock Stadium property."

154.   Commissioner Jordan's proposal to require the Dolphins to seek approval from the City of Miami Gardens and the County to host the Formula One event was rescheduled for second reading by the County Commission on February 19, 2019.  At least 100 residents from Miami Gardens attended the February 19, 2019 meeting and signed up to support Commissioner Jordan's proposal, i.e. to oppose Formula One racing.  However, the Board refused to allow the residents to speak.

155.   The proposal failed by an extremely narrow margin of 6-6. One commissioner was excused.

156.   Jose Diaz, a County Commissioner who voted against the proposal, explained his decision with the following statement: "We have to look at the greater good of all areas."

157.   Once again, the wellbeing and voice of the residents of Miami Gardens was suppressed in favor of the economic benefit to non-Miami Gardens businesses and residents, including the County itself.

158.   While both Bayfront Park and the Hardrock Stadium are event venues designed to draw large crowds of persons and hold large-scale events there is a key difference between the people residing in the two areas that are at the center of this case—race.

159.   According to the 2010 U.S. Census data, Downtown Miami is home to less than 70,000 people 57.6% who identify as Hispanic, 30.8% who identify as White (non-Hispanic), and only 7.2% Black.

160.   Meanwhile, the 2010 Census shows that Miami Gardens is home to more 112,000 people, 73% of whom identify as Black and only 23% of whom identify as White/Caucasian. Miami Gardens is now the third-largest city in the County.

## IMPACTS ON THE COMMUNITY

161.   During large events including the Dolphins home games, Miami Hurricanes games, college football championships, the Miami Open tennis tournament, and the Super Bowl, Plaintiffs have already experienced disruptions to their residential community and declining quality of life that will be materially

amplified and exacerbated with a Formula One race every year for the next ten (10) years.

162.   Plaintiffs have repeatedly experienced windows shaking from the noise and have had noise from the stadium intrude into their homes. Plaintiffs have repeatedly been unable to freely enter and exit their homes, as they have to leave their homes hours early or risk getting stuck in traffic on their narrow residential streets. Emergency vehicles have repeatedly been unable to access residents because of the traffic generated by events at the Hard Rock stadium.

163.   Assuming that the Formula One Races were to proceed according to the plans published by the Dolphins on January 28, 2020, residents near Hard Rock Stadium would experience dangerous noise levels that cause them to exceed not only daily recommended noise doses, but that pose significant health risks and negative impacts to their quality of life.

164.   Additionally, other noises typical of those created by events at the stadium with tens of thousands of spectators, such as the Public Address System that amplify sound and music, crowd noise, rock bands, and helicopters, would exacerbate the harm to the Plaintiffs and the violation of the Noise Ordinances.

165.   According to the Dolphins Study, with no additional materials, maximum exterior sound levels at the nearest residential properties were between 92 and 95 dBA.  The Dolphins Study states that, including a ten (10) foot barrier (total

height) on the north edge of the track reduced maximum sound levels to between 86 and 89 dBA (Figure 14). Increasing the total height of the structures to 15 ft resulted in maximum sound levels between 83 and 86 dBA (Figure 15).

166.   The Dolphins Study concludes by projecting the impact on sound inside residents' homes:  "Interior sound levels can typically be expected to be 10 to 20 dB below the estimated exterior levels; that is, between 72 to 82 dBA with no barriers or 63 to 76 dBA with barriers (depending on height)."

167.   However, sound levels in the 70 to 90 dBA range are not considered "reasonable" by any standard of community noise metric. Although the Dolphins Study argues that noise generated by Formula One racing *may not cause hearing damage,* that does not mean the noise levels are "reasonable" in the context of a residential neighborhood.

168.   The Dolphins Study shows that the admitted level of noise for the proposed Formula One Races at Hard Rock Stadium will cause residents and institutions within a radius of at least 4,044 meters (13,268 ft, or approximately 2.5 miles) to experience levels of noise, recognized by the World Health Organization (WHO), the Centers for Disease Control (CDC), National Institute for Occupational Safety and Health (NIOSH), that will disturb residents' and institutions' peace, quiet and comfort, disrupt normal speech, and consequently degrade their quality of life.

169.   Miami-Dade County and Mayor Gimenez are aware of the Dolphins Study findings yet continue planning to secure the Formula One Miami Grand Prix in Miami Gardens despite the continued objection of its residents. Mayor Gimenez has not hidden his disregard for the potential impacts on residents of Miami Gardens. In a *Miami Herald* article, published on October 30, 2019, he stated: "It is loud. Nobody can say it's not loud. There may be some other effects, but I believe we can find some common ground here and find a solution."

170.   It is commonly accepted that any exposure to sound levels above 85 dBA can cause hearing damage. The audiology community is clear that hearing protection should be used anytime levels beyond this can be expected. Analysis of the noise to be generated by the proposed Formula One Races shows a high likelihood that nearby residents, church-goers, and schoolchildren would be exposed to levels in excess of 85 dBA during races. Residents that live closest to the track can expect to experience considerably higher levels that have the potential to cause immediate, irreparable hearing damage if they do not protect their hearing. These noise levels also pose a significant risk of other potential negative health effects.

171.   According to calculations by the acoustical engineering firm of Leider & Associates, peak noise levels exceeding 97 dBA (similar to the sound levels produced by a chainsaw) can be expected at residences within a 2.5-mile radius of the Stadium, with significantly higher levels at residences closer to the track.

Hearing damage will likely occur with exposure to 95 dBA at 50 minutes or 100 dBA at 15 minutes. The closest homes to the track can expect levels in excess of 106–131 dBA, at which point permanent hearing damage can be expected in under two (2) minutes (and even instantaneously for the loudest transient sounds that residents will experience).

172.    Under the Defendants' most optimistic, scientifically unvalidated scenario, Plaintiffs and thousands of other Miami Gardens residents would be subjected to noise levels in their neighborhoods—outside their own homes, their businesses, their schools, and their churches— that pose a demonstrated risk of hearing damage after fifty (50) minutes of exposure, and a risk for instantaneous permanent damage for the closest residents, and they would have to stay inside their homes, businesses, schools, or churches and/or wear hearing protection during the races to minimize the risk of noise-induced hearing loss. Plaintiffs reside within this radius of Hard Rock Stadium.

173.    Churches and schools that would be in operation during the proposed Formula One Races located within the most dangerous 2.5-mile radius that would also experience noise levels that would disturb the peace, quiet and comfort, disrupt normal speech of their occupants, and require occupants to wear hearing protection and/or stay indoors during the races to minimize the risk of noise-induced hearing loss.

174.   Students, including those with special needs, that attend Norwood Elementary, located within 1-mile of the Hard Rock Stadium, would experience noise levels of 106 dBA, at which point permanent hearing damage can be expected in under two (2) minutes. In *Reuters* on February 1, 2020, the Principal at Norwood, Kevin Williams, highlighted the racial bias and impacts on the health of children and stated, "Locals say racial and socioeconomic bias is behind the plan. When you live in these communities, money talks, everything else walks."

175.   The information published by the Dolphins does not specify the precise levels of noise to be generated at the source by each Formula One vehicle that would race at Hard Rock Stadium. Further, the information published by the Defendants does not acknowledge that typical Formula One racing events throughout the world include races of vehicles that make more noise than Formula One cars, such as Formula Two and Historic Masters. The Dolphins' latest proposed lineup of races includes not only Formula One cars, but these louder Formula Two and Historic Masters. Consequently, the noise levels Plaintiffs will experience would be higher and more damaging than even the already-harmful levels published and admitted by the Defendants.

176.   Further, the "sound buffer" technology the Dolphins claim they will (a) use, and (b) will reduce the noise "down" to the level of 82–86 dBA in the Plaintiffs' neighborhood (which is still dangerous, as well as annoying and disruptive), would

need to be independently tested by another lab, given that data provided by manufacturers (even when tested by an "independent" lab) is frequently unreliable. Given this speculation, and the gravity of the potential harm that would be threatened to the Plaintiffs, it is extremely likely (even probable) that the level of noise pollution in the Plaintiffs' neighborhoods will exceed 85 dBA. Furthermore, the Dolphins have offered no calculations showing the effectiveness of the proposed barrier system, using actual race sound data. In addition, the photo of the proposed barrier system offered by the Dolphins shows that the barrier is full of holes, which will let sound through freely, rendering the barrier system ineffective.

177. Based on the independently measured levels of noise generated by Formula One race cars in past years (e.g., 139 dBA in Montreal in 2013, see reference – Proc. Mtngs. Acoust. 20,04003 , doi:10.1121/1.4865925), or 134 dBA according to the Fédération Internationale de l'Automobile (FIA, motorsport's governing body), Formula 1 racing poses a clear health risk and significant acoustic annoyance to nearby residents. It is reported that F-1 2021 rules allow for twenty (20) percent higher fuel flow which will increase RPMs and result in higher noise levels.

178. Residents immediately adjacent to the track (within a radius of 2.5 miles) can expect to experience significant auditory annoyance and unsafe noise levels, and they will likely be exposed to potential permanent noise-induced hearing

loss (NIHL). Residents closest to the track, within a radius of 95 meters projected on a tangent from the track, can expect to experience the most painful levels beyond those of annoyance that pose instantaneous and immediate risk for NIHL. According to community noise and room noise standards, the residents will be subject to the significant loss of quality of life. The noise outside their homes would be comparable to a jackhammer or an emergency vehicle driving by continuously while they are standing outside. Inside their homes, the noise would be comparable to intermittent chainsaw sounds, or a blender or hairdryer at close range, each time a car rounds a hairpin curve. Residents would need to not only stay inside their homes but would also be forced to keep doors and windows shut and to wear hearing protection devices in their homes. Talking on the telephone or watching television would not be possible for most residents.

179.    There are approximately eighteen (18) houses of worship within a 2.5-mile radius of Hard Rock Stadium, including a Seventh Day Adventist Church which holds worship services on Saturday. The Christian churches will have religious worship and Sunday School classes on the Sunday of any Formula One Races. The Defendants' proposed Formula One Races would interfere with these religious institutions' ability to conduct their normal religious and educational activities during the weekends of the Formula One Races.

180.   There is a significant body of information that Formula One racing creates dangerously high levels of air pollution as well as noise pollution. The County Commission Auditor General cited such studies in response to a request by Commissioner Jordan for an analysis of the impact of Formula One Racing on Miami Gardens. The County Mayor, a proponent of Formula One Racing in Miami Gardens despite broad opposition from the residents, sent a letter attacking the Commission's Auditor General and his analysis.

181.   Illustrated renderings of the proposed race published by Formula One do not reflect much possibility of adequate noise containment, as Racing is planned to occur in the property surrounding the stadium, as opposed to inside the stadium itself.

182.   The race is expected to bring in over 195,000 visitors, which is more than the population of the city of Miami Gardens. These visitors will jam traffic and block roads, making it difficult for residents to access their homes. The exhaust from the cars and the increased traffic would also cause dangerous increases in air pollution.

183.   Multiple public bus routes run through the residential streets of Miami Gardens. Residents who rely on the bus to get to work, school, and daily activities will experience lengthy delays and overcrowding on racing weekends. Lengthy

delays waiting for the bus in the heat pose serious threats to public health in the community.

## STATUTORY BACKGROUND

184.   42 U.S.C. § 1983 provides a remedy for persons who are deprived of their federally protected rights by persons or entities acting under color of law. The statute provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privilege, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declarator decree was violated or declarator relief was unavailable."

185.   The United States Supreme Court has held that the deprivation of rights under color of law does not have to be directly ordained, or outwardly planned to deprive someone of their rights; rather, a deprivation of rights may occur based on the simple enforcement of custom or historic practices that ultimately disenfranchise a community. *Adickes v. S.H. Kress & Co.*, 398 US 144, 166-68 (1970); *Monell v.*

*Dep't of Soc. Sec.*, 436 US 658, 690-92 (1978); *see also Grech v. Clayton Cnty*, 335 F.3d 1326, 1330 (11th Cir. 2003) (noting that a custom or practice, while not adopted as an official formal policy, may be so persuasive as to be the functional equivalent of a formal policy).

186.   42 U.S.C. § 1985(3) provides a remedy for a conspiracy to deprive a person of their federally protected rights between a government actor and a private individual. This statute provides:

> "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

187.   The Eleventh Circuit Court of Appeals has held that negligence is sufficient to maintain a claim for failure to prevent a civil rights conspiracy. *Park v. City of Atlanta*, 120 F.3d 1157 (11th Cir. 1997).

## COUNT I: DECLARATORY JUDGMENT AND INJUNCTION BASED ON VIOLATIONS OF EQUAL PROTECTION UNDER 42 U.S.C § 1983 AGAINST DEFENDANT MIAMI-DADE COUNTY AND DEFENDANT MAYOR GIMENEZ

188.    Plaintiffs repeat, re-allege and incorporate by reference Paragraphs 1-187 above as if fully set forth herein.

189.    The Equal Protection Clause of the Fourteenth Amendment protects the rights of all persons to equal treatment under the law. The purpose of Equal Protection Clause is to secure every person against intentional and arbitrary racial discrimination. It protects the rights of Plaintiffs to be safe in their homes, free from air and noise pollution, where other white residents are afforded the same protection and respect.

190.    Defendant Miami-Dade County, through its employees and elected officials, and Defendant Mayor Gimenez, acting within the scope of employment, and under the color of law, intentionally discriminated against the Plaintiffs on the basis of race, color, or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §1983.

191.    Defendant Miami-Dade County and Defendant Mayor Gimenez acting individually, jointly, and in conspiracy, as well as under color of law, denied Plaintiffs equal protection of the law in violation of their constitutional rights. Through persistent and widespread customs, policies, and practices that are permanent and well-settled, Defendant Miami-Dade County and Defendant Mayor Gimenez deprived Plaintiffs of the right to equal protection under the Fourteenth Amendment.

192.    Through persistent and widespread customs, policies, and practices to secure Formula One Racing at the Hard Rock Stadium, and not in Downtown Miami, Defendant Miami-Dade County and Defendant Mayor Gimenez, placed a premium on the rights, benefits, and entitlements of the predominantly white residents of Miami Downtown while disregarding those same rights, benefits, and entitlement of the Plaintiffs, Black residents of Miami Gardens. Plaintiffs were treated differently and there is no rational basis for the difference in treatment.

193.    Defendant Miami-Dade County and Defendant Mayor Gimenez actions set out in this Complaint have denied Plaintiffs the full and equal benefit of laws and proceedings for the security of persons and property as is enjoyed by white citizens of the Miami-Dade County.

194.    The acts and omissions of Defendant Miami-Dade County and Defendant Mayor Gimenez constituted a custom, practice, and policy of deliberate

indifference to Plaintiffs constitutional rights secured by the Equal Protection Clause of the Fourteenth Amendment.

195.   Defendant Miami-Dade County and Defendant Mayor Gimenez acts were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs constitutional rights.

196.   Defendant Miami-Dade County and Defendant Mayor Gimenez had constructive notice of the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct, yet continued to further the practices, and did nothing to stop it.

197.   As a direct and proximate result of Defendants' actions, the Plaintiffs will suffer injuries, including damage to their health, decrease in safety, exposure to pollution, excessive traffic, and noise, a blighting effect on their community, lowering of self-esteem, decrease in property values, and the diminution of their quality of life.

198.   Plaintiffs and Defendants have an actual, present, on-going and adverse interest in the subject matter of this controversy.

199.   There is therefore a present and actual dispute between the Plaintiffs and Defendants and the parties to this action disagree over their respective rights, obligations and responsibilities and there is a practical, on-going and actual need for

resolution of the issues raised in this litigation. Plaintiffs are therefore entitled to a declaration of their rights in relation to the issues raised in this Complaint.

200.   There is a bona fide adverse interest between the Plaintiffs and Defendants concerning the powers, privileges, immunities, status and rights of each party which requires resolution by this Court.

201.   The Plaintiffs seek a declaration from this Court as a matter of law as to whether Defendants actions and omissions described herein violate the Equal Protection Clause of the Fourteenth Amendment, a determination concerning Plaintiffs' rights, and an order from this Court that Defendants' illegal conduct cease.

202.   Plaintiffs have no adequate or speedy remedy at law for the intentional discrimination described above. This action for injunctive relief is Plaintiffs only means of securing prospective relief.

**COUNT II: DECLARATORY JUDGMENT AND INJUNCTION BASED ON VIOLATIONS OF 42 U.S.C. § 1985(3) AGAINST ALL DEFENDANTS**

203.   Plaintiffs repeat, re-allege and incorporate by reference Paragraphs 1-187 and 189-202 above as if fully set forth herein.

204.   All of the Defendants, in addition to other co-conspirators, known and not yet known to Plaintiffs, reached an agreement to bring Formula One to the Hard Rock Stadium in violation of Plaintiffs constitutional rights.

205.   In this manner, the Defendants, acting alone or in concert with other known and unknown co-conspirators, conspired for the purpose of depriving the predominantly Black community of Miami Gardens of their right to equal protection under the law and the security of freedom from racial discrimination.

206.   The Defendants, acting alone or in concert with other known and unknown co-conspirators, reached an understanding to deprive the Plaintiffs of their constitutional rights, all while receiving financial incentives, as alleged *supra* [¶¶ 103-06, 151-52]. Acting jointly, knowing the health risks to the community, and despite the Plaintiffs' objections, as alleged supra [¶¶ 85-183], the Defendants conspired to host the Formula One Race in a predominantly Black community, rather than in Downtown Miami, a predominantly white neighborhood. The Defendants treated the Plaintiffs differently and there is no rational basis for the difference in treatment.

207.   In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity as alleged *supra* [¶¶ 98-100, 102-03, 119, 146] that placed a placed a premium on the rights, benefits, and entitlements of the predominantly white residents of Miami Downtown while disregarding those same rights, benefits, and entitlement of the Plaintiffs, Black residents of Miami Gardens.

208.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the Plaintiffs constitutional rights. The County's actions, jointly with the Miami Dolphins and Formula One, and all other Defendants, demonstrate blatant disregard for the health and wellbeing of a Black community that has already experienced substantial racial discrimination at the hands of the County.

209.   As a direct and proximate result of the illicit agreement referenced above, Plaintiffs rights were violated, and Plaintiffs will suffer substantial and irreparable harm, including damage to their health, decrease in safety, exposure to pollution, excessive traffic, and noise, a blighting effect on their community, lowering of self-esteem, decrease in property values, and the diminution of their quality of life.

210.   Plaintiffs and Defendants have an actual, present, on-going and adverse interest in the subject matter of this controversy.

211.   There is therefore a present and actual dispute between the Plaintiffs and Defendants and the parties to this action disagree over their respective rights, obligations and responsibilities and there is a practical, on-going and actual need for resolution of the issues raised in this litigation. Plaintiffs are therefore entitled to a declaration of their rights in relation to the issues raised in this Complaint.

212.    There is a bona fide adverse interest between the Plaintiffs and Defendants concerning the powers, privileges, immunities, status and rights of each party which requires resolution by this Court.

213.    The Plaintiffs seek a declaration from this Court as a matter of law as to whether Defendants actions and omissions described herein violate the Equal Protection Clause of the Fourteenth Amendment, a determination concerning Plaintiffs' rights, and an order from this Court that Defendants' illegal conduct cease.

214.    Plaintiffs have no adequate or speedy remedy at law for the intentional discrimination described above. This action for injunctive relief is Plaintiffs only means of securing prospective relief.

### COUNT III: DECLARATORY JUDGMENT AND INJUNCTION BREACH OF DUTY TO PROTECT FLORIDA'S PUBLIC TRUST DOCTRINE AGAINST DEFENDANT MIAMI-DADE COUNTY

215.    Plaintiffs repeat, re-allege and incorporate by reference Paragraphs 1-187, 189-202, and 204-214 above as if fully set forth herein.

216.    The State of Florida, in the Florida Constitution, has explicitly codified the common law Public Trust Doctrine, an ancient legal doctrine6 that was expressed in Roman times in the Institutes of Justinian and enshrined in English common law,

---

6 The Institutes of Justinian declared: "By the law of nature these things are common to all mankind – the air, running water, the sea, and consequently the shores of the sea." J. Inst., Proemium, 2.1.1. (T. Sanders trans., 4th ed. 1867).

predates the existence of Florida's Constitution that is designed to protect common

natural resources that are essential to life, liberty, pursuit of happiness and property.

217.   The Legislature has declared English common law to be in force in

Florida in Section 2.01, Fla. Stat:

> The common and statute laws of England which are of a general and not a local nature, with the exception hereinafter mentioned, down to the 4th day of July, 1776, are declared to be of force in this state; provided, the said statutes and common law be not inconsistent with the Constitution and laws of the United States and the acts of the Legislature of this state.

218.   The Florida Constitution contains several provisions that reserve

and recognize Plaintiffs' public trust rights.

219.   Article I, Section I of the Florida Constitution states:

> All political power is inherent in the people. The enunciation herein of certain rights shall not be construed to deny or impair others retained by the people.

220.   Article II, Section 7(a) of the Florida Constitution states:

> It shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for the abatement of air and water pollution and of excessive and unnecessary noise and for the conservation and protection of natural resources.

221.   Article X, Section 11 of the Florida Constitution states:

> The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only

when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.

222.     Article X, Section 16 of the Florida Constitution states:

The marine resources of the State of Florida belong to all of the people of the state and should be conserved and managed for the benefit of the state, its people, and future generations.

223.   The Public Trust Doctrine requires all sovereign governments as trustees to protect and preserve Public Trust Resources for the beneficiaries of the trust—all present and future generations within the government's jurisdiction. The Public Trust is an attribute of sovereignty that cannot be surrendered or abrogated by any branch of government. Public Trust rights predate Florida's Constitution and are secured, not created, by it.

224.   Public Trust Resources include the atmosphere (air); waters of the state, including coastal, surface, and groundwater; state-owned lands, including forests, wetlands, estuaries, beaches, coral reefs, submerged lands and lands adjoining the seacoasts; and wild flora and fauna, including freshwater and marine resources.

225.   The atmosphere is a Public Trust Resource critical to the welfare of Public Trust Resources specifically enumerated in Article X, Section 11 and Article X, Section 16 of the Florida Constitution: marine resources, submerged sovereignty lands, and beaches. The atmosphere is also critical to the welfare of all other Public Trust Resources; without an atmosphere free from substantial impairment, all other Public Trust Resources will inevitably also be substantially impaired.

226.    Article II, Section 7(a) of the Florida Constitution specifically identifies the air, or atmosphere, and laws relating to the abatement of pollution therein, as necessary for the conservation and protection of natural resources. Article II, Section 7(a) thus explicitly incorporates the atmosphere as a Public Trust Resource and imposes a mandatory duty on Defendant Miami-Dade County to refrain from acting in a manner that results in waste or substantial impairment of Public Trust Resources. Defendant Miami-Dade County breached that duty in the past and is continuing to breach that duty.

227.    Defendant Miami-Dade County has a mandatory obligation to hold Public Trust Resources in trust for the benefit of all residents of Miami-Dade County and to refrain from acting in a manner that results in waste or substantial impairment of Public Trust Resources. Defendant Miami-Dade County breached that duty in the past and is continuing to breach that duty by planning, authorizing, and securing Formula One Racing at the Hard Rock Stadium which will result in air pollution and excessive and unnecessary noise.

228.    Defendant Miami-Dade County has a mandatory duty to exercise the appropriate skill, prudence, and caution in managing the Public Trust Resources. Defendant Miami-Dade County breached that duty and is continuing to breach that duty when the Defendant failed to show caution and continued planning, authorizing, and securing Formula One Racing at the Hard Rock Stadium after being

made aware of the harmful impacts to that Formula One racing will cause to human health and the environment as alleged *supra* [¶¶ 107-11, 161-83].

229.   Defendant Miami-Dade County violated and continues to violate Article II, Section 7(a) and Article X, Sections 11 and 16 of the Florida Constitution and the Public Trust Doctrine by breaching its duties to protect Public Trust Resources from material impairment and waste; by favoring present temporary economic benefits of certain citizens or other entities, especially corporations and self-interest, over all beneficiaries, including future generations; by failing to ensure Plaintiffs have continued use of and access to Florida's Public Trust Resources for the purposes of the trust; and by failing to exercise the appropriate skill, prudence, and caution in managing Florida's Public Trust Resources.

230.   Defendant Miami-Dade County systemic historic and ongoing affirmative aggregate actions of continuing to authorize, promote, and permit Formula One at the Hard Rock Stadium violates its affirmative obligations to protect Florida's Public Trust Resources from substantial impairment and waste.

231.   Defendant Miami-Dade County's failure to uphold its Public Trust obligations threatens the health, safety, and wellbeing of Plaintiffs, as well as all present and future generations of Miami Gardens residents.

232.   The constitutional and common law deprivations described herein are the result of the official policies, customs and continuing practices of the Defendant Miami-Dade County.

233.   Upon information and belief, Defendant Miami-Dade County has been, should have been, and is continuing to be aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

234.   All Defendants named herein have or claim an interest which will be affected by the declaration of rights in this case and are named herein due to their interests and claims pursuant to Section 86.091 of the Florida Statutes.

235.   Plaintiffs and Defendants have an actual, present, on-going and adverse interest in the subject matter of this controversy.

236.   There is therefore a present and actual dispute between the Plaintiffs and Defendants and the parties to this action disagree over their respective rights, obligations and responsibilities and there is a practical, on-going and actual need for resolution of the issues raised in this litigation. Plaintiffs are therefore entitled to a declaration of their rights in relation to the issues raised in this Complaint.

237.   There is a bona fide adverse interest between the Plaintiffs and Defendants concerning the powers, privileges, immunities, status and rights of each party which requires resolution by this Court.

238.   The Plaintiffs therefore seek a declaration from this Court as a matter of law as to whether Defendants actions and omissions described herein violate the Public Trust Doctrine and the Florida Constitution, a determination concerning Plaintiffs' rights, and an order from this Court that Defendants' illegal conduct cease.

## COUNT IV: DECLARATORY JUDGMENT AND INJUNCTION BASED ON OF THE MIAMI-DADE COUNTY ORDINANCE

239.   Plaintiffs repeat, re-allege and incorporate by reference Paragraphs 1-187, 189-202, 204-214, and 216-238 above as if fully set forth herein.

240.   Section 21-28 of the Miami-Dade County Code provides in relevant part:

> "It shall be unlawful for any person to make, continue, or cause to be made or continued any unreasonably loud, excessive, unnecessary or unusual noise. … the following acts come among others, are declared to be unreasonably loud common excessive come up unnecessary or unusual noises and violation of this section come up but this enumeration shall not be deemed to be exclusive common namely:
> . . . .

> (g) the creation of any excessive or unreasonably loud noise on any street adjacent to any school, institution of learning, house of worship or court while the same are in use, or adjacent to any hospital, which unreasonably interferes with the workings of such institutions, or which disturbs or unduly annoys the patients in the hospital, provided conspicuous signs are displayed in such streets indicating that it is a school, hospital or court district.

241.   Inasmuch as the Defendants published plans for Formula One Racing in Miami Gardens would, to a certainty, cause the Plaintiffs to experience levels of noise recognized by the World Health Organization (WHO), the Occupational Safety and Health Administration (OSHA), the National Aeronautics and Space Administration (NASA), and the National Institute of Occupational Safety and Health (NIOSH) that will disturb the Plaintiffs' peace, quiet and comfort, disrupt normal speech, and pose a risk of hearing loss, the Defendants' plans if executed would violate Section 21-28 of the County Code.

242.   Under the Defendants' most optimistic, scientifically unvalidated scenario, Plaintiffs and thousands of other Miami Gardens residents would be subjected to noise levels outside their own homes, their businesses, their schools, and their churches that pose a demonstrated risk of hearing damage and would have to stay inside their homes, businesses, schools, or churches and/or wear hearing protection during the races to minimize the risk of noise-induced hearing loss.

243.   As such, the Defendants' conduct will result in the making and causing of "unreasonably loud, excessive, unnecessary, or unusual noise" in Miami Gardens in violation of the County Noise Ordinance.

244.   Similarly, the Defendants' proposed activity would create unnecessary, excessive, unreasonable, and unusual levels of noise for the dozens of houses of worship within a 2.5 mile radius of Hard Rock Stadium, which hold religious

services on Saturday and Sunday, and which hold school then as well.   The Defendants' proposed Formula One Races would interfere with these religious institutions ability to conduct their normal religious and educational activities during the weekends of the Formula One Races.

245.   This Court has the authority and duty to enforce the County Noise Ordinance by declaring the proposed Formula One races in Miami Gardens at the Hard Rock Stadium to present a clear and present danger of harm to the Plaintiffs and other Miami Gardens residents, in violation of Section 21-28 of the Miami-Dade County Code, and to order the Defendants to cease and desist from undertaking the proposed activities that will, to a certainty, violate Section 21-28.

246.   Plaintiffs seek a declaration that the Defendants' announced plans to conduct Formula One Racing at Hard Rock Stadium would, if implemented, violate the County's Noise Ordinance, and a permanent injunction against the Defendants following through on announced plans to hold Formula One Racing in Miami Gardens at any time.

## COUNT V: VIOLATION OF THE MIAMI GARDENS NOISE ORIDNANCE

247.   Plaintiffs repeat, re-allege and incorporate by reference Paragraphs 1-187, 189-202, 204-214, 216-238, and 240-246 above as if fully set forth herein.

248.    Section 16-24 of the Code of Ordinances of the City of Miami Gardens Provides:

Sec. 16-24 – general prohibition

(a)    No person shall make, continue, or cause to be made or continued:

    (1)    Any unreasonable loud or raucous noise;

    (2)    Any noise which unreasonably disturbs, injures, or endangers the comfort, repose, health, or safety of reasonable persons of ordinary sensitivity, within the city; or

    (3)    Any noise which is so harsh, prolonged, unnatural, or unusual in time or place a to occasion unreasonable discomfort to any persons within the neighborhood from which said noises emanate, or as to unreasonably interfere with the peace and comfort of neighbors or their guests, or operators or customers in places of business, or as to detrimentally or adversely affect such residences or places of business.

(b)    Factors for determining whether a sound is unreasonably loud and raucous include, but are not limited to, the following:

    (1) The proximity of the sound to sleeping facilities, whether residential or commercial;
    (2) The land use, nature, and zoning of the area from which the sound emanates and the area where it is received or perceived;
    (3) The time of day or night the sound occurs;
    (4) The duration of the sound;
    (5) Whether the sound is recurrent, intermittent, or constant.

249.    Inasmuch as the Defendants published plans for Formula One Racing in Miami Gardens would, to a certainty, cause the Plaintiffs to experience levels of noise recognized by the World Health Organization (WHO),   the National

Aeronautics and Space Administration (NASA), and the National Institute of Occupational Safety and Health (NIOSH) that will disturb the Plaintiffs' peace, quiet and comfort, disrupt normal speech, and pose a risk of hearing loss, the Defendants' plans if executed would violate Section 16-24 of the City of Miami Gardens Code of Ordinances.

250.   Under the Defendants' most optimistic, scientifically unvalidated scenario, Plaintiffs and thousands of other Miami Gardens residents would be subjected to noise levels outside their own homes, their businesses, their schools, and their churches that pose a demonstrated risk of hearing damage and would have to stay inside their homes, businesses, schools, or churches and/or wear hearing protection during the races to minimize the risk of noise-induced hearing loss.

251.   As such, the running of Formula One races in Miami Gardens will result in the making and causing of "unreasonably loud and raucous noise" "noise which unreasonably disturbs, injures, or endangers the comfort, repose, health, peace, or safety of reasonable persons of ordinary sensitivity within the City," including the Plaintiffs, and "noise which is so harsh, prolonged, unnatural, or unusual in time or place, as to unreasonably interfere with the peace and comfort of neighbors and their guests, or operators or customers in places of business, or as to detrimentally or adversely affect such residences or places of business – causing major harm to

Plaintiffs' bedroom community of 113,000 residents, churches, schools, and businesses.

252.   This Court has the authority and duty to enforce the City of Miami Gardens Noise Ordinance by declaring the proposed Formula One races in Miami Gardens at the Hard Rock Stadium to present a clear and present danger of harm to the Plaintiffs and other Miami Gardens residents, in violation of Section 16-24 of the Miami Gardens Code of Ordinances, and to order the Defendants to cease and desist from undertaking the proposed activities that will, to a certainty, violate Section 16-24.

253.   Plaintiffs seek a declaration that the Defendants' announced plans to conduct Formula One Racing at Hard Rock Stadium would, if implemented, violate the City of Miami Gardens Noise Ordinance, and a permanent injunction against the Defendants following through on announced plans to hold Formula One Racing in Miami Gardens at any time.

## RELIEF DEMANDED

WHEREFORE, Plaintiffs respectfully request this Court to grant the following relief:

(1) an order declaring that Defendant Miami-Dade County and Defendant Mayor Gimenez intentionally discriminated against the Plaintiffs on the basis of

race, color, or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §1983;

(2) an order declaring that Defendants conspired to bring Formula One to the Hard Rock Stadium in violation of Plaintiffs constitutional rights;

(3) a permanent injunction to prevent the Dolphins and Formula One from proceeding with high-speed automobile races in the City of Miami Gardens;

(4) a declaration that the Formula One Race in the City of Miami Gardens, Florida planned by the Defendants at Hard Rock Stadium beginning in May 2021 would violate Section 21-28 of the Miami-Dade County Code and Section 16-24 of the City of Miami Gardens Code of Ordinances;

(5) an award of costs and attorney's fees pursuant to 42 U.S.C. §1988;

(6) an order requiring that the Defendants to pay Plaintiffs' reasonable expert and attorney's fees and Plaintiffs' costs.

Dated:  October 30, 2020          /s/ Samuel J. Dubbin, P.A.

DUBBIN & KRAVETZ, LLP
Samuel J. Dubbin, P.A.
Fla. Bar No. 328189
1200 Anastasia Avenue, Ste. 300
Coral Gables, Florida 33134
Telephone:  (305) 357-9004
Email: sdubbin@dubbinkkravetz.com

*Attorneys for Plaintiffs*

# EXHIBIT 1

OFFICIAL FILE COPY
CLERK OF THE BOARD
OF COUNTY COMMISSIONERS
MIAMI-DADE COUNTY, FLORIDA

# MEMORANDUM

Amended
Agenda Item No. 14(A)(1)

| | | | |
|---|---|---|---|
| **TO:** | Honorable Chairman Esteban L. Bovo, Jr. and Members, Board of County Commissioners | **DATE:** | May 15, 2018 |
| **FROM:** | Abigail Price-Williams County Attorney | **SUBJECT:** | Resolution supporting Formula One racing events in Miami-Dade County; directing the County Mayor to negotiate an agreement with the appropriate entity for the hosting of Formula One racing events in Miami-Dade County and, on or before July 1, 2018, to present said agreement to this Board or, if such agreement is not ready, to report to this Board on the status of negotiations; and further directing the County Mayor to coordinate with any hosting municipality and with adjacent municipalities |

Resolution No. R-518-18

The accompanying resolution was prepared and placed on the agenda at the request of Prime Sponsor Commissioner Jose "Pepe" Diaz, and Co-Sponsors Commissioner Sally A. Heyman and Commissioner Rebeca Sosa.

Abigail Price-Williams
County Attorney

APW/smm

/



# MEMORANDUM
### (Revised)

| | |
|---|---|
| **TO:** Honorable Chairman Esteban L. Bovo, Jr.<br>and Members, Board of County Commissioners | **DATE:**   May 15, 2018 |
| **FROM:** Abigail Price-Williams<br>County Attorney | **SUBJECT:** Amended<br>Agenda Item No. 14(A)(1) |

Please note any items checked.

_____   "3-Day Rule" for committees applicable if raised

_____   6 weeks required between first reading and public hearing

_____   4 weeks notification to municipal officials required prior to public
hearing

_____   Decreases revenues or increases expenditures without balancing budget

_____   Budget required

_____   Statement of fiscal impact required

_____   Statement of social equity required

_____   Ordinance creating a new board requires detailed County Mayor's
report for public hearing

_____   No committee review

_____   Applicable legislation requires more than a majority vote (i.e., 2/3's _____,
3/5's _____, unanimous _____) to approve

_____   Current information regarding funding source, index code and available
balance, and available capacity (if debt is contemplated) required

2

| Approved | _____ **Mayor** | Amended<br>Agenda Item No. 14(A)(1) |
|---|---|---|
| Veto | _____ | 5-15-18 |
| Override | _____ | |

<u>RESOLUTION NO.</u>   <u>R-518-18</u>

RESOLUTION SUPPORTING FORMULA ONE RACING
EVENTS IN MIAMI-DADE COUNTY; DIRECTING THE
COUNTY MAYOR OR COUNTY MAYOR'S DESIGNEE TO
NEGOTIATE AN AGREEMENT WITH THE APPROPRIATE
ENTITY FOR THE HOSTING OF FORMULA ONE RACING
EVENTS IN MIAMI-DADE COUNTY AND, ON OR BEFORE
JULY 1, 2018, TO PRESENT SAID AGREEMENT TO THIS
BOARD OR, IF SUCH AGREEMENT IS NOT READY, TO
REPORT TO THIS BOARD ON THE STATUS OF
NEGOTIATIONS; AND FURTHER DIRECTING THE COUNTY
MAYOR OR COUNTY MAYOR'S DESIGNEE TO
COORDINATE WITH ANY HOSTING MUNICIPALITY AND
WITH ADJACENT MUNICIPALITIES

**WHEREAS,** Formula One, also known as Formula 1 or F1, is the highest class of single-seat auto racing sanctioned by the Fédération Internationale de l'Automobile; and

**WHEREAS,** a Formula One season consists of a series of races, known as Grand Prix, which are held worldwide on purpose-built circuits and on public roads; and

**WHEREAS,** a Formula One Grand Prix race is one of the world's most powerful tourism advertisements for the city hosting the race, as Formula One is among the world's most-watched annual sports series garnering a cumulative audience of 1.8 billion viewers each season; and

**WHEREAS,** this is especially true in cities where Formula One races are held through city streets, rather than an out of town circuit, because this showcases the city's landmarks, monuments, and beauty for all the world to see as they are viewing the auto race; and

**WHEREAS,** in addition, cities that host a Formula One Grand Prix race also benefit from increased tourism, spending, and economic development that accompanies the race; and

*3*

**WHEREAS**, for example, in Austin, Texas, where a Formula One Grand Prix race is held annually, it is reported that the economic benefit to the Austin economy resulting from the Formula One race between the years 2012-2015 was $2.8 billion and almost half a million visitors to the city; and

**WHEREAS**, in 2012, during the five-day period surrounding the first inaugural race in Austin, the hotels in the Austin area took in $32 million- triple the amount made during the same period the previous year; and

**WHEREAS**, similarly, in 2016, Mexico City experienced a 12 percent increase in hotel occupancy in 4 and 5 star hotels around the Grand Prix race weekend and delivered approximately $350 million to the Mexican economy; and

**WHEREAS**, Formula One has indicated that it has approximately 15 million followers on social media and during the 2017 season was the fastest growing sports brand on social media, generating in excess of 375 million impressions per race; and

**WHEREAS**, this Board desires to have Miami-Dade County host a Formula One auto race event through the city streets in order to highlight to the world the natural and architectural beauty of the County, bring economic development to the County, and increase tourism; and

**WHEREAS**, this Board further desires to have the County Mayor or County Mayor's designee negotiate with the appropriate entities in order to host such Formula One race events in Miami-Dade County and to coordinate with any hosting municipality and with other municipalities within Miami-Dade County,

4

Amended
Agenda Item No. 14(A)(1)
Page No. 3

**NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF MIAMI-DADE COUNTY, FLORIDA,** that:

<u>Section 1.</u>     The foregoing recitals are hereby incorporated by reference and are approved.  This Board supports Formula One racing events in Miami-Dade County.

<u>Section 2.</u>     This Board directs the County Mayor or County Mayor's designee to negotiate an agreement with the appropriate entity for the hosting of Formula One racing events in Miami-Dade County and to coordinate with any hosting municipality and other municipalities on such events, provided, however, that the site commonly referred to as Parcel B and located behind the American Airlines Arena will not be considered or used as a site for hosting the Formula One racing events.

<u>Section 3.</u>     This Board directs the County Mayor or County Mayor's designee to present said agreement to this Board on or before July 1, 2018, or, if such agreement is not ready by such date, to present a written report to this Board by said date on the status of the negotiations. Pursuant to Ordinance No. 14-65, the report shall be placed on an agenda of the Board.

The Prime Sponsor of the foregoing resolution is Commissioner Jose "Pepe" Diaz, and the Co-Sponsors are Commissioner Sally A. Heyman and Commissioner Rebeca Sosa. It was offered by Commissioner     José "Pepe" Diaz     , who moved its adoption.  The motion was seconded by Commissioner  Audrey M. Edmonson  and upon being put to a vote, the vote was as follows:

|  | | | |
|---|---|---|---|
| Esteban L. Bovo, Jr., Chairman | | aye | |
| Audrey M. Edmonson, Vice Chairwoman | | aye | |
| Daniella Levine Cava | aye | Jose "Pepe" Diaz | aye |
| Sally A. Heyman | aye | Barbara J. Jordan | aye |
| Joe A. Martinez | aye | Jean Monestime | aye |
| Dennis C. Moss | aye | Rebeca Sosa | absent |
| Sen. Javier D. Souto | aye | Xavier L. Suarez | aye |
| District 5 - Vacant | | | |

5

Amended
Agenda Item No. 14(A)(1)
Page No. 4

The Chairperson thereupon declared the resolution duly passed and adopted this 15th day

of May, 2018.  This resolution shall become effective upon the earlier of (1) 10 days after the date

of its adoption unless vetoed by the County Mayor, and if vetoed, shall become effective only upon

an override by this Board, or (2) approval by the County Mayor of this Resolution and the filing

of this approval with the Clerk of the Board.



MIAMI-DADE COUNTY, FLORIDA
BY ITS BOARD OF
COUNTY COMMISSIONERS

HARVEY RUVIN, CLERK



By:_____
       Deputy Clerk

Approved by County Attorney as
to form and legal sufficiency.

Monica Rizo Perez



# EXHIBIT 2



**City of Miami Gardens**
# City Council Agenda
## October 23, 2019 at 7:00 PM

**City Council:**
Mayor Oliver Gilbert
Vice Mayor Rodney Harris
Councilman Erhabor Ighodaro, Ph.D.
Councilwoman Lillie Q. Odom
Councilman Reggie Leon
Councilman David Williams Jr
Councilwoman Katrina Wilson

**Staff:**
City Manager Cameron Benson
City Attorney Sonja K. Dickens, Esq.
City Clerk Mario Bataille, CMC

**Contact:**
Council Chambers
Miami Gardens, Florida 33056
Phone: (305) 914-9010
Fax: (305) 914-9033
Website: www.miamigardens-fl.gov

Next Regular Meeting Date: November 13, 2019

**Article VII of the Miami Gardens Code entitled, "Lobbyist" requires that all lobbyists before engaging in any lobbying activities to register with the City Clerk and pay a one-time annual fee of $250.00. This applies to all persons who are retained (whether paid or not) to represent a business entity or organization to influence "City" action. "City" action is broadly described to include the ranking and selection of professional consultants, and virtually all-legislative, quasi-judicial and administrative action.  All not-for-profit organizations, local chamber and merchant groups, homeowner associations, or trade associations and unions must also register however an annual fee is not required.**

Page

1. **CALL TO ORDER/ROLL CALL**

2. **INVOCATION**

3. **PLEDGE OF ALLEGIANCE**

4. **APPROVAL OF MINUTES**

    *4.1    Regular City Council Meeting Draft Minutes - September 25, 2019*

    *4.2    Regular City Council Meeting Draft Minutes – October 9, 2019*

5. **ORDER OF BUSINESS**
    (Items to be pulled from Consent Agenda at this time)

6. **SPECIAL PRESENTATIONS (5 MINUTES EACH)**

    *6.1    Women in Law Enforcement Presentation*
        **Sponsored by:**  Councilman David Williams Jr.

7.    **PUBLIC COMMENTS**

8.    **ORDINANCE(S) FOR FIRST READING:**

9.    **ORDINANCE(S) FOR SECOND READING/PUBLIC HEARING(S)**

10.   **RESOLUTION(S)/PUBLIC HEARING(S)**

11.   **CONSENT AGENDA:**

11.1   *A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MIAMI GARDENS, FLORIDA, OBJECTING TO THE PROPOSAL OF FORMULA ONE (1) RACING AT THE HARD ROCK STADIUM; PROVIDING FOR THE ADOPTION OF REPRESENTATIONS; PROVIDING FOR AN EFFECTIVE DATE.*   5 - 9

**Sponsored by:**  Councilwoman Lillie Q. Odom

Agenda Cover Memo #19-120 - Pdf

11.2   *A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MIAMI GARDENS, FLORIDA, RECOGNIZING OCTOBER 25-27, 2019, AS FLORIDA MEMORIAL UNIVERSITY ALUMNI WEEKEND AND WAIVING FEE USAGE FOR THE USE OF THE SHOWMOBILE; PROVIDING FOR INSTRUCTIONS TO THE CITY MANAGER; PROVIDING FOR THE ADOPTION OF REPRESENTATIONS; PROVIDING FOR AN EFFECTIVE DATE.*   11 - 15

**Sponsored by:**  Councilman Erhabor Ighodaro

Agenda Cover Memo #19-121 - Pdf

11.3   *A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MIAMI GARDENS, FLORIDA, AWARDING REQUEST FOR PROPOSAL (RFP) 18-19-013 TO UNITED STATES SERVICES INDUSTRIES, INC., FOR JANITORIAL SERVICES; AUTHORIZING THE CITY MANAGER AND CITY ATTORNEY TO NEGOTIATE AND EXECUTE AN AGREEMENT FOR THIS PURPOSE IN AN AMOUNT NOT TO EXCEED ONE HUNDRED AND FIFTY-SEVEN THOUSAND FIVE HUNDRED AND SIXTY-THREE DOLLARS ($157,563.00) ANNUALLY; PROVIDING FOR THE ADOPTION OF REPRESENTATIONS; PROVIDING FOR AN EFFECTIVE DATE.*   17 - 23

**Sponsored by:**  City Manager

Agenda Cover Memo #19-081 - Pdf

11.4   *A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MIAMI GARDENS, FLORIDA, RATIFYING AND APPROVING THE COLLECTIVE BARGAINING AGREEMENT BETWEEN THE TEAMSTERS LOCAL 769 AND THE CITYOF MIAMI GARDENS, FLORIDA FOR A PERIOD FROM OCTOBER 1, 2019 THROUGH SEPTEMBER 30, 2022*   25 - 28

**Sponsored by:**  City Manager

Agenda Cover Memo #19-118 - Pdf

11.5 *A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MIAMI GARDENS, FLORIDA, CANCELING THE NOVEMBER 27, 2019, AND DECEMBER 25, 2019, CITY COUNCIL MEETINGS; PROVIDING FOR THE ADOPTION OF REPRESENTATIONS; PROVIDING AN EFFECTIVE DATE.*     29 - 31

**Sponsored by:** City Clerk

Agenda Cover Memo #19-123 - Pdf

**12.** **RESOLUTION(S)**

**13.** **QUASI-JUDICIAL ZONING HEARINGS/JENNINGS DISCLOSURE:**

**13.1. ORDINANCES ON FOR FIRST READING/PUBLIC HEARING(S):**

**13.2. ORDINANCES ON FOR SECOND READING/PUBLIC HEARING(S)**

**13.3. RESOLUTION(S)/PUBLIC HEARING(S)**

**14.** **REPORTS OF CITY MANAGER/CITY ATTORNEY/CITY CLERK (3 MINUTES EACH)**

14.1 *Police Monthly Report - September 2019*     33 - 51

**Sponsored by:** City Manager

Monthly Report (September)

**15.** **REPORTS OF MAYOR AND COUNCIL MEMBERS (3 MINUTES EACH)**

**16.** **WRITTEN REQUESTS, PETITIONS & OTHER WRITTEN COMMUNICATIONS FROM THE PUBLIC**

**17.** **ADJOURNMENT**

In accordance with the American with Disabilities Act of 1990, all persons who are disabled and who need special accommodations to participate in this meeting because of that disability should contact Mario Bataille, CMC, City Clerk (305) 622-8000 ext. 2830, no later than 48 hours prior to such proceedings. TDD number 1-800-955-8771.

Anyone wishing to obtain a copy of any agenda item may contact Mario Bataille, CMC, City Clerk (305) 914-9010 ext. 2830. The entire agenda packet can also be found on the city's website at www.miamigardens-fl.gov.

Anyone wishing to appeal any decision made by the city of Miami Gardens with respect to any matter considered at such meeting or hearing will need a record of the proceedings and, for such purpose, may need to ensure that a verbatim record of the proceedings is made, which record includes the testimony and evidence upon which the appeal is to be based.

**Agenda Item #11.1**



*City of Miami Gardens*

# Agenda Cover Memo

**19-120**

**Meeting:** City Council - Oct 23 2019

| **Department** | **Sponsored By** |
|---|---|
| Mayor and City Council | Councilwoman Lillie Q. Odom |

### Agenda Item Title

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF MIAMI GARDENS, FLORIDA, OBJECTING TO THE PROPOSAL OF FORMULA ONE (1) RACING AT THE HARD ROCK STADIUM; PROVIDING FOR THE ADOPTION OF REPRESENTATIONS; PROVIDING FOR AN EFFECTIVE DATE.

### Staff Summary

The City of Miami Gardens is the third largest city in Miami-Dade County with approximately 113,000 residents. There are twenty-two public schools in the city, several private and two universities.

The Hard Rock Stadium is a major landmark in Miami Gardens, Florida and it is surrounded in close proximity to a plethora of single family homes and some small businesses. Currently, the stadium is home or host to:

1. The Miami Dolphins of the National Football League
2. University of Miami Hurricanes football team
3. The Orange Bowl Classic (American college football bowl game)
4. Miami Open Tennis Tournament
5. Numerous concerts and events through-out the calendar year

While these variety of events are great, they generate traffic congestions throughout the city and it is cumbersome to all stakeholders.

What is Formula One (1) and its proposal to the City of Miami Gardens? Formula One (1) is a motor sport event which takes place over three days, with a series of practice and qualifying sessions prior to the race day... These cars can race up to 200 miles an hour.

Among other things, Formula One (1) generates mega dollars, and tourism; it is foreseeable that there will be days of deafening engine noise; a disruption of the regular flow of traffic and the air quality will be compromised because of engine fumes. These burdensome effects, were a concern to Miami-Dade County and the City of Miami residents, as such they've rejected the proposal in their communities.

While the race track may not be running through-out the neighborhoods as propositioned to

**Agenda Item #11.1**

the other two entities. The updated proposal is to utilize lanes on 199th Street will add more traffic disruptions to the quality of life and enjoyment for all residing and visiting the City of Miami Gardens.

At the community meeting held on Wednesday, September 18, 2019 at 6:00 p.m. at Norland Senior High School at 1051 NW 195th Street, Miami Gardens, Florida, over two hundred residents clearly exhibited their disapproval of Formula One (1) in the neighborhood.  They are not happy with the proposal because  the short and long term effects on their health and property prices are in question.

The residents have the fundamental right to disdain the idea of Formula (One) 1 in their residential area.  This is their home, a place where they live, sleep, breathe fresh air and work. Formula One (1) is a misfit for any residential area.

Too often corporate America focuses on profit over people's lives.  There is no showing of a positive impact that Formula One (1) races will benefit the residents and the environment. Therefore Councilwoman Odom is recommending that City Council support this resolution in opposition of Formula One (1) Racing in the City of Miami Gardens.

---

**Fiscal Impact**

N/A

---

**Recommended Action**

Councilwoman Odom proposes that the City Council approves this Resolution

---

**Attachments**

Resolution 2019 -Objection to the Formula One Proposal

**Agenda Item #11.1**

1        RESOLUTION NO. 2019____

2

3    A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF
4    MIAMI GARDENS, FLORIDA, OBJECTING TO THE PROPOSAL
5    OF FORMULA ONE (1) RACING AT THE HARD ROCK STADIUM;
6    PROVIDING FOR THE ADOPTION OF REPRESENTATIONS;
7    PROVIDING FOR AN EFFECTIVE DATE.

8

9

10    WHEREAS, the City of Miami Gardens is the third largest city in Miami-Dade

11 County with approximately 113,000 residents, and

12    WHEREAS, there are twenty-two public schools in the city, several private and

13 two universities, and

14    WHEREAS, the Hard Rock Stadium is a major landmark in Miami Gardens,

15 Florida and it is surrounded in close proximity to a plethora of single family homes and

16 some small businesses, and

17    Whereas, currently, the stadium is home to or host of: The Miami Dolphins of the

18 National Football League, University of Miami Hurricanes football team, The Orange

19 Bowl Classic (American college football bowl game), Miami Open Tennis Tournament,

20 and Numerous concerts and events through-out the calendar year, and

21    WHEREAS, while these variety of events are great, they generate traffic

22 congestions throughout the city and it is cumbersome to all stakeholders, and

23    WHEREAS, Formula One (1) is a motor sport event which takes place over three

24 days, with a series of practice and qualifying sessions prior to the race day, these cars

25 can race up to 200 miles an hour, and

26    WHEREAS, Formula One (1) generates mega dollars, and tourism; it is

27 foreseeable that there will be days of deafening engine noise, a disruption of the regular

28 flow of traffic and the air quality will be compromised because of engine fumes, and

**Agenda Item #11.1**

29        WHEREAS, these burdensome effects, were a concern to Miami-Dade County

30    and the City of Miami residents, as such they've rejected the proposal in their

31    communities, and

32        WHEREAS, while the race track may not be running through-out the

33    neighborhoods as propositioned to the other two entities, and

34        WHEREAS, the updated proposal is to utilize lanes on 199th Street will add more

35    traffic disruptions to the quality of life and enjoyment for all residing and visiting the City

36    of Miami Gardens, and

37        WHEREAS, at the community meeting held on Wednesday, September 18, 2019

38    at 6:00 p.m. at Norland Senior High School located at 1051 NW 195th Street, Miami

39    Gardens, Florida, over two hundred residents clearly exhibited their disapproval of

40    Formula One (1) in the neighborhood, and

41        WHEREAS, there is no showing of a positive impact that Formula One (1) races

42    will benefit the residents and the environment, and

43        WHEREAS, Councilwoman Odom is recommending that City Council support

44    this resolution in opposition of Formula One (1) Racing in the City of Miami Gardens,

45        NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY

46    OF MIAMI GARDENS, FLORIDA AS FOLLOWS:

47    Section 1:   ADOPTION OF REPRESENTATIONS:  The foregoing Whereas

48    paragraphs are hereby ratified and confirmed as being true, and the same are hereby

49    made a specific part of this Resolution.

50    Section 2:   AUTHORIZATION:  The City Council of the City of Miami Gardens

51    hereby objects to the proposal of Formula One (1) racing at the Hard Rock Stadium.

2

**Agenda Item #11.1**

52        Section 3:    EFFECTIVE DATE: This Resolution shall take effect immediately

53    upon its final passage.

54        PASSED AND ADOPTED BY THE CITY COUNCIL OF THE CITY OF MIAMI

55    GARDENS AT ITS REGULAR MEETING HELD ON _____, 2019.

56

57        _____
58        OLIVER GILBERT, III, MAYOR
59
60
61
62    **ATTEST:**
63
64
65    _____
66    MARIO BATAILLE, CITY CLERK
67
68
69    PREPARED BY:  SONJA KNIGHTON DICKENS, CITY ATTORNEY
70
71
72    SPONSORED BY:  COUNCILWOMAN LILLIE Q. ODOM
73
74    Moved by:  _____
75
76    **VOTE:** _____
77
78    Mayor Oliver Gilbert, III                          _____ (Yes)          _____ (No)
79    Vice Mayor Rodney Harris                       _____ (Yes)          _____ (No)
80    Councilwoman Katrina Wilson                 _____ (Yes)          _____ (No)
81    Councilman Erhabor Ighodaro, Ph.D.      _____ (Yes)          _____ (No)
82    Councilwoman Lillie Q. Odom                 _____ (Yes)          _____ (No)
83    Councilman Reggie Leon                         _____ (Yes)          _____ (No)
84    Councilman David Williams Jr                 _____ (Yes)          _____ (No)

3