**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-24483-CIV-SCOLA/GOODMAN**

BETTY T. FERGUSON, et al.,⁣   )
⁣   )
⁣   Plaintiffs,   )
⁣   )
v.   )
⁣   )
MIAMI DOLPHINS, LTD., et al.,   )
⁣   )
⁣   Defendants.   )
_____)

## <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT</u>

Plaintiffs, Betty Ferguson, et al., submit their Response in Opposition to Defendants' Motion to Dismiss Complaint [Doc. 35], and respectfully request that the Court deny Defendants' motion in its entirety.

## <u>INTRODUCTION</u>

Plaintiffs are Black citizens who reside in the City of Miami Gardens in neighborhoods surrounding the Hard Rock Stadium. They brought this civil rights action to challenge the intentional discriminatory acts and omissions of Defendants Miami-Dade County, Mayor Gimenez, the Miami Dolphins, F1, and others to bring high-speed automobile racing, i.e., F1, to the City of Miami Gardens, Florida on the grounds that the Defendants' acts violate the Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985. Defendants engaged in a pattern of intentional discrimination and conspiracy against Plaintiffs on the basis of race depriving them of rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs' Complaint seeks (1) an order declaring that Defendant Miami-Dade County and Mayor Gimenez intentionally discriminated against the Plaintiffs on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §1983; (2) an order declaring that Defendants conspired to bring F1 to the Hard Rock Stadium in violation of

Plaintiffs' constitutional rights; (3) a permanent injunction to prevent the Dolphins and F1 from proceeding with high-speed automobile races in the City of Miami Gardens; (4) a declaration that the F1 races at Hard Rock Stadium in the City of Miami Gardens, Florida, announced by Defendants in January 2020, would violate Section 21-28 of the Miami-Dade County Code and Section 16-24 of the City of Miami Gardens Code of Ordinances; (5) and other relief. [Doc. 1, and hereafter with "¶" or "¶¶" numbers unless otherwise specified, ¶ 3].

Defendants' primary argument in support of dismissal, that the Stadium Zoning Ordinance allows for racing at Hard Rock Stadium, is misleading, contradictory, and improper in a motion to dismiss. But to be clear: even if the planned F1 races were currently permitted as a matter of County and municipal zoning at Hard Rock Stadium (they are not) that would not, under any circumstances, justify the Defendants' racially discriminatory conduct, denial of Plaintiffs' rights to equal protection of the law, and conspiracy to violate the Plaintiffs' civil rights. Indeed, the purpose of the Equal Protection Clause, which is central to Plaintiffs' claims, is to prohibit the Defendants from engaging in the exact acts and omissions which they now try to justify. The possibility that the County had agreed through its legislative process to zone the area for these races in the heart of the Plaintiffs' neighborhood would *not* be a defense to the Defendants' violations of Plaintiffs' rights to equal protection of the laws in Counts I and II. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 4 (1967) ("The two statutes under which appellants were convicted and sentenced are part of a comprehensive statutory scheme aimed at prohibiting and punishing interracial marriages.").

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss for failure to state a claim, a complaint need not contain "detailed factual allegations," but instead must contain enough factual matter that, when accepted as true and viewed in the light most favorable to the plaintiff, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (U.S. 2007)); *Cooper v. Progressive Am. Ins. Co.*, 2017 WL 784816 at *1 (M.D. Fla. Mar. 1, 2017). This plausibility standard does not require that the defendant's liability is probable; instead, this standard merely requires something "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550

U.S. at 556). "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is...exceedingly low.'" *Corbett v. Transp. Sec. Admin.*, 968 F. Supp. 2d 1171, 1178 (S.D. Fla. 2012) (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

When considering a FED. R. CIV. P. 12(b)(6) motion, the court may not, with limited exceptions, consider any facts or allegations beyond the four corners of the complaint. *Milburn v. U.S.*, 734 F.2d 762, 765 (11th Cir. 1984); *Randles v. Hester*, 2001 WL 1736881 (M.D. Fla. 2001). Defendants, while expressly moving pursuant to FED. R. CIV. P. 12(b)(6), expediently ignore this limitation and improperly provide over two and a half pages of inadmissible and controverted factual content. Furthermore, Defendants pepper their Motion to Dismiss with hyperbolic, filler adjectives, calling the Plaintiffs pleadings "sensational," "outrageous," and "implausible," but provide no legal analysis to support such language. [Doc. 35, pp. 2, 13, 23]. This Court should disregard places throughout the Motion where Defendants improperly insert "facts" outside the four corners of the Complaint into the record and rely upon them to support their arguments.

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING UNDER ARTICLE III AND ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF.

Article III of the U.S. Constitution limits a federal court's jurisdiction to "actual cases or controversies." U.S. Const. art. III, § 2, cl. 1; *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). To satisfy Article III's requirement, a plaintiff must demonstrate (1) that the plaintiff has suffered an actual or threatened injury; (2) a causal connection between that threatened injury and the challenged action of the defendant; and (3) that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Harmonious with the Article III case or controversy requirement, the Declaratory Judgment Act, which allows Plaintiffs to seek declaratory relief, contains a similar requirement—an "actual controversy." 28 U.S.C. § 2201(a); *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937). For purposes of the Act, an "actual controversy" exists when there is a substantial continuing controversy between parties having adverse legal interests. *See, e.g., Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1284 (11th Cir. 2012). Similarly, a party has standing to seek injunctive relief "only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of 'future injury.'"

*Williams ex rel. J W v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994)).

"Whether a future injury is likely to occur in part depends on whether the misconduct alleged is authorized by or part of a government policy." *Id*. at 1264. "When alleged misconduct is 'authorized or part of a policy, it is significantly more likely that the injury will occur again.'" *Id*. Plaintiffs need only assert a reasonable expectation that the injury they have suffered will continue or will be repeated in the future from the application of the policy they challenge. *C.F.C. v. Miami-Dade County*, 349 F.Supp.3d 1236, 1253 (S.D. Fla. 2018). And "[w]hen standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000).

The Complaint alleges that Plaintiffs have suffered injuries due to the acts and omissions of the Defendants, [¶¶ 188-238], and are in real and immediate danger of suffering future injuries, [¶¶ 161-183], without declaratory and injunctive relief from this Court. As a direct result of Defendants' actions, Plaintiffs will suffer injuries, including damage to their health, decrease in safety, exposure to pollution, excessive traffic, and noise, a blighting effect on their community, lowering of self-esteem, decrease in property values, and the diminution of their quality of life. [¶ 197]. The Complaint also alleges that the Defendants' conduct will violate the Miami-Dade County and City of Miami Gardens noise ordinances and cause special injuries to the Plaintiffs that are different in kind than the community at large. [¶ 241, 249].

Plaintiffs have alleged a continuing, immediate controversy between Plaintiffs and Defendants that creates a definite threat of future injury. [¶¶ 197-202, 210-214, 235-238, 245-246, 252-253]. The causation requirement is satisfied because Plaintiffs' threatened injury is traceable to the Defendants' practice or policy.  [¶¶ 87-160, 188-212]. Plaintiffs' threatened injuries would be remedied by both declaratory and injunctive relief. [¶¶ 188-212].

Defendants argue that Plaintiffs lack standing under Article III, yet they fail to identify the elements of Article III that Plaintiffs fail to allege. [Doc. 35, pp. 7-8]. Defendants state that declaratory relief is improper but fail to argue that Plaintiff did not allege a controversy. *Id*. Seemingly, the only argument Defendants present is one of ripeness, [Doc. 35, p. 8], a separate and distinct doctrine. Ripeness is one-half of the threshold jurisdictional question of whether a court may consider a dispute. *Eland v. Basham*, 471 F.3d 1199, 1204-05 (11th Cir. 2006); *see also*

*Bochese v. Town of Ponce Inlet*, 405, F.3d 964, 974 (11th Cir. 2005). The ripeness doctrines asks whether there is sufficient injury to meet Article III's requirements of a case or controversy, and if so, whether the claim is sufficiently mature, defined, and concrete to permit effective decision-making by the court. *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995). When a plaintiff challenges a government action, the issues are ripe for judicial review if the plaintiff shows they sustained or are in immediate danger of sustaining a direct injury as a result of the act. *Nat'l Ad. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) (internal citation and quotation omitted).

As noted above, Plaintiffs are in immediate danger of sustaining a direct injury as a result of Defendants' policies and practices; the threatened injuries [¶¶ 161-83] are not abstract by any means. Thus, Plaintiffs' claims are fit and ripe for review. Defendants attempt to circumvent this troubling reality by arguing that the impacts are undetermined, and the event is "proposed." [Doc. 35, p. 8]. But this argument impermissibly ignores Plaintiffs' actual allegations. The Complaint alleges that based on the published sound levels for the planned F1 race, Plaintiffs' acoustical expert determined, as a matter of acoustical engineering science, that Plaintiffs will suffer injuries. [¶¶ 161-88]. Moreover, the event is not merely proposed in a hypothetical or subjunctive way; the Defendants have taken a number of concrete steps toward a ten-year agreement for F1 racing in Miami Gardens, and stated that the County issued permits for "construction required to stage the race." [¶¶ 22, 107-11].

Defendants' argument that Plaintiffs' Complaint is somehow hypothetical and therefore not appropriate under the Declaratory Judgment Act is specious, [Doc. 35, p. 8], as is their citation to *Gagliardi v. TJCV Land Trust*, 889 F.3d 728, 734 (11th Cir. 2018). In *Gagliardi*, the Court affirmed the dismissal of an action for declaratory and injunctive relief to stop a project which had already been invalidated by the state court. Here, no such invalidation by a state court exists.

Furthermore, for all the reasons stated above, Plaintiffs, Rolling Oaks Homeowners' Association, Inc., Miami Gardens Crestview Homeowner's Association, Inc., and Lake Lucerne Civic Association, Inc. ("Homeowners' Associations"), have standing. The Homeowners' Associations may institute and maintain, legal actions or hearings in its name on behalf of all members concerning matters of common interest to the members. Fla. Stat. § 720.303. They have standing to sue for common interest where expenses, harms, or injuries are shared amongst the members. *Homeowner's Ass'n of Overlook, Inc. v. Seabrooke Homeowners' Ass'n. Inc.*, 62 So.

2d 667, 670-71 (Fla. 2d DCA 2011). The Complaint specifically alleges each "is the association of homeowners residing in the Rolling Oaks, Crestview, and Lake Lucerne subdivisions of Miami Gardens who would be harmed by Formula One racing . . . ." [¶¶ 18-20, 161-183, 191-202].

## II.   PLAINTIFFS HAVE STATED A CLAIM FOR RELIEF FOR MIAMI-DADE COUNTY'S VIOLATION OF THE EQUAL PROTECTION CLAUSE UNDER 42 U.S.C. SECTION 1983.

Section 1983 affords plaintiffs the vehicle to redress violations of constitutional rights, in this case a violation of the Fourteenth Amendment to the United States Constitution, where such rights have been violated by public officials acting in their official capacity under "color of law." 42 U.S.C. § 1983.  Municipalities are subject to liability under Section 1983 and may be sued directly for relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In short, a plaintiff must plead three elements: a policymaker; an official policy or custom; and a violation of constitutional rights whose 'moving force' is the policy or custom. *Id.*

### A.   Miami-Dade County and Mayor Gimenez are Official Policymakers.

Municipal liability under Section 1983 attaches where a "deliberate choice to follow a course of action is made from among various alternatives" by the officials responsible for establishing final policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Official policymakers have been found to be a mayor, *Monell*, 436 U.S. 658, a county sheriff, *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397 (1997), and a county prosecutor. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Here, Miami-Dade County (via its lawmaking body, the Board of County Commissioners) and Mayor Gimenez are official policymakers, as both Defendants are responsible for establishing final policy.

Defendants argue that there can be no official policy established by Mayor Gimenez because any policy or agreement would require approval by the County's governing body, the Board of County Commissioners. [Doc. 35, p. 16]. This is erroneous. The Mayor, as the head of the County, holds veto power over the Board of County Commissioners and other executive powers, and by wielding these powers Mayor Gimenez is capable of creating policy, and did so here.  Mayor Gimenez used his executive authority to advance the Dolphins-F1 agreement, and used his veto power to thwart the Plaintiffs' elected county commissioner from advancing

legislation to protect her mostly Black constituents against the F1 invasion, depriving Plaintiffs equal protection under the law. [¶¶ 102-104, 106, 130, 143, 145-147, 152, 190-196].

Furthermore, in a last-ditch effort, Defendants argue that allegations against the Board of Commissioners fail, not because the Board of Commissioner is not a final policymaker, but rather because Plaintiffs did not identify any official policy of the County. [Doc. 35, p. 16]. This is inaccurate, and as discussed below, Plaintiffs clearly identify official policies, customs, and practices of the County that deprived Plaintiffs of their constitutional rights. [¶¶ 87-160, 188-202].

### B.     Through Official Policies, Customs, and Practices, Miami-Dade County Deprived Plaintiffs of Their Constitutional Rights.

"A plaintiff can establish Section 1983 liability by identifying that she has been deprived of constitutional rights by either an express policy or a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom and usage with the force of law." *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966 (11th Cir. 2002)) (quoting *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1481 (11th Cir.1991).

An official policy includes policy statements, ordinances, regulations, or decisions officially adopted or promulgated. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 659 (1978). Policy is promulgated by a "municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority," *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984), on reh'g, 739 F.2d 993 (5th Cir. 1984), and by "those whose edicts or acts may fairly be said to represent official policy," *Monell*, 436 U.S. at 659. "If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy'…. [W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

On the other hand, demonstrating a custom within a municipality requires showing "a persistent and wide-spread practice." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). A plaintiff must "plead factual content that allows the court to draw the reasonable inference that the [municipal entity] maintained a policy, custom, or practice that contributed to the alleged constitutional violations." *C.F.C. v. Miami-Dade County*, 349 F. Supp. 3d 1236, 1263 (S.D. Fla.

2018). However, a "single decision by an official policymaker can establish the existence of an unconstitutional municipal policy." *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992).

Here, Defendants, Miami-Dade County and Mayor Gimenez, lawmakers with policy-making authority, adopted a particular course of action to deprive Plaintiffs of their constitutional rights. The County and the Mayor applied its resolution to "coordinate with any hosting municipality" differently in a predominately white area (Downtown City of Miami) than it did in a predominately Black area (Miami Gardens). [ ¶ 94]. While Defendants heeded the concerns of the Downtown residents, they ignored and rebuffed the City of Miami Gardens, Plaintiffs, and other residents. [ ¶¶ 25, 89, 106, 125]. From approximately 2018 – 2019, Defendants, including the County and Mayor Gimenez, negotiated an agreement with the Dolphins and F1, spearheaded by Mayor Gimenez, without coordinating with the City of Miami Gardens [ ¶¶ 100-106]. Even after the Miami Gardens City Council, residents, and Plaintiffs opposed the F1 race in their community, the County moved forward with negotiations and arrived at an agreement, depriving Plaintiffs of equal protection of the law, [ ¶¶ 112-157, 188-202], protection that was afforded to white residents [¶¶ 96-99]. Mayor Gimenez,  "an official of such rank that he or she could be said to be acting on behalf of the municipality," *Douglas-Smith v. Lamberti*, 2009 WL 10667445, at *4 (S.D. Fla. Sept. 30, 2009), took the highly irregular step of revoking his recusal in a matter in which he had previously admitted to having a conflict of interest, in order to veto the Board of Commissioners' decision to make Formula 1 more accountable to the residents of the County and the City of Miami Gardens. [¶¶ 91, 130].  Worse yet, Defendants plotted against, and threatened, Plaintiffs' elected representatives when the residents appealed for help from their elected officials. [¶¶ 121, 142].

Furthermore, the County has a longstanding history of discrimination which includes racial zoning, maintaining racially segregated public housing, and inequitable development. [¶¶ 29, 32-84]. The County formalized discriminatory customs, policies, and practices that resulted in the violent policing of Black neighborhoods, racial discrimination against Black businesses in the award of County contracts, suppression of Black votes, and municipal inequities. [¶¶ 32-84].  The County's history of discrimination against Black residents is set forth in painful detail in the Complaint [¶¶ 32-84], and is far too voluminous to even summarize here; but the County's egregious discriminatory history was captured by Judge Donald Graham in 1992 when he when

8

he stated that "there is no dispute that Blacks in Dade County continue to suffer from lower income levels, lower job classifications, lower education levels, higher poverty rates and higher unemployment rates than do Non–Blacks" due to the discriminatory acts and omissions of Miami-Dade County. [¶ 72]. Plaintiffs' Complaint alleges the impacts of these customs, policies, and practices are still felt today. [ ¶¶ 29-31, 72, 79, 84]. Most relevant here, Miami-Dade County suppressed the political rights and power of the residents of Miami Gardens and continues to do so today. [¶¶ 72-75, 100-120]. The persistence of this custom and practice is evidenced by the County and Mayor's disregard for the rights and privileges guaranteed to the Plaintiffs by the Fourteenth Amendment. [¶¶ 100-20, 188-97]. Most notably, this disregard is on display in the County officials' stated reasoning for hosting the F1 race in Miami Gardens, as well as in the Defendants' Motion to Dismiss. [¶ 156, 169; Doc. 35, p. 7].

### C.   The Customs and Policies of Miami-Dade County are the Moving Force Behind the Deprivation of Plaintiffs' rights.

Governmental entities are liable under Section 1983 when a governmental 'policy or custom' is the 'moving force' behind the constitutional deprivation. *Farred v. Hicks*, 915 F.2d 1530, 1532–33 (11th Cir. 1990) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). The plaintiff must demonstrate a direct causal link between the constitutional violation and a municipal policy or custom. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997). A direct causal link exists when a final policy maker makes "a deliberate choice to follow a certain course of action" that results in the constitutional deprivation, when a "formal policy statement, ordinance, regulation or decision officially adopted and promulgated" by the municipality leads to a constitutional violation, or when the constitutional deprivation is consistent with a "persistent and widespread practice and custom having the effective force of a formal policy." *Kingdom v. City of Riviera Beach*, 04-80042-CIV, 2007 WL 9702757, at *1 (S.D. Fla. Feb. 27, 2007).

Citing a dissenting opinion (*City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267 (1987)), Defendants argue that the causal link is absent because Plaintiffs fail to allege the County's role in the Miami Grand Prix [Doc. 35, p. 17]. Defendants clearly skipped certain sections of Plaintiffs pleadings—the County's role is crystal clear. First, the County owns the land where the race is set to occur and leases the land to the Miami Dolphins organization. [¶ 101]. Second, the County, along with all other Defendants, negotiated and agreed to host F1 racing in Miami, [Doc. 35, p.1-

3, ¶ 90]. The County was deeply involved in the decision to acquiesce in the Downtown residents' opposition. [¶¶ 89–97]. Third, the Mayor Gimenez negotiated a secret agreement with the Miami Dolphins, offering taxpayer-funded County subsidies to host a F1 race at the Hard Rock Stadium. [¶¶ 103-06]. Notably, F1 published details about its agreement with the Miami Dolphins, including a statement that the agreement required approval by the County. [¶ 120]. And Mayor Gimenez also took the highly unusual step of revoking his prior recusal in a matter where he had a clear conflict of interest, in order to veto the Board of County Commissioner's decision. [¶¶ 91, 130].

Here, Mayor Gimenez's actions were "deliberate choices" selected from "various alternatives" by a "final policymaker." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Kingdom v. City of Riviera Beach*, 04-80042-CIV. Acting against the express mandate of a unanimous County Commission and Resolution 8-518-18, Mayor Gimenez failed to coordinate with the proposed "hosting" community, Miami Gardens, [¶ 102], and instead conspired with Defendants [¶¶ 103-06] to deprive Plaintiffs of their constitutional rights, all while gaining personal benefits [ ¶ 152] and offering his co-conspirators financial incentives [¶ 104-05]. Worse yet, knowing that F1 race cars  generate 140 decibels (loud enough to cause hearing damage), the Mayor spearheaded the agreement [¶ 106] with F1 and the Miami Dolphins in violation of City and County Noise Ordinances, in deliberate indifference for the health and well-being of the Black residents of Miami Gardens. And throughout these acts and omissions, the Mayor played footsie with recusal and his professional ethics. [¶¶ 91, 103, 130]. Plaintiffs' allegations no doubt support a reasonable inference that, without relief from this Court, the intentional actions of Miami-Dade County and Mayor Gimenez constituted a custom, practice, and policy that deprived, and will continue to deprive, Plaintiffs of their constitutional rights secured by the Equal Protection Clause. [¶¶ 188–202].[1]

> **D.**     **Miami-Dade County's Customs, Policies, and Practices Deprived, and Will Continue to Deprive, Plaintiffs of Their Right to Equal Protection.**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

---

[1] Where when an officer is sued "in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'" *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citations omitted). Plaintiffs acknowledge this precedent, and as such, will remove Mayor Gimenez as a named Defendant.

direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To prevail on an Equal Protection claim, plaintiffs must show (1) that they were treated differently from others similarly situated, and (2) that the defendants treated the plaintiffs differently for the purposes of discriminating against the plaintiffs. *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). First, a plaintiff and her comparators must be similarly situated in all material respects. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019). However, a plaintiff and the comparators need *not* be similar in *all* but the protected ways; meaning, a plaintiff need not prove that she and her comparators are *identical* except for their race. *Id.*

Here, the two proposed race locations, Bayfront Park in Downtown Miami and Hard Rock Stadium in Miami Gardens, are similarly situated in all material respects. Both locations would be allow for global racing events and drive economic value to Miami-Dade County and South Florida [¶¶ 89, 142, 229]. Such racing events, regardless of location, would bring extreme noise, air pollution, and traffic to residential areas, causing serious harm to health and depriving residents of the quiet enjoyment of their property [¶¶ 92, 96, 100-54]. And both racing events were planned and authorized by the same parties: F1, the Miami Dolphins, Stephen Ross, Miami-Dade County, and Mayor Gimenez [¶¶ 1, 87-154].

Defendants claim that because the Stadium is designed to "host large-scale sporting events" and the SZO permits automotive racing at the Hard Rock Stadium, that "it is facially implausible that the only meaningful distinction between these two sites is the racial composition." [¶¶ 13-14]. This argument is illogical. Assuming, *arguendo*, that these facts are indeed relevant to whether the races are similarly situated, Bayfront Park, where Defendants originally planned to host the race in Downtown Miami before bowing to the objections of the resident population which is predominantly white. [¶¶ 92-95], is also designed to host large-scale events, such as July 4, New Year's Eve, Ultra Music Festival, Woodapalooza [¶ 158].

Defendants claim that one distinction between the two events—road closures—prevents the Plaintiffs from establishing that the two races are similarly situated, conveniently ignoring Plaintiffs' allegations that whether or not 199th Street is formally closed (as originally proposed), F1 races in Miami Gardens will cause massive traffic disruption on the streets Plaintiffs and other Miami Gardens residents need to navigate work, school, childcare, senior care, worship, shopping, and other essential errands. [¶¶ 7, 9, 12, 14, 15, 17, 137, 162, 182, 197, 209]. Furthermore,

Defendants fail to provide any legal argument as to how a prudent person, looking objectively, would not find that a F1 race in Downtown Miami and F1 race in Miami Gardens are similarly situated for purposes of Plaintiffs' equal protection claim.

Second, Plaintiffs must show that the County's decisions or acts had a discriminatory purpose and effect. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). To determine whether invidious discriminatory purpose was a motivating factor, the Court must look to the impact of the official action and whether it "bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). A clear pattern, unexplainable on grounds other than race, is a starting point when establishing discriminatory purpose. *Arlington Heights*, 429 U.S. at 266. The Supreme Court suggested that relevant evidentiary factors include substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision. *Id.* at 265–69. The Eleventh Circuit has repeatedly recognized that evidence of "'[t]he historical background of the decision'" is relevant to the issue of discriminatory intent. *Williams v. City of Dothan*, 745 F.2d 1406, 1415 (11th Cir.1984) (quoting *Arlington Heights*, 429 U.S. at 267).

Here, evidence of substantial disparate impact, [¶¶ 161-83], a history of discriminatory official actions, [¶¶ 32-84], departures from the norms, [¶¶ 91, 103-06, 130], and the history of the decision, [¶¶ 100-160], establish a clear pattern of discrimination. Plaintiffs' Complaint contains well-pled allegations that the racing locations  are similarly situated and that the Defendants treated the Plaintiff differently for the purposes of discriminating against the Plaintiffs [¶¶ 87-160, 189-196], adequately stating a claim for violations of Equal Protection under 42 U.S.C. § 1983; and thus, dismissal is improper.

## III.    PLAINTIFFS HAVE ADEQUATELY ALLEGED A CONSPIRACY UNDER SECTION 1985(3).

In order to state a cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627 (11th Cir. 1992).

### A.      Defendants Reached an Agreement to Violate Plaintiffs' Rights.

In order to state a claim for conspiracy, a plaintiff must allege an agreement between the defendants. *See Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1346 (S.D. Fla. 2012). "[T]he linchpin for conspiracy is agreement, which presupposes communication . . . ." *Id*. Here, Plaintiffs alleged in their Complaint that Defendants "reached an agreement to bring F1 to the Hard Rock Stadium in violation of Plaintiffs' constitutional rights" and provided sufficient facts supporting this statement. [¶ 64].

Based on public records, Defendants negotiated, and later reached, an agreement to bring F1 racing to Miami Gardens. [¶ 100-02]. Mayor Gimenez, who had publicly recused himself from F1 matters, reversed his decision, deemed himself no longer recused, and used his veto power to support the plans to allow F1 racing in Miami Gardens, including many actions long before the plans were announced. [Doc. 1, ¶¶ 103, 130, 145]. Despite Mayor Gimenez having publicly recused himself from matters related to F1, public records disclosed that senior officials who report to Mayor Gimenez reviewed and supported the proposal by the Dolphins and F1 for several months before the proposal was announced. [¶¶ 91, 103-04]. The *Miami Herald* revealed that Mayor Gimenez offered the Miami Dolphins financial incentives to bring F1 racing to the Hard Rock Stadium. [¶ 104]. Mayor Gimenez did more than negotiate; the F1 grant amendment was spearheaded by the Mayor's Office. [¶ 106].  Later, F1 and the Miami Dolphins issued a joint statement that they had reached an agreement to hold F1 racing at the Hard Rock Stadium. [¶ 119]. Throughout this period of negotiation, Defendants took no steps to notify the residents of Miami Gardens or their elected representatives of their intention to host F1 racing in Miami Gardens, violating the County resolution requiring consultation with affected communities. [¶ 106].

To support their argument that Plaintiffs failed to properly allege a conspiracy, Defendants erroneously contend that Plaintiffs do not know *which Defendants* are responsible for the planning of F1 races in Miami Gardens. [Doc. 35, p. 20]. This argument mischaracterizes Plaintiffs' Complaint, which simply states that "Defendants' public correspondence pertaining to plans for F1 racing in Miami Gardens makes it impossible to *differentiate* among the Dolphins and F1 entities that are responsible for the negotiations, agreement, and anticipated consummation of proposed F1 races in Miami Gardens." [Doc. 1 at 9, n.1] (emphasis added).   As the Complaint shows, the Miami Dolphins and F1 correspondence invariably omits the specific corporate names of the entities involved, and use "trade" or common usage names instead. *Id*. For this reason,

Defendants' communications prevent Plaintiffs from alleging exactly which entity did what act at this stage in the litigation. However, there is evidence that each Defendant is involved in the conspiracy—accordingly, Plaintiffs named all Defendants in Count II of the Complaint. [¶ 204].

Defendants claim that the few allegations against Defendant RSE Ventures, LLC ("RSE") in the Complaint show that Plaintiffs do not know who is involved in planning for the F1 races in Miami Gardens. [Doc. 35, p. 20]. However, the allegation that RSE retained lobbyists to secure approval of the Miami Grand Prix in Miami Gardens adequately shows that RSE participated in the conspiracy to hold F1 racing there. [¶ 25]. Additionally, the allegation that either RSE or Stephen Ross (who public information shows acts for RSE) has the exclusive franchise to promote F1 racing in South Florida lends support to Plaintiffs' claim that RSE is involved in the conspiracy. *Id.* Plaintiffs also quote Sean Bratches, the Managing Director of Commercial Operations at Defendant F1 Management Limited, which read: "In the last few months we have worked diligently alongside our promoter Stephen Ross of RSE Ventures . . . to realize our ambition to bring a F1 Grand Prix to Miami . . . ." [¶ 98].

### B.    Defendants Acted for the Purpose of Depriving Plaintiffs of Their Constitutional Rights.

In a Section 1985(3) claim, a plaintiff must allege that the defendants acted at least in part for the purpose of depriving the plaintiff of a right. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276 (1993). "'Intent to deprive of a right' requires that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." *Id.* Thus, a claim under Section 1985(3) requires a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Lucero*, 954 F.2d at 628.

Defendants deny that their decision to hold F1 racing in Miami Gardens was motivated by racially discriminatory animus. [Doc. 35, p. 22]. However, the facts show otherwise. Defendants here showed an invidiously discriminatory animus behind their agreement to hold F1 racing in Miami Gardens by choosing to respect the rights, benefits, and entitlements of the predominantly white community of Downtown Miami but not those of the Miami Gardens residents of whom over 70% are Black. [¶ 207]. When the City of Miami agreed to host F1 racing Downtown, the residents of that predominantly white community mobilized a grassroots effort against such racing

because of the health risks and disruptions to their everyday lives it would cause; soon after, the Defendants abandoned their plans to hold F1 racing Downtown. [¶¶ 92–99]. Yet, when residents from Miami Gardens, a predominantly Black community, expressed their opposition to F1 racing in their community, just as Downtown Miami residents had, Defendants muscled forward with their plan to hold the races in Miami Gardens. [¶¶ 112–19]. And to underscore their determination to ram the event down the Miami Gardens residents' throats, the Mayor and other city officials refused to coordinate with the Miami Gardens community in any way despite a County resolution requiring just that. [¶ 106].

Defendants have full knowledge about the health risks and other harms that F1 racing pose for the Plaintiffs and residents of Miami Gardens, yet continued to act with clear disregard for their health, safety, and welfare. [¶¶ 92–120]. For example, the County Auditor report— issued after the proposed plan to hold F1 racing in Miami Gardens was announced—cited a study finding that F1 racing could produce noise levels that cause hearing damage and outlined how Miami Gardens residents could face difficulty accessing emergency services and major roadways in the weeks prior to and days of the mega-event. [¶¶ 109, 111].  Mayor Gimenez immediately attacked the auditor's conclusions.  [¶ 144].  The *Miami Herald* covered Miami Gardens community meetings at which the residents' expert reported his preliminary findings that F1 racing at Hard Rock would cause serious risks of disturbance and hearing loss, at which hundreds of residents expressed their belief that their community was being targeted because most residents were Black and not as politically influential as Downtown residents, and Dolphins and F1 officials attended the meetings. [ ¶115]. The Downtown Miami residents had previously raised the same noise, traffic, and safety concerns in public meetings and in the press.  [¶¶ 92-99]. Thus, when F1 and the Miami Dolphins formally issued a statement that they had reached an agreement to hold F1 racing at the Hard Rock Stadium, [¶ 119], all Defendants knew in reaching the agreement how the racing would negatively impact the Plaintiffs.

Contrary to Defendants' argument, the conflict at issue in this case is not "purely economic." Defendants use language from *United Broth. of Carpenters v. Scott*, 463 U.S. 825, 838–39 (1983) to argue that the economic motivations to hold F1 racing in Miami Gardens do not constitute the requisite racial discriminatory animus. [Doc. 35, p. 22]. In *Scott*, the controversy pitted union versus non-union workers. *Id*. at 829. Here, Plaintiffs do not comprise any sort of "economic" class, as the plaintiffs in *Scott* did, nor do Plaintiffs claim that Defendants belong to

any competitive economic class. *Id*. Plaintiffs allege that Defendants discriminated against them on the basis of race, depriving them of their constitutional rights. [¶¶ 205–06]. Additionally, Defendants do not specify any particular economic group to which Plaintiffs supposedly belong. As explained in *Scott*, the predominant "purpose of § 1985(3) was to combat the prevalent animus against [Black people]." 463 U.S. at 836. The residents of Miami Gardens, who are predominantly Black, belong to the exact group that Congress intended Section 1985(3) to protect. Defendants' argument that Plaintiffs represent some unidentified "economic group" not protected by Section 1985(3) utterly fails.

Furthermore, it is well-known that in civil rights cases "the requisite proof of the defendant's discriminatory intent is often in the exclusive control of the defendant," *McCleary-Evans v. Maryland Dept. of Transp., State Highway Admin.*, 780 F.3d 582, 592 (4th Cir. 2015) (Dissent), and that "violators have learned not to leave the proverbial 'smoking gun' behind." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081–82 (3d Cir. 1996). Thus, "[d]iscovery is a particularly valuable and necessary tool in uncovering the subtle and sophisticated forms of discrimination that have become more commonplace than the more overt examples that once permeated our society."[2] Here, Plaintiffs have "raise[d] a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## C.   Plaintiffs Have Pled Defendants' Overt Acts in Furtherance of the Conspiracy with Specificity.

Defendants argue that because Plaintiffs have (in their view) failed to plead an actionable conspiracy, Plaintiffs cannot prove an act in furtherance of the conspiracy, a required element of a § 1985(3) claim. [Doc. 35, p. 23]. This circular reasoning lacks merit.  As shown in Section III(A) above, Plaintiffs have alleged sufficient facts showing overt acts in furtherance of the agreement among Defendants to hold F1 races in Miami Gardens despite the known harms they will cause to Plaintiffs and other Black residents.

Referring to County Commissioner Jordan's legislative proposals regarding F1 racing in Miami Gardens, the Miami Dolphins President wrote a letter to the County Commissioners

---

[2] Access to Justice Denied: *Ashcroft v. Iqbal*: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary, 111th Cong. 6-7 (2009) at 86.

"vehemently objecting to" legislative efforts "to preempt the citizens of Miami-Dade County from even having a conversation about" preventing such races in their community. [¶ 116]. On the day before the County Commissioners planned to vote on Commissioner Jordan's proposals, Mayor Gimenez requested review of his former recusal and subsequently threatened to veto Jordan's proposals. [¶ 130]. The Miami Dolphins spent approximately $40,000 on social media ads pointedly criticizing the County Commissioners who voted to support the residents of Miami Gardens. [¶ 142].  On November 8, 2019, Mayor Gimenez vetoed the resolution approved the previous month by the Commission that aimed to protect the Miami Gardens community. [¶ 143]. In January, the day before Commissioner Jordan's proposed ordinance was scheduled for second reading, the Dolphins and F1 announced a new track design, effectively delaying the vote [¶ 150], and before the vote the Dolphins offered commissioners free tickets to the Super Bowl and Mayor Gimenez took two, eventually paying for one of them. [¶ 152]. As such, Plaintiffs sufficiently pled facts showing the existence of acts in furtherance of the conspiracy.

### D.       Plaintiffs Were Deprived of Their Constitutional Right to Equal Protection.

Defendants claim that Plaintiffs failed to allege that they were deprived of any right or privilege of a citizen of the United States, the fourth requirement of pleading a Section 1985(3) claim [Doc. 35, p. 23], arguing that because the Miami Grand Prix has not occurred, it is impossible for Plaintiffs to have been injured. *Id*. at 24. Additionally, Defendants assert that Plaintiffs failed to allege which specific constitutionally protected right would be violated if the race occurred and that there is no "constitutionally guaranteed right to be free from future traffic congestion, noise, or any of the other impacts [Plaintiffs] allege would result from a race . . . ." *Id*.

As Plaintiffs clearly allege throughout the Complaint, Defendants violated their constitutional right to equal protection guaranteed by the Equal Protection Clause of the Fourteenth Amendment. [ ¶¶ 2–3, 205, 213]. Plaintiffs are not required to allege that Defendants violated their right to equal protection of a *specific* law. *See Terry Props., Inc. v. Standard Oil Co. (Ind.)*, 799 F.2d 1523, 1532–34 (11th Cir. 1986) (plaintiff alleged that defendants violated his right to equal protection under the Fourteenth Amendment); *Cook v. Randolph Cty.*, 573 F.3d 1143, 1145–1151 (11th Cir. 2009) (plaintiff asserted that county entities violated his right to equal protection under the Fourteenth Amendment); *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1480 (S.D. Fla. 1987) (plaintiff claimed that a corporation conspired to deny him his right to equal protection guaranteed by Fourteenth Amendment).

Here, Plaintiffs do not claim to have a constitutional right to be free from harmful effects of mega-events, but they do have a constitutional right to be protected from such hazards when a predominantly white community was. [ ¶¶ 188-202, 206].

Furthermore, Defendants' assertion that Plaintiffs have not yet suffered any injury is irrelevant because Plaintiffs need only show that they were deprived of any right or privilege of a citizen of the United States, and deprivation will continue to occur without relief from the Court. [Doc. 35, p. 23]; *see Griffin*, 403 U.S. at 102–03. Although the Miami Grand Prix has yet to occur, Defendants already violated Plaintiffs' right to equal protection by choosing to harm a predominantly Black community when a predominantly white area—equally capable of hosting F1 racing—successfully contested the exposure to such risks. [ ¶¶ 92–100]. When F1 racing occurs in Miami Gardens, Plaintiffs will suffer substantial harm, including damage to their health, decrease in safety, exposure to pollution, excessive traffic and noise, a blighting effect on their community, decrease in property values, and diminution of their quality of life. [ ¶ 209]. And Plaintiffs need not wait until after the damage is done to seek declaratory and injunctive relief to prevent a violation of their rights to equal protection of the laws.   *Baldwin v. Morgan*, 251 F.2d 780, 787 (5th Cir. 1958) ("Where the allegation, as it is here, is positive that compulsory segregation by reason of race is being enforced by the specified practice, the action is unconstitutional and redress should be afforded the complainants, . . . without the necessity of precipitating an incident, such as a claim of right and resistance of arrest as a 'test' case.").

Lastly, Defendants contend that Plaintiffs were not deprived of any right because "[i]t is clearly not illegal to engage in negotiations to hold an automotive race at a sporting venue where automotive racing is a permitted use, and that is all Plaintiffs have alleged." [Doc. 35, p. 24]. However, it is illegal to inflict definable harm on a group of people on the basis of race, which is a violation of the Equal Protection Clause of the Fourteenth Amendment, and which Plaintiffs have alleged. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1188–90 (11th Cir. 1999) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is to prohibit states from discriminating against individuals on the basis of race.").

**E.      Plaintiffs Allege a Conspiracy Among All Defendants.**

Defendants claim that an alleged conspiracy among the private Defendants would only be actionable if it involved the right to interstate travel and the right against involuntary servitude. [Doc. 35, p. 21]. This assertion would be correct if Plaintiffs had alleged the existence of a *purely*

private conspiracy. *See Scott*, 463 U.S. at 833. However, Plaintiffs here allege a conspiracy among private *and* public actors. [ ¶ 203-14]. In § 1985(3) cases, plaintiffs can bring claims against private actors for conspiring with state actors to violate their rights under the Equal Protection Clause of the Fourteenth Amendment. *See Terry Props.,* 799 F.2d 1523, 1533–34 (in § 1985(3) actions, private actors may be liable for infringing plaintiff's right to equal protection under the Fourteenth Amendment through conspiracy with state actors).

## IV.   *LAKE LUCERNE* **DOES NOT MANDATE DISMISSAL.**

Defendants claim that Plaintiffs' allegations are equally deficient as those in *Lake Lucerne*, in which the Court dismissed the residents' § 1983 and § 1985(3) claims. *See Lake Lucerne Civic Ass'n v. Dolphin Stadium Corp.*, 801 F. Supp. 684 (S.D. Fla. 1992); [Doc. 35, p. 7].

When analyzing the plaintiffs § 1985(3) claim in *Lake Lucerne*, the Court stated, "Plaintiffs point to the alleged history of discrimination by Dade County, the alleged history of events leading to the rezoning, and the alleged disparate impact of building Robbie Stadium in the midst of the Plaintiffs' predominantly black middle-class residential neighborhood as their only evidence of racial animus. None of these allegations, nor any other allegations in the Complaint rise to the level of 'racial, discriminatory animus' required to state a claim under § 1985(3)." 801 F. Supp. at 701. The Court dismissed the Section 1983 claim because the plaintiffs failed to allege that the defendants reached an understanding to work together to deprive the plaintiffs of their rights. *Id*. at 702.

Unlike in *Lake Lucerne*, Plaintiffs here allege that Defendants chose to locate a harmful event in their predominantly Black community *only after* acquiescing to the same concerns when raised by residents of a predominantly white neighborhood. [¶¶ 92–100]. Instead of coordinating with the affected community as mandated by County Resolution R-518-18, the Mayor stealthily manipulated the organs of County government to hide negotiations for the race in Miami Gardens knowing of the community's opposition.  [¶¶ 100-12]. Additionally, as explained above in Section III, Plaintiffs allege abundant facts showing that Defendants reached an agreement to deprive plaintiffs of their rights. [¶¶ 91, 100, 103–106, 119–21].

Defendants try to bolster their *Lake Lucerne* argument by asserting that the Complaint "makes clear that the Defendants' motivations for the Miami Grand Prix are purely economic and political." [Doc. 35, p. 7]. Plaintiffs' recognition that the event will generate wealth for *non*-Miami Gardens businesses and residents does not negate Plaintiffs' allegations, nor support Defendants'

contention that their decision was not motivated by racial animus—discriminatory and economic motives are not mutually exclusive. [¶ 157]. As noted above in Section III, a claim under § 1985(3) requires the plaintiff to allege that the defendants acted *at least in part* for the purpose of depriving the plaintiff of a right. *See Bray*, 506 U.S. at 276. Plaintiffs allege just that—Defendants acted at least in part to deprive Plaintiffs of their right to equal protection under the laws. [¶¶ 205–06]. Defendants' observation that Plaintiffs recognize Defendants' economic motivations for hosting F1 racing in Miami Gardens is irrelevant.

Arguing that they possessed only legitimate motives, Defendants cite to *Greene*, in which the United States Supreme Court held that although a certain street closing would primarily inconvenience Black motorists, "the impact of the closing . . . is a routine burden of citizenship; it does not reflect a violation of the Thirteenth Amendment." *City of Memphis v. Greene*, 451 U.S. 100, 111–12, 128–129 (1981); [Doc. 35, p. 7]. In *Greene*, the Court stated that the street closing, with respect to through traffic, would not make the affected route any longer and, with respect to local traffic, would only add some distance for motorists along a particular route to a recreation area and would make access to a certain neighborhood slightly less convenient. *See Greene*, 451 U.S. at 103. In this case, however, hosting a F1 mega-event that will cause permanent hearing damage and other negative health impacts, attract about 195,000 visitors (more than the population of Miami Gardens), and cause prolonged traffic congestion, is not a routine burden of citizenship. [¶¶ 161–83]. While *Greene* deals with minor traffic inconveniences, this case concerns the documented negative health impacts on a Black community that ten years of F1 racing will cause. *Id*.

Next, Defendants cite *Terry Props.* to support their argument that they chose to hold F1 racing in Miami Gardens for purely legitimate reasons. *See Terry Props.*, 799 F.2d at 1536; [Doc. 35, p. 7]. In *Terry Props.*, two Black business owners sued their city and private corporations under § 1985(3) for conspiring to deprive them of their right to equal protection guaranteed by the Fourteenth Amendment when the defendants (1) located an industrial plant adjacent to the plaintiffs' property on which they had built a residential development for the Black community and (2) consequently rerouted a road connecting to the plaintiffs' property. *Id*. at 1525–32. Defendants state that in *Terry Props.*, the site for the industrial plant was chosen because it was "the most attractive [ ] from a business perspective." *Id*. at 1535; [Doc. 35, p. 7]. However, Defendants failed to include the court's statement in *Terry Props.* that the record evidence showed

20

that the site was "the only feasible site." *Id*. In this case, the Hard Rock Stadium in Miami Gardens was *not* the only feasible site at which to hold F1 racing, as Downtown Miami was another viable option. [ ¶¶ 87–90]. Therefore, Defendants' reliance on *Terry Props.* does not support its argument that Defendants were justified in planning to hold F1 racing in Miami Gardens.

Moreover, Plaintiffs' Complaint alleges that, subsequent to the events in the mid-1980s that led to the *Lake Lucerne* decision, and the decision itself, Miami-Dade County *continued to discriminate* harshly against Black residents, including in in Miami Gardens, up through the current imposition of F1 racing against their well-expressed opposition and evidence of harms they would suffer.  A 1987 report found the county continuing to steer Black homebuyers and renters into segregated neighborhoods in violation of federal law.  [¶70].  Two independent 1992 studies found continuing discrimination against Black vendors in the awarding of county contracts.  [¶71]. In 1990 and 1993, U.S. District Judge Donald Graham found, and the Eleventh Circuit agreed, that Miami-Dade County's election system discriminated against Black voters on the basis of race in violation of Section 2 of the Voting Rights Act. The Courts found specifically that the County diluted the votes of Black voters in Miami Gardens, and struck down the County's racially discriminatory election system.   ¶¶72-74.  *Meek v. Metro-Dade Cty.,* 908 F.2d 1540 (11th Cir. 1990); *Meek v. Metro-Dade Cty*., 805 F.Supp. 967, 979-980 (S.D. Fla. 1992).  The County's effort to suppress the Black community's rights did not end there.

The County and the Dolphins organization "openly and aggressively opposed" persistently opposed Miami Gardens' residents' efforts to incorporate in the 1990s and early 2000s. [¶¶76-78]. And it did not end there.  Blacks in Miami-Dade County and Miami Gardens continued to endure persistently higher levels of unemployment, homelessness, and poverty in 2018 and 2019, [¶¶81-82].  The County disproportionately flagged mail-in ballots by Black voters for possible disqualification in the November 2020 elections. [¶75].  Miami-Dade County's actions reflect a deliberate indifference to the possibility that constitutional violations would result from these customs, policies, and practices. *C.F.C. v. Miami-Dade County*, 349 F.Supp.3d at 1253 (plaintiffs met the pleading requirement by alleging Miami-Dade County knew that its policy and/or practice would violate plaintiffs' constitutional rights). In light of these damning allegations on ongoing, systematic discrimination, Defendants' profession of unintentional racial discrimination rings hollow, and certainly cannot be resolved on a motion to dismiss.

**V.     DEFENDANT COUNTY AND MAYOR GIMENEZ BREACHED THEIR DUTY**

**TO PROTECT PUBLIC TRUST RESOURCES.**

Florida's "public trust doctrine" is a long-standing and essential part of Florida's common and constitutional law.  *Lee v. Williams*, 711 So. 2d 57, 60 (Fla. 5th DCA 1998) ("the public trust doctrine . . . is subject to judicial determination, at least where there is no contrary constitutional or legislative directive."); *see also Brickell v. Trammell*, 77 Fla. 544, 558, 82 So. 221, 226 (Fla. 1919) (finding the public trust doctrine traces to English common law and recognizing navigable waters and the lands thereunder as property of the state held in its sovereign capacity "for the use of all the people of the state for purposes of navigation, commerce, fishing, and other useful purposes afforded by the waters thereon.").

In Florida, the public trust doctrine has both common law and constitutional dimensions. For instance, the doctrine is partially enshrined in Article X, Section 11 of the Florida Constitution:

> The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.

*See also Coastal Petroleum Co. v. American Cyanamid Co.*, 492 So. 2d 339, 344 (Fla. 1986) (Art. X, §11 "is largely a constitutional codification of the public trust doctrine contained in our case law.").  Article X, Section 16 similarly reflects the constitutional recognition of public trust principles with respect to marine resources:  "The marine resources of the state of Florida belong to all of the people of the state and should be conserved and managed for the benefit of the state, its people, and future generations." The doctrine is also reflected in "the general policy power of the state to protect the public health, safety, and welfare," *Coastal Petroleum v. Chiles*, 701 So. 2d 619, 624 (Fla. 1st DCA 1997), and is considered a part of Florida's common law.  *Lee v. Williams*, 711 at 60; *see also Brickell v. Trammell*, 77 Fla. 544, 559 82 So. 221, 226 (Fla. 1919).

Courts have jurisdiction to hear and decide public trust cases, under the common law and as a constitutionally based and judicially enforced doctrine.  *Illinois Cent. R.R. v. Illionois*, 146 U.S. 387 (1892) (recognizing the public trust doctrine as part of common law).  In fact, Florida courts have resolved many public trust cases, and routinely require compliance with the doctrine's mandate that the public interest be protected in managing public trust resources. *See*, e.g., *Coastal Petroleum Co.*, 492 So. 2d 339; *Mariner Properties Dev. v. Bd. of Trustees of Internal Imp. Tr.*

*Fund*, 743 So. 2d 1121, 1122 (Fla. 1st DCA 1999); *Lee*, 711 So. 2d at 60. Plaintiffs, as beneficiaries of the public trust, retain the right to bring this action against the public trustees, Miami-Dade County and Mayor Gimenez, for failing to discharge their duties and causing impairment of public trust resources. *Walton County v. Stop Beach Renourishment*, Inc., 998 So. 2d 1102, 1114-15 (Fla. 2008) ("[T]he State has a constitutional duty to protect Florida's beaches, part of which it holds in trust for public use.").

Under the public trust doctrine, Florida "has an affirmative obligation to restrict or eliminate private activity on sovereign lands when such activity becomes contrary to the public interest. Article X, Section 11, Florida Constitution confirms this obligation.*" Coastal Petroleum*, 701 So. 2d at 624 (affirming the trial court); *Walton Cty.,* 998 So. 2d at 1110 ("the State has an obligation to conserve and protect Florida's beaches as important natural resources."); *id*. at 1110-11 (quoting Art. X, § 11, Fla. Const.) (describing the state's public trust duty as "a constitutional duty to protect Florida's beaches, part of which it holds 'in trust for all people.'"). Miami-Dade County's primary role in administering trust resources is to ensure that they are "devoted to the fulfillment of the purposes of the trust, to wit [sic]: the service of the people." *Hayes*, 91 So. 2d at 799.

Plaintiffs alleged Mayor Gimenez and Miami-Dade County have a duty to protect Florida's public trust resources; and they breached that duty when it reached an agreement with the Defendants to bring F1 racing, a dangerous event evidenced to cause harm to people and the environment, to Hard Rock Stadium. [ ¶¶ 40, 41, 149, 170, 171].

Defendants' attempt to *analogize In Coal. For Adequacy & Fairness in Sch. Funding, Inc. v. Chiles,* 680 So.2d 400 (Fla. 1996) to the present case under the guise of a separation of powers issue is misguided. [Doc. 35, p. 27]. Plaintiffs are not asking the Court "to subjectively evaluate the Legislature's value judgments . . . in order to grant the relief sought by Plaintiffs." *In Coal. For Adequacy & Fairness in Sch. Funding, Inc.,* 680 So.2d at 407. Rather, Plaintiffs allege a valid cause of action under the Public Trust Doctrine. [ ¶¶ 180-183]. Asserting that the Complaint is purely subjective ignores Plaintiff's allegations that the F1 Races will release significant carbon emissions into the atmosphere, causing avoidable damage to public trust resources. *Id*.

### A.  Florida's Public Trust Doctrine Should Be Extended to Protect the Atmosphere.

Plaintiffs acknowledge that no Florida court has yet explicitly extended the public trust doctrine to the atmosphere. Rather, Plaintiffs argue that such an extension is reasonable given the

purpose of the public trust doctrine and the facts presented in the Complaint. Various reasons justify extending Florida's public trust doctrine to the atmosphere.

First, such interpretation would be consistent with the logic of previous judicial decisions in which the public trust doctrine was extended to protect resources beyond submerged lands. For instance, Florida courts have applied the public trust doctrine to beaches (*Walton County*, 998 So. 2d at 1110-11 (Fla. 2008)); to the banks of rivers and creeks (*Teat v. City of Apalachicola*, 738 So.2d 413, 414 (Fla. 1999)); to state lands (*Coastal Petroleum*, 701 So. 2d at 625); and the ocean (*City of Daytona Beach v. Tona-Rama, Inc.*, 294 So. 2d 73, 75 (1974)).  The Florida Constitution similarly applies the doctrine to marine resources within the ocean. Art. X, § 16. The atmosphere is connected with and critical to the viability of each of these resources.

Second, ancient Roman and common law authority recognize that the air and atmosphere are included public trust resources within the County's sovereign trust, control, and ownership.  J. Inst. 2.1.1 (T. Sanders trans., 4th ed. 1867); 2 William Blackstone, 11 Commentaries on the Laws of England 4 (1766). The County has expressly asserted sovereign control over the air and atmosphere in Florida, Art. II, § 7(a), and must exert its control in a manner that likewise protects the resource for present and future generations. The County erroneously argues that Plaintiffs are asking the Court to infer a "private right of action," a seemingly favored argument of the Defendants, under Art. II, § 7, Fla. Const. [Doc. 35, p. 25-26]. Plaintiffs' Complaint contains no cause of action alleging violation of Article II, Section 7. Rather, Plaintiffs cite this provision as support for recognition of the atmosphere as a public trust resource. As we are in a global climate crisis, Plaintiffs are, and will continue to be, harmed by the County's reference to protection of natural resources as an "aspirational goal."

Third, there is ample historic support for treating the atmosphere as subject to the public trust doctrine.  The historic pedigree of the public trust doctrine dates back to Roman law; the Institutes of the Roman Emperor Justinian I declared in the sixth century that "[by] the law of nature, these things are common to mankind: the air, running water, the sea, and consequently, the shores of the sea." J. Inst. 2.1.1 (T. Sanders trans., 4th ed. 1867). Under Roman law, air, like running water, the sea and the shoreline, was in some respects the property of all and in others the property of nobody. *Sullivan v. Richardson*, 33 Fla. 1, 117 (1894), aff'd sub nom. *Richardson v. Louisville & N.R. Co.*, 169 U.S. 128 (1898).  The Florida Supreme Court cited to the Institutes of Justinian in its early public trust jurisprudence. *Geiger v. Filor*, 8 Fla. 325, 335-36 (1859). United

States jurisprudence traces the public trust doctrine from these ancient sources, through the English common law to inheritance by the Colonies and the United States. *See*, e.g., *PPL Montana, L.L.C. v. Montana*, 565 U.S. 576, 589-90 (2012).  Common law assigned everything that cannot be exclusively occupied and enjoyed to the sovereign. *Geiger*, 8 Fla. at 336 (citations omitted).  This rationale applies to the atmosphere: since it cannot be exclusively occupied, it belongs to the sovereign to manage and protect in trust for its citizens.

## VI.     PLAINTIFFS HAVE STANDING TO ENFORCE ORDINANCES.

It is well-established under Florida law that: "A private citizen may seek redress for a violation of a municipal ordinance where he or she proves special damages differing in kind from the damages suffered by the community as a whole." *Kagan v. West*, 677 So.2d 905, 908 (Fla. 4th DCA 1996), citing *Renard v. Dade County*, 261 So.2d 832, 837 (Fla. 1972) (An aggrieved or adversely affected person having standing to sue is a person who has a legally recognizable interest which is or will be affected by the action of the zoning authority in question.). Plaintiffs have standing under Counts IV and V because they have alleged that they will suffer injuries from the F1 races at Hard Rock Stadium that are different in kind than other residents due to Defendants' threatened noise ordinance violations.

In *Kagan*, the Court held that city residents had standing to sue neighbors with whom they shared a private road, who built a two-story cabana in violation of local building code setback and height restrictions. By virtue of sharing the private road, "the adjacent landowners allege special damages different from those suffered by the community as a whole." *Id.* at 906. In *Chapman v. Town of Redington Beach*, 282 So.3d 979 (Fla. 2d DCA 2019), the Court held two residents had standing to sue their neighbor over improvements that violated the Town's zoning ordinances and made their property "'materially less safe and materially less valuable.'"

> A private citizen has standing to enforce a valid municipal zoning ordinance only when special damages are alleged and proven. . . . In this instance special damages are any injury "peculiar to [the plaintiff] differing in kind as distinguished from damages differing in degree suffered by the community as a whole." . . . .

*Id.* at 982-83 (citations omitted).[3]

---

[3]  For a small sample of other "special injury" standing cases, *see Skaggs-Albertsons v. ABC Liquors, Inc.*, 363 So.2d 1082, 1086 (Fla. 1978)(grocery and liquor store in the same shopping plaza as another liquor store had standing to contest competitor's zoning violation); *Thompson v. Planning Comm'n of City of Jacksonville*, 464 So.2d 1231, 1236-37 (Fla. 1st DCA 1985)(neighbor had standing to challenge

Florida courts have applied the special injury rule to allow standing to enforce municipal ordinances since at least 1910, *Brown v. Florida Chatauqua Ass'n*, 59 Fla. 447, 451 (1910), yet Defendants fail to even mention the principle.  In *Mid-American Waste Systems of Florida, Inc., v. City of Jacksonville*, 596 So.2d 1187 (Fla. 1st DCA 1992), the Court held that a competing bidder had standing to challenge the city's violation of its ordinance prohibiting contracts with entities whose principals had been convicted of certain offences:  "As the second most responsible bidder, appellant has alleged an injury different in kind from the injury suffered by the community as a whole as a result of the alleged violation of the ordinance." The Court in *Mid-American* also rejected one of the Defendants' main arguments here, that the existence of an enforcement scheme within the City foreclosed the rights of a citizen who suffers special injury to seek enforcement of the law:

> The fact that the ordinance at issue contains provisions permitting imposition of a penal sanction against an officer or employee of the City for violation of the ordinance does not warrant a different result.  Similar to other competitive bidding statutes and ordinances, the goal appears to be protection of the public interest, the integrity of the competitive bidding process, and the rights of the individual bidder.  Accordingly, we conclude that appellant has standing to seek injunctive [and declaratory] relief.

596 So.2d at 1189.

Here, it is clear from the language of the County and City Noise Ordinances that the County and City intended the laws to both confer a public benefit and protect the general welfare of the public.  § 16-20, City Code ("This article is enacted to protect, preserve, and promote the health, safety, welfare, peace, and quiet of the residents of the city through the reduction, control, and

---

construction of office building with inadequate on-site parking facilities because it would burden plaintiff with overflow parking, unsightly clutter, and traffic);  *State ex rel. Gardner v. Sailboat Key, Inc*, 305 So.2d 616, 617-18 (Fla. 3d DCA 1974)(adjacent landowner had standing to challenge zoning violations that would obstruct the plaintiff's view and increase the risk of flooding); *Carroll v. City of West Palm Beach,* 276 So.2d 491, 492 (Fla. 4th DCA 1973)(adjacent property owner had standing to enjoin high voltage power lines in violation of zoning ordinance that reduced  usability value and salability of plaintiff's property).

In *Chapman*, the Court affirmed the trial court's dismissal of the town as a defendant, while holding the residents had standing to sue their neighbors.  In *Haver v. City of West Palm Beach, Inc*., 298 So.3d 647, 654 (Fla. 4th DCA 2020), the Court held the plaintiff could sue the city as well as the neighbors, and certified a conflict with *Chapman* and *Detournay v. City of Coral Gables*, 127 So.3d 869 (Fla. 2013)(under separation of powers, residents could not "require the City of Coral Gables to prosecute an enforcement action" for a zoning code violation).  The Supreme Court accepted jurisdiction of the case on October 9, 2020.  Case No. 20-1284.  The case does not concern the residents' standing to sue the non-governmental violators.

prevention of loud and raucous *noise*, or any *noise* which unreasonably disturbs, injures, or endangers the comfort, repose, health, peace, or safety of reasonable persons of ordinary sensitivity"). Plaintiffs have alleged their proximity to the proposed F1 racecourse puts them at risk of special injury, with ample evidence that the published noise levels of F1 racecars **will** cause them injury different in kind than the general public. [¶¶ 107,109, 249-251].

### A. Defendants' "Private Right of Action" Cases Are Inapposite Because They Involve Claims for Monetary Relief.

Defendants' argument that Plaintiffs lack standing because the Miami-Dade County and Miami Gardens Noise Ordinances "do not create a private right of action" is a red-herring. As the foregoing cases demonstrate, a resident who can allege and show special injury does not need a statutorily prescribed "private right of action" to challenge a local government's violation of its laws. Moreover, the "private right of action" cases cited by Defendants involve claims for money damages, which is not what Plaintiffs here are seeking. *Loftus v. Bobzien*, 848 F.3d 278 (4th Cir. 2017) (dismissing lawsuit by an assistant city attorney seeking "$6,000,000 in damages"); *Francois v. Caribbean Airmail, Inc*., 2002 WL 31465742, at *1 (S.D. Fla. June 18, 2002) (County removed "express provision for a private cause of action in employment discrimination actions" between the County's 1990 and 1997 versions of the law."); *Lawrence v. IMAGINE*, 333 F.Supp.2d 379 (D. Md. 2004)(suit for money damages for hearing loss from charter boat operator's discharge of a cannon); *Vaughn v. Segal*, 707 So.2d 951, 951-52 (Fla. 3d DCA 1998) ( "lawsuit against the adjacent property owner for damage caused by trees encroaching on plaintiff-appellant's property").

*City of Sarasota v. Windom*, 736 So.2d 741 (Fla. 2d DCA 1999), which Defendants cite, is instructive. The Court denied standing to two residents who sued to stop the city from erecting speed humps or speed tables, alleging they violated DOT requirements. The Court held that the statutory framework specifically authorized the Department of Transportation to adopt a system of traffic signals and devices *and* to direct their removal and did not provide a private cause of action for residents "to challenge an allegedly improper traffic device." *Id.* at 742. However, the Court *then* asked "whether standing derives from any other basis," and analyzed whether the plaintiffs had standing as a taxpayer: "[i]t has long been the rule in Florida that, in the absence of a constitutional challenge, a taxpayer may bring suit only upon a showing of special injury which is distinct from that suffered by other taxpayers." *Id.* at 743. The Court concluded that because

neither plaintiff was "required to traverse any of the speed humps or speed tables for normal ingress or egress to his residence," *id.* at 742, they did not "allege nor demonstrate a special injury." *Id.* at 743. In obvious contrast, Plaintiffs here have alleged special injury to confer standing, as the Court in *Windom* recognized was possible despite the absence of a statutory right of action.

Defendants also argue for dismissal of Counts IV and V because the County and City Codes provide for enforcement by code inspectors or law enforcement officers and do not "provide a private right of action." However, Defendants cite no case precluding a specially injured resident's access to court to enforce a code provision because the local government provides procedures for investigating and citing violations, establishing fines, and giving accused violators the right to a hearing and appeals. Moreover, the argument is improper on a motion to dismiss, and in any event contrary to relevant authorities.[4] *In re Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practice Litig*, 955 F. Supp.2d 1311, 1346, 1349 (S.D. Fla. 2013)((FTC's determination not to take enforcement action did not require dismissal of plaintiffs' consumer fraud claims; "every day courts decide whether conduct is misleading"); *Karhu v. Vital Pharmaceuticals, Inc*., No. 13-60768, 2013 WL 4047016, *5 (S.D. Fla. Aug. 9, 2013)("Determining whether a manufacturer has misled consumers is squarely within the judicial function, and does not require the special expertise of the FDA or the FTC.").

   **B.   The Stadium Zoning District Ordinance Does Not Permit F1 Racing on the Entire Proposed Hard Rock Stadium Track, Is Irrelevant for Purposes of Rule 12(b)(6), and by its Express Terms Would Not Preclude Application of the Zoning Ordinance.**

Defendants' pin their hopes on the demonstrably erroneous – and improper – argument that the Stadium Zoning Ordinance "precludes" Counts IV and V. [Doc. 35, p. at 31]. In addition to being improper on a motion to dismiss, the argument is repudiated by the terms of the ordinances themselves. As explained in detail in Plaintiffs' Judicial Notice Response at pages 8-9, the SZO

---

   [4]   As shown in Plaintiffs' Response to Defendants' Request for Judicial Notice in Support of Motion to Dismiss ("Judicial Notice Response"), *none of the ten (10)* extraneous Code provisions Defendants rely on are properly considered in a motion to dismiss under Rule 12(b)(6). *See, e.g., Legacy Entertainment Group, LLC v. Endemol USA Inc.,* 2015 WL 12838795, *4 (M.D. Fla. Oct. 1, 2015)("[T]he basis for Defendants' proposed facts are not central to Plaintiffs' claims . . . . The Court reviews the facts as alleged in the complaint on a motion to dismiss for failure to state a claim. Defendants' proposed facts are not yet facts of the case. Accordingly, the Court will not take judicial notice of Defendants' proposed facts pursuant to FRE 201."

does not permit racing in portions of the designated track in the Stadium Outer Sub-District without approval by the City of Miami Gardens, which has not occurred.  However, even if the zoning does permit auto racing, the Stadium Zoning Ordinance does not, *by its plain terms*, purport to nullify the County Noise Ordinance.  Subsection 33-451(2) provides: "Nothing herein shall create an exception to or otherwise vary any Countywide regulations that otherwise exist pursuant to the Code of Miami-Dade County."  The County Noise Ordinance Plaintiffs' Count IV alleges Defendants will violate, Section 21-28 of the Miami-Dade County Code, is a countywide regulation, so whatever zoning applies to racing at the stadium, it does not create an exception to the noise ordinance.  *See* Judicial Notice Response, at 9. With respect to Count V, the Miami Gardens Noise Ordinance, Section 16-24(a), expressly includes zoning as *only one of a number of factors to be weighed* in determining whether a sound is "unreasonably loud and raucous," and would present a factual issue if raised by Defendants in their answer and/or defenses or affirmative defenses.  *See* Judicial Notice Response, at 10.

## VII.  DEFENDANTS' DECLARATORY JUDGMENT AND SEPRARTION OF POWERS ARGUMENT CITES NO APPLICABLE AUTHORITY.

Defendants' Section H argues: "Separation of powers further militates against the Court exercising its ample discretion in favor of construing Plaintiffs' claims for declaratory relief," [Doc. 35, pp. 31-32]. However, Defendants' cases do not hold that Federal courts have complete discretion whether to exercise their jurisdiction under the Declaratory Judgment Act.  In each cited case, the declaratory judgment claim was duplicative of other claims that the Court did or would address, negating the need for a declaratory judgment.  *Organo Gold Int'l, Nc., vu Aussie Rules Marine Services, Ltd*., 416 F.Supp.3d 1369, 1376-77 (S.D. Fla. 2019) ("whether Plaintiff properly terminated the Agreements will necessarily be determined by both the breach of contract claim and counterclaim, and the declaratory judgment count serves no useful purpose."); *ABC University Shops, LLC v. Scottsdale Ins. Co*., 2018 WL 6271839 (S.D. Fla. Oct. 18, 2018) (dismissing declaratory action which in effect sought adjudication on the merits of a breach of contract claim); *Ministerio Evangelistico Int'l v. United Specialty Ins. Co.*, 2017 WL 1363344, at *1 (S.D. Fla. Apr. 5, 2017) ("'[a] court must dismiss a claim for declaratory judgment if it is duplicative of a claim for breach of contract).

Plaintiffs' Complaint is precisely the kind of case for which Congress enacted the Declaratory Judgment Act.  *Regency of Palm Beach, Inc. v. QBE Ins. Corp.*, 2009 WL 2729954,

at *4 (S.D. Fla. Aug. 25, 2009) ("The point of a declaratory judgment is to permit 'actual controversies to be settled before they ripen into violations of law,' not to adjudicate past conduct."). If Defendants are making a variation on their "ripeness" argument, i.e., suggesting that the Court should stay its hand until the track is built, engines rev, and Plaintiffs lose their ability to hear, the argument falls under its own weight. *Baldwin v. Morgan*, 251 F.2d 780, 784 (5ᵗʰ Cir. 1958) (where an equal protection violation is alleged, "redress should be afforded the complainants …without the necessity of precipitating an incident.").

Defendants' separation of powers claim carries no greater weight. They cite no authority for the proposition that "separation of powers" limits this Court's ability to adjudicate Plaintiffs' claims. It is an excuse for unaccountable exercise of local government power and has been rightly rejected.  In *Hawkins v. Town of Shaw, Mississippi*, 437 F.2d 1286, 1292 (5th Cir. 1971), *aff'd en banc* 461 F.2d 1171 (5th Cir. 1972), the Court rejected the town's argument that even if municipal services had been allocated in a discriminatory manner, "the correction of this problem is not a judicial function:"

> The separation of powers principle assumes that we have a system of checks and balances.  In Madisonian terms, each department or power center is to act as a curb on the other departments or centers.  Indeed, "unless these departments be so far connected and blended, as to give to each a constitutional control over the others, the degree of separation which the maxim requires as essential to a free government, can never in practice, be duly maintained."  Madison, The Federalist, No. 48.  Utilizing the power vested in this court to check an abuse of state of municipal power is, in effect consistent with the separation of powers principle.

Defendants do not advance a serious "separation of powers" argument, but in light of the foregoing authorities, and many others, the suggestion lacks any merit.  *See, e.g.*, *State ex rel. Lake Hamilton Lakeshore Owners Ass'n, Inc. v. Neidlinger*, 182 So.3d 738, 741 (Fla. 2ⁿᵈ DCA 2015) (activity "may constitute a judicially recognized nuisance even if such activity is authorized by statute, regulation, or ordinance").

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request this Court to deny Defendants' Motion to Dismiss, or if the Court deems any count to be subject to dismissal, to allow leave to amend.

Dated:  March 29, 2021                    Respectfully submitted,

DUBBIN & KRAVETZ, LLP
Samuel J. Dubbin, P.A.
Florida Bar No. 328189
1200 Anastasia Avenue, Ste. 300
Coral Gables, Florida 33134
Office Phone: (305) 357-9004
Cell Phone:  (305 815-8060
Email:  sdubbin@dubbinkravetz.com

By: /s/ Samuel J. Dubbin, P.A.
         Samuel J. Dubbin, P.A.


*Counsel for Plaintiffs Betty Ferguson, et al.*