UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-24483-SCOLA-GOODMAN

BETTY T. FERGUSON, *et al.,*
    Plaintiffs,
v.

MIAMI DOLPHINS, LTD., *et al.,*
    Defendants.
_____/

## **REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

Pursuant to Federal Rule 12(b), Defendants[1] file this Reply in support of their Motion to Dismiss (the "Motion") [ECF No. 35] Plaintiffs' Complaint ("Complaint" or "Compl.") [ECF 1], and state:

### I.    INTRODUCTION

Plaintiffs ask the Court to draw the extraordinary inference that the reason for holding a Formula 1 Grand Prix at Hard Rock Stadium in Miami Gardens (the "Miami Grand Prix") is to discriminate against African Americans. Plaintiffs' sensational and conclusory assertion that sophisticated commercial enterprises, who are in the business of hosting world-class sporting events,[2] selected the location of this prestigious event for racially discriminatory reasons defies common sense and cannot withstand dismissal.

Plaintiffs concede they have no constitutional right to be free from the externalities of "mega events." (Opposition ("Opp.") [ECF 44] at 18). But that is the exact relief they seek. In this regard, Plaintiffs allege that their constitutional rights have been violated because certain Defendants attempted to plan a Grand Prix in downtown Miami's Bayfront Park, but when that plan failed, set the race at Hard Rock Stadium (the "Stadium"), instead. The logistical, operational, regulatory, and financial benefits of holding the race at the Stadium, a facility and

---

[1] Miami Dolphins, Ltd., South Florida Stadium LLC, RSE Ventures, LLC, Liberty Media Corporation, Formula One Management Limited, Formula One World Championship Limited, Miami-Dade County, Florida ("County"), and Mayor Gimenez (collectively, "Defendants").

[2] The relevant Defendants include the operator of Hard Rock Stadium, who naturally wants the Miami Grand Prix to be held at its property instead of another location in the county, and entities associated with Formula 1, who are obviously motivated to hold races at commercially viable locations.

1

grounds that are zoned for sporting events—and for automotive racing, specifically—as opposed to through the crowded city streets of downtown Miami, are evident from Plaintiffs' own allegations. So, too, are the significant physical, race-neutral differences between the two sites. *See* Compl. ¶¶ 150, 180. Contrary to Plaintiffs' assertions, the purpose of the Equal Protection Clause is not to confer a cause of action on local residents anytime a large-scale motorsport event is planned in their neighborhood instead of another potential location that was previously considered.

Further, Plaintiffs lack standing to challenge Defendants' future compliance with the noise ordinances of the County (the "County Noise Ordinance") or Miami Gardens (the "City Noise Ordinance," and together, the "Noise Ordinances"), which do not allow for private enforcement actions. Plaintiffs urge this Court to apply the "special damages" rule, which is only applicable in the *zoning* context, to confer standing to enforce the Noise Ordinances, but Plaintiffs' allegations reveal that they cannot satisfy that standard, in any event.

While pleading standards may be liberal, Plaintiffs' theories are devoid of factual support and fly in the face of logic and reason. This Court should not exercise its discretion under the Declaratory Judgment Act to entertain claims that are completely lacking in factual and logical basis and which Plaintiffs lack standing to assert. Accordingly, the Complaint, in its entirety, should be dismissed with prejudice.

## II. ARGUMENT

### A. PLAINTIFFS FAIL TO MEANINGFULLY DISTINGUISH *LAKE LUCERNE*

This Court has already considered and rejected the theory that allegedly disparate impacts from activities at the Stadium can serve as the basis of § 1983 and § 1985 claims. *Lake Lucerne Civic Ass'n, Inc. v. Dolphin Stadium Corp.*, 801 F. Supp. 684 (S.D. Fla. 1992); *see* Motion at 6–7. Plaintiffs suggest the Court should reach a different result in this case solely because the decision to hold the Miami Grand Prix at the Stadium allegedly occurred after downtown Miami was abandoned as a potential site, whereas *Lake Lucerne* is silent as to any prior attempt to locate the Stadium in a predominantly white neighborhood. *See* Opp. at 19. This non-sequitur is insufficient to nudge Plaintiffs' far-fetched and conclusory allegations of race-based discriminatory animus across the line from inconceivable to plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

Plaintiffs admit that they have no "constitutional right to be free from harmful effects of mega-events." Opp. at 18. And yet, they argue that the fact that an (allegedly) "predominantly white community"[3] was spared such effects, while Plaintiffs may not be, somehow *does* give rise to a constitutional violation. *Id.* Ultimately, Plaintiffs contend that lawful conduct becomes unlawful and intentionally discriminatory simply because it happens to occur in their neighborhood. As set forth more fully in Section C below, this is incorrect. *See, e.g.*, *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 925 (5th Cir. 1977) ("there can only be a deprivation of the rights of a plaintiff when the action of the defendants is otherwise illegal.").

It is axiomatic that Defendant South Florida Stadium, LLC, who "operates the Hard Rock Stadium," (Compl. ¶ 24) is commercially motivated to have the Miami Grand Prix at the Stadium (which is zoned for automotive racing), instead of elsewhere. The suggestion that sophisticated private organizations in the business of hosting and sponsoring world-class sporting events would decide where to hold a marquee event with the goal of discriminating against one racial group is patently absurd.[4] Just as in *Lake Lucerne*, Plaintiffs have not pled any facts to support a plausible inference that certain Defendants' efforts to facilitate the Miami Grand Prix at the Stadium were designed to deprive Plaintiffs of any constitutionally guaranteed right. Accordingly, as in *Lake Lucerne*, the Court should dismiss Plaintiffs' § 1983 and § 1985 claims.

Plaintiffs also argue that in the years since *Lake Lucerne*, "Blacks in Miami-Dade County [an area which encompasses Bayfront Park in Downtown] and Miami Gardens continued to endure persistently higher levels of unemployment, homelessness and poverty" and vote dilution. Opp. at 21. These allegations bear no relation whatsoever to the Miami Grand Prix,[5] and thus cannot serve as a basis to infer the existence of a conspiracy.

**B. COUNT I, UNDER 42 U.S.C. § 1983, FAILS TO STATE A CLAIM.**
   **1. Plaintiffs' Allegations Relating to Mayor Gimenez Fail to Establish Official Policy by a final policymaker.**

Count I purports to state a claim against the County for alleged violations of 42 U.S.C. §

---

[3] Plaintiffs do not allege a factual basis for their conclusory assertion that downtown Miami, a racially and ethnically diverse area, is predominately white.

[4] Defendants vehemently reject Plaintiffs' insinuation that Defendants have "profess[ed] unintentional racial discrimination[.]" Opp. at 21. To the contrary, Defendants categorically deny ***any*** racial discrimination—intentional or unintentional.

[5] Nor do these allegations bear any relation to the private Defendants, at all.

3

1983.[6] The allegations relating to the Mayor are insufficient to establish the requisite "official policy by a final policymaker" because "any agreement between the County and any of the Defendants would require approval by the County's governing body—the Board of County Commissioners." Motion at 16. In response, Plaintiffs claim that Mayor Gimenez serves as a final policymaker because he "holds veto power over the Board of County Commissioners and other executive powers, and by wielding these powers Mayor Gimenez is capable of creating policy, and did so here." Opp. at 6. Plaintiffs further allege that he "used his executive authority to advance the Dolphins-F1 agreement." *Id*. These allegations, however, are unavailing. *See* Compl. ¶¶ 102–104, 106, 130, 143, 145–147, 152, 190–196.

First, contrary to Plaintiffs' conclusory assertions, the Mayor's veto authority does not vest him with final policymaking authority for purposes of municipal liability. In fact, the Eleventh Circuit has previously held otherwise. In *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637–38 (11th Cir. 1991), the Eleventh Circuit expressly determined that a mayoral veto did not establish final policy for a municipality on a planning and zoning matter because, like here, "[t]he city council had the power to override [the mayor's] veto…." *See also* Compl. ¶ 145 (recognizing that the County Commission had similar authority to override the Mayor's veto).

Second, Plaintiffs' argument that the Mayor "used his executive authority to ***advance*** the Dolphins-F1 agreement," Opp. at 6 (emphasis added), does not establish that the Mayor has any kind of final-policy making authority in this area or that the alleged conduct constitutes ***final*** policy. Nowhere among the 17 numbered-paragraphs that Plaintiffs cite in their Opposition is there any allegation that either (a) an agreement between Miami-Dade County and any of the other Defendants has ever been approved by the County Commission or (b) the County Commission has delegated the final approval of any agreement to the Mayor. *See, e.g.*, Compl. ¶ 104 (describing only "draft negotiations").

In fact, the material attached to the Complaint dooms Plaintiffs' claim. In Resolution R-518-18, the County Commission only directed the Mayor to "negotiate an agreement with the appropriate entity for hosting of Formula One racing events in Miami-Dade County." Compl. Ex. 1. More importantly for purposes of this suit, however, the Resolution also directed the Mayor to "present said agreement to [the County Commission] on or before July 1, 2018" for its potential approval. *Id*.; *see also* Compl. ¶ 120 (admitting that any agreement "required approval by the

---

[6] Plaintiffs have agreed to "remove Mayor Gimenez as a named Defendant." *See* Opp. at 10 n.1.

4

County"). Because the Complaint is devoid of any allegation that an agreement was ever presented to and approved by the County Commission, Plaintiffs fail to allege any facts showing that the Mayor has final policymaking authority with respect to the disputed actions and decisions.

### 2. Plaintiffs Also Fail to Allege Any Harm Caused by an Official Policy, Custom, or Practice of the County.

To assert a municipal liability claim, plaintiffs must also properly allege that they were harmed by an "act[] officially sanctioned or ordered by the municipality." *Bannum, Inc. v. City of Ft. Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990). Plaintiffs contend that they have "clearly identif[ied] official policies, customs, and practices of the County that deprived Plaintiffs of their constitutional rights" and cite to a collection of 89 numbered paragraphs in their Complaint as support. Opp. at 7. While high on volume, these allegations are devoid of relevance for the municipal liability claim.

First, many of Plaintiffs' allegations concern the actions taken by other municipalities or other individuals, which certainly cannot form the basis for liability against the County. *See, e.g.*, Compl. ¶¶ 90, 96–97, 99 (allegations concerning the City of Miami); 92–93, 98, 114–15, 132–35, 141, 149 (allegations concerning residents); 87, 89, 113, 116, 119–20, 126, 142, 150–51, 153 (allegations concerning other Defendants); 122–25, 127–28, 136-39 (allegations concerning the City of Miami Gardens). Second, the allegations that reference the County deal exclusively with conduct that, as a matter of law, cannot establish an official County policy (i.e., negotiations that remain on-going, agreements that have yet to be approved, legislation that has not been adopted, or actions by a non-final policymaker). *See, e.g.*, *Id.* ¶¶ 88, 91, 100, 102–106, 108–112, 117–118, 121, 129–31, 140, 143–48, 152, 154–56. Indeed, the Complaint is devoid of a single allegation of a final act or official policy decision approved by the County that, even if assumed to be true, would be the moving force behind the patently speculative harms alleged.

### 3. Miami-Dade County Did Not Violate Plaintiffs' Right to Equal Protection.

To establish an Equal Protection claim, Plaintiffs must show that they have been treated differently from other similarly situated entities. *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). And, those "other similarly situated entities—or comparators—must be alike in all material respects…. In other words, a plaintiff and its comparators must be sufficiently similar, in an objective sense, such that they cannot reasonably be distinguished."

*Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade County Florida,* 2021 WL 230181, at 10 (S.D. Fla. Jan. 22, 2021) (cleaned up).

Here, Plaintiffs contend that "the two proposed race locations, Bayfront Park in Downtown Miami and Hard Rock Stadium in Miami Gardens, are similarly situated" and list various surface-level similarities that exist between the two locations. *See* Opp. at 11 (*e.g*, both venues would "drive economic value to Miami-Dade County" and allegedly "bring extreme noise, air pollution, and traffic to residential areas"). But, jurisprudence does not state that comparators be similarly situated in the respects that Plaintiffs selectively identified. Instead, prevailing precedent demands that comparators be similarly situated in all ***material*** respects.

The Complaint makes clear that this standard cannot be met. For example, Plaintiffs' Opposition ignores the fact that the proposed race in Miami Gardens would occur almost exclusively within the grounds of the Stadium property—a venue specifically designed and zoned for hosting sporting events—and would not require Miami Gardens' street closures. Compl. ¶ 150. Conversely, as Plaintiffs acknowledge, the proposed race in the City of Miami would have occurred on city streets "through Downtown Miami in Bayfront Park and the Port of Miami near the city's restaurants, shops, and residential districts." *Id*. ¶ 87. This fact alone readily distinguishes the two proposed locations.[7] Accordingly, Count 1 should be dismissed for failure to state an Equal Protection claim against the County.

## C. COUNT II, UNDER 42 U.S.C. § 1985(3), FAILS TO STATE A CLAIM.

Count II purports to state a claim against all Defendants for alleged violations of 42 U.S.C. § 1985(3). Plaintiffs contend that they have stated a claim because they make the conclusory (and ludicrous) statement that Defendants' decision to hold an automotive race at the Stadium rather than downtown was racially motivated. This assertion is factually unsupported and facially implausible. The law is clear that "[o]nly a complaint that states a ***plausible*** claim for relief survives a motion to dismiss." *Ashcroft*, 556 U.S. at 679 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (emphasis added).

---

[7] Aside from the material differences with respect to road closures, Plaintiffs' effort to equate Downtown Miami and Hard Rock Stadium as materially similar venues for a major sporting event also ignores the general and obvious differences that exist between the center and most densely populated area within our urban core, on the one hand, and a football stadium located in a suburban corner of the County, on the other.

Plaintiffs have done nothing more than cobble together innocuous facts and attempt to stretch them to say that Defendants' intent in hosting a race at the Stadium is for the purpose of discriminating, a far cry from any well-pleaded factual allegations supporting the necessary elements of a § 1985(3) claim. Plaintiffs have not pled (1) a conspiracy, (2) for the purpose of directly or indirectly depriving any person or class or persons of equal protection of the laws, or equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See Childree v. UAP/GA Chem, Inc.*, 92 F.3d 1140, 1146–47 (11th Cir. 1996) (citing *Lucero v. Operation Rescue*, 954 F.2d 624, 627 (11th Cir. 1992).

First, Plaintiffs failed to allege that Defendants[8] reached an agreement or understanding to violate Plaintiffs' constitutional rights. *See Montford v. Moreno*, 2005 WL 1369563, at *8 (11th Cir. June 9, 2005). Plaintiffs instead allege that Defendants reached an agreement to "bring F1 racing to Miami Gardens" and "participated in the conspiracy to hold F1 racing there." *See* Opp. at 13–14 (citing Compl. ¶¶ 100–102; 25). An allegation that certain Defendants agreed to host the world's most prestigious motorsporting event at the region's premier stadium is *not* the same as an allegation that Defendants agreed to violate Plaintiffs' constitutional rights. Plaintiffs do not, and cannot, make that allegation.

Next, Plaintiffs failed to plead the requisite intent—i.e., that Defendants conspired *for the purpose of* depriving African Americans of their constitutional rights. *See Childree*, 92 F.3d at 1146–47. It does not suffice that a protected right be incidentally affected—it must be a "conscious objective" of the enterprise to impair Plaintiffs' rights. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993). This requires Plaintiffs to plead that Defendants had "invidiously discriminatory animus" in choosing to hold an automotive race at the Stadium. *Lucero*, 954 F.2d at 628. "[I]nvidiously discriminatory animus" "requires that the defendant have taken his action 'at least in part ***'because of,' not merely 'in spite of,'*** its adverse effects upon an identifiable group." *Bray*, 506 U.S. at 275–76 (emphasis added).

Here, Plaintiffs allege that Defendants "muscled forward with their plan to hold the races in Miami Gardens" despite knowing the health risks and other harms the race could pose. *See* Opp. at 15 (citing Compl. ¶¶ 92–120). But, Plaintiffs simply do not—and cannot—allege that

---

[8] Plaintiffs concede that if the County (the "public actor") is not a member of any alleged conspiracy, Plaintiffs' § 1983 and § 1985 claims fail. *See* Opp. at 18–19.

Defendants chose to have the race in Miami Gardens in order to harm African Americans. Thus, Plaintiffs have failed to plead the necessary "invidiously discriminatory animus" required to establish the second element of a § 1985(3) claim.

Plaintiffs' request to engage in discovery in order to "uncover" discriminatory intent is a glaring indication that Plaintiffs' claims are baseless and must be dismissed. *See* Opp. at 16. Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79; *see also Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006) ("[T]he discovery rules do not permit the appellants to go on a fishing expedition.").

As to the third element, Plaintiffs argue that Defendants' continued planning for the race is an act in furtherance of a conspiracy to deprive them of their constitutional rights. *See* Opp. at 16. But Plaintiffs concede that, in response to local residents' concerns, Defendants confined the track plan to Stadium grounds, eliminating the need to close any County or City streets—which would have been necessary in Downtown Miami—and adjusted the race schedule so that no racing will occur during school hours. *See id.* (citing Compl. ¶ 150). That is the exact opposite of taking overt acts in furtherance of a conspiracy to violate civil rights.

Lastly, Plaintiffs cannot plead the fourth element of § 1985(3) (harm or deprivation of right) because they have not suffered any injury. It is undisputed that a race has not yet occurred. Any alleged harm at this point is purely speculative. Plaintiffs attempt to make an end-run around this insurmountable fact, arguing that Defendants "already violated Plaintiffs' rights to equal protection by choosing to harm a predominantly Black community" rather than a predominantly white community. *See* Opp. at 18. It defies common sense—and offends notions of plausibility—to suggest that holding an automotive race at a stadium zoned for automotive racing, rather than through a crowded urban center, violates the Equal Protection Clause, or that Defendants planned the race for the purpose of exposing Black residents to a parade of purported (but entirely speculative) horribles, or to hinder their quality of life.[9]

Moreover, and perhaps most importantly, Plaintiffs fail to explain how Defendants' conduct in planning to hold an automotive race in a sporting venue zoned for racing is illegal. *See McLellan*, 545 F.2d at 925 ("[T]here can only be a deprivation of the rights of a plaintiff

---

[9] On top of these fatal pleading deficiencies, Counts I and II also fail as to the Association Plaintiffs because the Complaint is silent as to the racial composition of their members, so as to support an inference that their members belong to a constitutionally protected class.

when the action of the defendants is otherwise illegal."). Indeed, "[s]ection 1985(3) redresses deprivations of the protection of the laws, and one is only deprived of the protection of the laws when the laws themselves have been violated." *See id.* at 927. Plaintiffs attempt to satisfy this requirement by claiming Defendants violated the Equal Protection Clause of the Fourteenth Amendment.[10] *See* Opp. at 17. Plaintiffs' attempt at truth-by-assertion falls flat. An Equal Protection claim comes with its own series of elements. Unless and until Plaintiffs successfully plead and prove those elements, their § 1985(3) claim must necessarily fail. As described above, Plaintiffs do not and cannot plead a claim under § 1985(3), and Count II should, therefore, be dismissed with prejudice.

### D. COUNT III, UNDER THE PUBLIC TRUST DOCTRINE, FAILS TO STATE A CLAIM.

Plaintiffs' claim against the County under Florida's public trust doctrine must be dismissed because this doctrine "relate[s] exclusively to navigable waters" and the lands thereunder. Motion at 25. Plaintiffs' Opposition does little more than restate general holdings from state courts that have applied this doctrine exclusively in its intended context. Opp. at 22–23. Nothing in those cases supports the misapplication of the doctrine that Plaintiffs propose.

First, the proposed race location lies almost exclusively on land managed by a private company for its stadium operations, *see* Compl. ¶ 21, 24; this property is not on navigable waters, which are held "for the use of all the people of the state for purposes of navigation, commerce, fishing, and other useful purposes afforded by the waters thereon." *Brickell v. Trammell*, 82 So. 221, 226 (Fla. 1919). Second, the very cases that Plaintiffs cite recognize that this doctrine is limited to navigable waters and the lands thereunder. In *Lee v. Williams*, 711 So. 2d 57, 62 (Fla. 5th DCA 1998), the Fifth District declined to extend the doctrine in a case involving nonnavigable tidelands (recognizing that "[n]o Florida supreme court case has actually held a nonnavigable tideland to be sovereignty land [subject to the public trust doctrine], however, and *Clement* [*v. Watson*, 58 So. 25 (1925)] has expressly held that they are not"). Third, even if these arguments were set aside, Plaintiffs would still lack standing to raise their claim because none of the cases that Plaintiffs cite in their Opposition involve a member of the

---

[10] Plaintiffs also state that they are not required to allege Defendants violated their right to equal protection of a specific law. *See* Opp. at 17. None of the three decisions that Plaintiffs cite stands for that proposition.

public suing the government on a claim that the government has not done enough to protect the State's natural resources.[11]

Although Plaintiffs implicitly concede that they have no state law precedent in support of expanding Florida's public trust doctrine to this context (Opp. at 23), they nevertheless argue that this Federal Court should set new state law precedent based on "ancient Roman and common law authority…," *Id.* at 24. However, the Fifth District's holding in *Lee*, which rejected a general expansion of the public trust doctrine, and the State Circuit Court's decision in *Reynolds v. State of Fla.,* 2020 WL 3410846 (Fla. Cir. Ct. June 10, 2020), which rejected an analogous expansion, compel this Court to dismiss this claim. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as matter of comity and to promote justice between the parties, by procuring them a surer-footed reading of applicable law."); *McMahan v. Toto*, 311 F.3d 1077, 1079 (noting that "when [federal courts] write to a state law issue, [federal courts] write in faint and disappearing ink.").

### E. COUNTS IV AND V, UNDER THE NOISE ORDINANCES, FAIL TO STATE A CLAIM.
#### 1. The "No Private Right of Action" Case Law Applies Equally to Claims for Declaratory and Injunctive Relief.

Counts IV and V purport to state claims for alleged violations of the County and City Noise Ordinances, respectively, against unspecified Defendants. Defendants' Motion (p. 28–31) cites a substantial body of case law, from Florida and beyond, holding that where a local ordinance or statute establishes a comprehensive enforcement scheme or delegates enforcement to specified officials, as the County and City Noise Ordinances do, courts do not have jurisdiction to infer a private right of action. Plaintiffs urge this Court to disregard those authorities, incorrectly claiming that they address only claims for money damages. On the contrary, consistent with the cases seeking money damages, in both *Loftus v. Bobzien*, 848 F.3d 278, 284 (4th Cir. 2017) and *City of Sarasota v. Windom*, 736 So. 2d 741, 742 (Fla. 2d DCA 1999), the courts held that the plaintiffs lacked standing to seek declaratory and/or injunctive relief under the applicable legislation because that legislation was silent as to any private cause

---

[11]Even if the standing concerns were ignored, such a claim, if allowed to proceed, would also raise questions of sovereign immunity. *See Wallace v. Dean*, 3 So.3d 1035, 1053 (Fla. 2009) (recognizing "that the separation-of-powers provision present in article II, section 3 of the Florida Constitution requires that certain quasi-legislative policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability") (cleaned up).

of action. And, in *Windom*, plaintiff's claim further failed because enforcement was vested in the Department of Transportation. *Windom*, 736 So. 2d at 742.

In the remaining cases Defendants cite,[12] the courts did not distinguish between private rights of action for money damages versus equitable relief, and their decisions were not guided by any such purported distinction. Instead, the clear policy driving the holdings in all these cases is that where the legislature provided for enforcement to occur through specific procedures or officials, private individuals should not be permitted to circumvent the legislatively prescribed procedures and take matters into their own hands via the judiciary. *See, e.g.*, *Francois*, 2002 WL 31465742, at *1 (holding that "extensive administrative scheme" provided by County Code precluded a private right of action because it was "the only remedy that Miami-Dade County provided. . . . Had the County intended a judicial remedy in addition to the administrative one, it would have so expressly stated."); *Betancourt*, 2019 WL 2119611, at *4. This policy is grounded in the doctrine of separation of powers which is at the heart of the present case and militates in favor of dismissal of the Complaint, in its entirety. *See* Motion at 32–33. *See Loftus*, 848 F.3d at 291 ("Absent clear and specific evidence of legislative intent, if a federal court creates a private right of action in a state law it abrogates both the prerogatives of the political branches and the obvious authority of states to sculpt the content of state law.") (cleaned up).

As Plaintiffs correctly assert, the Noise Ordinances were intended "to confer a public benefit and protect the general welfare of the public." Opp. at 26. As such, the Noise Ordinances cannot be preemptively enforced by a handful of private citizens who speculate that noise violations may potentially occur in the future. Rather, enforcement of these Code provisions must be left to the public officials authorized by their respective government bodies to undertake such actions, *if* such violations ever occur. *See Lawrence*, 333 F. Supp. 2d at 389 (holding that inferring private causes of action under legislation intended to confer a benefit upon the general public and which contains its own enforcement scheme "runs the risk of creating 'conflicting rules, interpretations, and practices that would ultimately hinder the enforcement' of regulatory provisions like the noise regulation scheme at issue here.").

---

[12] *Betancourt v. Margaritaville Hollywood, Beach Resort, L.P.*, 2019 WL 2119611 (S.D. Fla. Mar. 29, 2019); *Francois v. Caribbean Airmail, Inc.*, 2002 WL 31465742 (S.D. Fla. June 18, 2002); *Lawrence v. IMAGINE*, 333 F. Supp. 2d 379 (D. Md. 2004); *Vaughn v. Segal*, 707 So.2d 951 (Fla. 3d DCA 1998); *Cunningham v. Pinellas Cty. Sheriff's Dep't*, 2000 WL 641601 (M.D. Fla. Feb. 29, 2000).

### 2. The "Special Damages" Rule Does Not Apply Here, and Plaintiffs Cannot Satisfy that Standard, Anyway.

Unable to legitimately distinguish the "no private right of action" cases, Plaintiffs argue (without supporting factual allegations) that they have standing because they face "special injury" and "special damages" (Opp. at 25, 27); i.e., the Miami Grand Prix will cause them damages that differ in kind, not just degree, from those suffered by the rest of the community. *See Skaggs-Albertson's v. ABC Liquors, Inc.*, 363 So. 2d 1082, 1086 (Fla. 1978); *Chapman v. Town of Redington Beach*, 282 So. 3d 979, 982–85 (Fla. 2d DCA 2019). The "special damages" rule can, under very limited circumstances, confer standing upon a private citizen only to enforce a **zoning** ordinance. *See Chapman*, 282 So. 3d at 985. But Plaintiffs do not seek relief under a zoning ordinance. Critically, no Florida authority supports the extension of the "special damages" rule to the context of a **noise** ordinance that contains its own enforcement scheme. This Court should not be the first to do so.

Further, even if this Court were to expand the "special damages" rule to the noise ordinance context, Plaintiffs' generic and conclusory allegations are woefully inadequate to meet that standard. Plaintiffs allege that the Stadium is "***surrounded by*** and located in close proximity to, a ***plethora*** of single family homes and some small businesses[,]" all of whom face the same alleged impacts. Compl. ¶ 122 (emphasis added). Indeed, Plaintiffs allege that the noise from the race will impact "thousands of other residents" (*id.* ¶ 172) and the "entire community" (*id.* ¶ 12).

The number of Plaintiffs and the significant variances in their respective distances from the Stadium alone, belie the notion that any one of them faces "special damages." Indeed, Plaintiffs have not even alleged that they are the residents who live closest to the track. For example, the Complaint alleges that Plaintiff Betty T. Ferguson lives within two miles of the Stadium. *Id.* ¶ 7. Meanwhile, Plaintiffs allege that some unspecified residents purportedly live 95 meters from the track. Compl. ¶ 178. They further allege that 18 houses of worship are also located within a two mile radius of the Stadium, and that all residents within a 2.5 mile radius of the Stadium will experience unspecified excessive noise levels. *Id.* ¶¶ 168, 178. These allegations negate the possibility that Plaintiffs can satisfy the strict "special damages" standard.

*Chapman v. Town of Redington Beach*, 282 So. 3d 979, 985 (Fla. 2d DCA 2019) demonstrates Plaintiffs' failure and inability to plead special damages here. In *Chapman*, the plaintiffs sued their neighbor for erecting improvements on his property in violation of a local

zoning ordinance. *Id*. The Court held that because the plaintiffs were the defendant's only neighbors they sufficiently alleged special damages in the form of a traffic hazard unique to plaintiffs and diminution in their property value alone. *Id.*

In reaching its conclusion, the court provided the illuminating hypothetical of a small community of homes arrayed in a W-shape on the water. *Id.* If the house at the point of the W built a house higher and wider than allowed by the applicable zoning ordinances, the owner of the lot directly behind the violation might have special damages sufficient to confer standing, while the rest of the community would not. *Id.* While "[a]ll members of this community might have their water views impaired. . . the owner of the lot directly behind the new house will by virtue of the magnitude of the new construction have his or her water view totally occluded." *Id.* In stark contrast, Plaintiffs' own allegations reveal that they are not uniquely positioned relative to the Stadium when compared to thousands of other Miami Gardens residents, and they face no threat of special damages as a consequence of automotive racing-related noise.

The participation of two homeowners' associations and one civic association as Plaintiffs eviscerates the assertion that they will all suffer "special damages." Plaintiffs cannot allege that the Associations Plaintiffs face "special damages," but simultaneously have a "common interest" of their members in the relief sought, so as to confer HOA standing under Fla. Stat. 720.303. These two concepts are inherently irreconcilable. At best, certain individual members of the Associations might be akin to the lot owners further away from the point of the W in the *Chapman* hypothetical, who still would not have standing to enforce the applicable ordinance. *See Chapman*, 282 So. 3d at 985. But the Complaint lacks any allegations to support even that inadequate level of potential harm. Other than providing the address for one Lake Lucerne Civic Association member, Susan Smith (Compl. ¶ 10), Plaintiffs allege *nothing* about the Associations Plaintiffs' members' respective distances from the proposed race track.

Accordingly, even if this Court were to elect to be the first in Florida to create a private cause of action to preemptively enforce the Noise Ordinances, Plaintiffs have failed to plead adequate facts to infer that they face special noise-related damages that would confer standing. *See id.* ¶ 242; *See Chapman,* 282 So. 3d at 985; *U.S. Steel Corp. v. Save Sand Key, Inc.*, 303 So. 2d 9, 12 (Fla. 1974) (holding plaintiff lacked special damages and therefore standing to bring suit for declaratory and injunctive relief against developer of high rise for alleged public nuisance resulting from fencing that impeded enjoyment of beach); *cf. Pichette v. City of N. Miami*, 642

13

So. 2d 1165, 1165–66 (Fla. 3d DCA 1994) (holding plaintiffs lacked standing to challenge ordinance permitting the construction of an amphitheater, which plaintiffs contended would cause a noise-related nuisance once operated because one lived "more than a mile across Biscayne Bay from the rezoned site[,]" and the others were separated from the site by a "57-acre buffer area from the rezoned tract of land, 3,000 and 2,800 feet, respectively, away[.]").

### 3. The Stadium Zoning Ordinance Supports Dismissal of Counts IV and V.

The Complaint concedes that the proposed track for the Miami Grand Prix: (1) will not utilize NW 199th Street, "effectively eliminating the need for a formal street closure for the race" (Compl. ¶ 150); and (2) "will be contained on the Stadium property." (*Id*. ¶ 153). None of Plaintiffs' allegations concerning the current track plan for the Stadium location supports an inference that the track will not be confined to the Stadium District, to which the Stadium Zoning Ordinance applies.[13] *See* Opp. at 28.

Automotive racing is a permitted use within the Stadium District.[14] *See* Secs. 33-452 (2), 33-463, Miami-Dade Code; Secs. 34-603(2), 34-614, Miami Gardens Code. Plaintiffs argue that the Court should disregard the Stadium Zoning Ordinance because sub-section 33-451(2) states that the Stadium Zoning Ordinance does not "create an exception to or vary any Countywide regulations that otherwise exist pursuant to the Code of Miami-Dade County." But the fact that the Stadium Zoning Ordinance makes automotive races an allowable use of the Stadium property is of course relevant to whether a sound emanating from the Stadium property is "unreasonably loud, excessive, or unusual" for purposes of the County's noise ordinance. Sec. 21-28, County Code.

### F. PLAINTIFFS FAIL TO MEET ARTICLE III REQUIREMENTS BECAUSE THEY LACK STANDING AND THE ACTION IS NOT RIPE FOR REVIEW

To survive dismissal, Plaintiffs must allege a case or controversy that satisfies Article III of the U.S. Constitution. Plaintiffs' primary argument is that they adequately pled an injury-in-

---

[13] With respect to this argument, Plaintiffs disregard the Court's Order [ECF 43] concerning page limit by incorporating and relying solely on their opposition to Defendants' Request for Judicial Notice for support [ECF 45]. The Opposition to the Motion to Dismiss itself, contains no basis for this contention.

[14] Stadium Zoning Ordinance, Sec. 33-451, County Code; Sec. 34-602, City Code (Stadium District "applies to the area bounded by N.W. 203rd Street on the north, the Florida Turnpike on the east, N.W. 195th Street on the south, and N.W. 27th Avenue on the west, [ ] referred to as the Stadium District (S District)."

14

fact, which satisfies the first element of standing and supports a determination that the matter is ripe for review. Opp. at 3–4. They are incorrect. Determining whether a matter before a federal court is a proper case or controversy as required by Article III requires an evaluation of both ripeness and standing. *Trump v. NY*, 141 S.Ct. 530, 535 (2020). Standing requires that "an injury is concrete, particularized, and imminent rather than conjectural or hypothetical," while ripeness requires that the action is not dependent on "contingent future events that may not occur as anticipated." *Id.* at 535. Although these are separate doctrines, standing's injury-in-fact requirement permeates the determination of ripeness. *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006) ("It is the first element [of standing], that most often converges with ripeness. If an action for prospective relief is not ripe because the factual predicate for the injury has not fully materialized, then it generally will not contain a concrete injury requisite for standing.").

Here, Plaintiffs' failure to sufficiently allege a concrete injury prevents Plaintiffs from having standing *and* makes their claims not ripe for adjudication. Simply put, the "factual predicate" for injury has not "materialized." Instead, Plaintiffs are asking the Court to award them prospective relief for purported injuries that they contend may arise from a race, such as noise.[15] Compl. ¶¶ 197, 209. However, Plaintiffs' allegations are long on speculation and fear-mongering, but woefully short on facts. Plaintiffs' alleged injuries are hypothetical and any opinion issued by the Court would merely be an improper advisory opinion. *National Ad. Co. v. City of Miami*, 402 F. 3d 1335, 1339 (11th Cir. 2005). Because Plaintiffs do not have standing and their claims are not ripe for review, all of Plaintiffs' claims must be dismissed.

### III.    CONCLUSION

**WHEREFORE**, for the foregoing reasons, and those set forth in Defendants' Motion to Dismiss [ECF No. 35], Defendants respectfully request that this Court enter an order dismissing Plaintiffs' Complaint with prejudice and awarding Defendants their reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

Dated: April 12, 2021

---

[15] For the avoidance of doubt, it is currently contemplated that the race will be held at the Stadium in 2022.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: */s/ Melissa Pallett-Vasquez*
    Melissa Pallett-Vasquez (FBN 715816)
    mpallett@bilzin.com
    Shalia Sakona (FBN 107398)
    ssakona@bilzin.com
    alopez@bilzin.com
    stapanes@bilzin.com
    eservice@bilzin.com

*Counsel for Defendants Miami Dolphins, Ltd., South Florida Stadium LLC, and RSE Ventures, LLC*

HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
(305) 374-8500 (telephone)
(305) 789-7799 (facsimile)

By: */s/ Scott D. Ponce*
    Scott D. Ponce (FBN 0169528)
    scott.ponce@hklaw.com
    Wifredo Ferrer (FBN 887005)
    wifredo.ferrer@hklaw.com
    Sydney B. Alexander (FBN 1019569)
    sydney.alexander@hklaw.com

*Counsel for Defendants Liberty Media Corporation, Formula One Management Limited and Formula One World Championship Limited*

GERALDINE BONZON-KEENAN
Miami Dade County Attorney
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
(305) 375-5151 (telephone)
(305) 375-5634 (facsimile)

By: */s/ Michael B. Valdes*
    Michael B. Valdes (FBN 93129)
    mbv@miamidade.gov

*Counsel for Miami-Dade County, Florida and Mayor Carlos Gimenez*

## **CERTIFICATE OF SERVICE**

    I hereby certify that I caused a true and correct copy of the foregoing to be served electronically via the CM/ECF system this 12th day of April, 2021 upon all counsel of record.

                                          By: */s/ Melissa Pallett-Vasquez*

MIAMI 8215005.10 80838/49182