United States District Court
for the
Southern District of Florida

| Betty T. Ferguson and others, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-24483-Civ-Scola |
| | ) | |
| Miami Dolphins and others, | ) | |
| Defendants. | ) | |

## **Omnibus Order**

The Plaintiffs, residents[1] and homeowner associations[2] in Miami Gardens, Florida, complain the Defendants, Miami-Dade County[3] and various private-entity Defendants,[4] violated their rights, and certain state, county, and city laws, by planning to hold a large-scale, car-racing event at the Hard Rock Stadium in their neighborhood. (Compl., ECF No. 1.) The Plaintiffs seek injunctive and declaratory relief based on equal-protection violations, under 42 U.S.C. § 1983, against the County (count one); a conspiracy, against all Defendants, to deprive the Plaintiffs of their federally protected rights, under 42 U.S.C. § 1985(3) (count two); Florida's Public Trust Doctrine, against the County (count three); the County's noise ordinance, against all Defendants (count four); and Miami Gardens' noise ordinance, against all Defendants (count five). The Defendants have jointly filed a motion to dismiss, arguing, among other things, the Plaintiffs lack standing; the Plaintiffs have failed to state an equal-protection claim under § 1983 against the County; the Plaintiffs have failed to state a claim for conspiracy under § 1985(3); the Public Trust Doctrine is inapplicable; and

---

[1] The individual resident Plaintiffs, who describe themselves as Black residents of Miami Gardens, living in neighborhoods surrounding the Hard Rock Stadium, are Betty T. Ferguson, Thomas Jones, Jr., Bobby Wooden, Howard Dupree, David Dykes, Anne Dykes, Janice Smith, Susan Smith, Sylvia Porter Perkins, Gloria Taylor, Josette Elysee, and Sallie Holmes (collectively, the "Miami Gardens Residents").

[2] The homeowner association Plaintiffs are the Lake Lucerne Civic Association, Inc., the Rolling Oaks Homeowners Association, Inc., and the Miami Gardens Crestview Homeowners Association, Inc. (collectively, the "Miami Gardens Associations").

[3] The Plaintiffs agreed to dismiss Mayor Carlos Gimenez, being sued in his official capacity, from this action. (Pls.' Resp. at 10 n.1.)

[4] The entity Defendants are Miami Dolphins, Ltd., South Florida Stadium, LLC, RSE Ventures, LLC, Formula One Management Limited, Formula One Miami, Formula One, Formula One Miami Grand Prix Racing, and Liberty Media Corporation (collectively, the "Entity Defendants").

there is no private right of action under the municipal noise ordinances.[5] (Defs.' Mot., ECF No. 35.) The Plaintiffs have responded[6] (Pls.' Resp., ECF No. 44), opposing the motion, and the Defendants have replied[7] (Defs.' Reply, ECF No. 48). After careful review, the Court agrees with the Plaintiffs that they have standing but nevertheless finds the Plaintiffs have failed to state a claim under either § 1983 or § 1985(3)—the Plaintiffs' only federal claims. And, because jurisdiction in this case is based on federal-question jurisdiction, the Court exercises its discretion to dismiss the remaining state-law claims, without prejudice. Accordingly, the Court **grants** the Defendants' motion to dismiss (**ECF No. 35**) as fully explained below.

1. **Background**[8]
A. **Historical Framework**

In framing their case, the Plaintiffs recount what they describe as Miami-Dade County's long "history of systemic racism." (Compl. ¶¶ 32–84.) Their historical review begins in the 1930s, with the County's 1936 adoption of a "negro resettlement plan." (*Id.* ¶ 34.) This plan, along with the implementation of a series of other race-based policies, set in motion a cascade of events which resulted in the stark racial segregation of much the County's Black population into areas far outside of Miami's city limits, primarily in the County's central and northwest regions. (*Id.* ¶¶ 34, 38–51, 55–57, 70.) A large portion of this

---

[5] The Defendants also filed a motion requesting judicial notice of various county ordinances and records. (Defs.' Mot. for Jud. Not., ECF No. 34.) The Court's order does not turn on its notice or review of any of those documents and, therefore, the Court **denies** the motion to take judicial notice **as moot** (**ECF No. 34**).

[6] The Florida State Conference of the National Association for the Advancement of Colored People and the Miami-Dade branch of the NAACP jointly moved for leave to file an amici curiae brief in support of the Plaintiffs' opposition. (Mot., ECF No. 51.) As the Defendants point out, in response, the movants' motion is untimely. (Defs.' Resp., ECF No. 56.) Under Federal Rule of Appellate Procedure 29(a)(6), "an amicus curiae *must* file its brief, accompanied by a motion for filing where necessary, no later than 7 days after the principal brief of the party being supported is filed." Fed. R. App. P. 29(a)(6) (emphasis added). Not only did the movants fail to meet this deadline, they also failed to file the actual brief they seek to submit. Further, the movants fail to provide any justification for the delay. The Court thus **denies** the movants' motion (**ECF No 51**).

[7] The Plaintiffs also sought leave to file a sur-reply. (Pls.' Mot., ECF No. 58.) Because the Court does not find that the Defendants' reply expanded the scope of the issues presented, and because much of the material presented in the Plaintiffs' proposed sur-reply does not, in any event, affect the Court's analysis, the Court **denies** the motion (**ECF No. 58**).

[8] The Court generally accepts the Plaintiffs' factual allegations as true for the purposes of evaluating the Defendants' motion to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

population eventually came to reside in the area that is now Miami Gardens. (*Id.* ¶¶ 40–41, 44, 51–52.)

The County's segregated areas are or have been characterized by overcrowding; poverty; high unemployment; substandard levels of municipal services, like, for example, regular garbage collection; overpopulated schools; and discriminatory, violent, and oppressive policing. (*Id.* ¶¶ 46–47, 50, 53, 60–64.) Studies conducted have attributed many of these conditions to the County's neglect and maintenance of persistent discriminatory policies and plans. (*Id.* ¶¶ 68–70, 79.) According to certain reports and surveys, these practices have resulted in extraordinary disadvantages to the Black community, with respect to, for example, businesses, employment, education, voting rights, income, and housing. (*Id.* ¶¶ 71–75, 80–82.) Against this historical backdrop, the Plaintiffs describe the maneuverings of the Defendants and the County's subsequent approval and permitting, in conjunction with an agreement among some or all of the Defendants, to bring the Formula One Miami Grand Prix to the Hard Rock Stadium, in the Plaintiffs' backyard, as set forth below. (¶¶ 21–22, 24–26, 28.)

### B. Efforts to Bring the Race to Downtown Miami

Liberty Media, the entity that owns and controls Formula One, announced, in September 2016, its goal of expanding Formula One racing to Miami. (*Id.* ¶ 87.) The plans initially contemplated a long weekend of racing in 2019, through the streets of downtown Miami, near Bayfront Park and the Port of Miami, among the city's restaurants, shops, and residential areas. (*Id.*) In May 2018, Stephen Ross, the owner of the Miami Dolphins and the owner of the exclusive franchising rights to Formula One races in South Florida, expressed the goal of Formula One, "[i]n cooperation with the City of Miami and Miami-Dade County," to "deliver yet another global event that will be a destination for people from around the world and drive economic value to South Florida." (*Id.* ¶¶ 86, 89.)

A week after Ross's statement, the City of Miami commission unanimously authorized its city manager to negotiate a ten-year agreement to bring a Formula One race to downtown Miami. (*Id.* ¶ 90.) Formula One later announced that the combined decisions of the County and the City of Miami constituted preliminary approval of bringing the Formula One Grand Prix to Miami. (*Id.*) In response to these plans, the residents of downtown Miami mobilized a grassroots effort to persuade their elected officials to reject bringing the race to their neighborhood. (*Id.* ¶ 92.) In mounting their campaign, the downtown residents complained about the anticipated excessive noise, damage

to their health and hearing, and threats to the quiet enjoyment and values of their homes that would all accompany the event. (*Id.* ¶¶ 92–93, 95.)

Concurrently, in May 2018, the County commission passed a resolution encouraging Formula One to "coordinate with any hosting municipality and with other municipalities within Miami-Dade County to bring a Formula 1 race to the County." (*Id.* ¶ 94.) In June 2018, residents from the Bayfront Park area sent a cease-and-desist letter to the mayor and city commissioners, outlining their objections to the race and detailing the negative effects various mega-events held at the park have had on their quality of life. (*Id.* ¶ 98.) Shortly thereafter, Formula One, referencing "complicated negotiations," announced it would no longer be possible to bring the race to Miami in 2019, but expressed optimism for a 2020 event. (*Id.*) Ultimately, however, negotiations failed, and any plans for bringing the race to downtown Miami were ultimately abandoned. (*Id.* ¶ 99.)

## C. Efforts to Bring the Race to Miami Gardens and Residents' Opposition

A year after scrapping plans for holding the race downtown, the Dolphins discussed, over the course of many months, in summer 2019, holding races in and around Hard Rock Stadium with senior aides from the Mayor Gimenez's office. (*Id.* ¶¶ 100, 103.) Later, the Miami Dolphins announced an agreement with Formula One to hold races on the stadium grounds as well as on NW 199th Street, a public street in Miami Gardens, next to the stadium. (*Id.*) The plan was for the races to take place over a ten-year period, beginning in May 2021. (*Id.*) Notably, contrary to the County commission's resolution that Formula One coordinate with any hosting municipality, none of the Defendants ever discussed the proposal with Miami Gardens residents or leaders prior to the announcement. (*Id.* ¶¶ 102, 106.)

Various records discovered by the *Miami Herald* evidenced the County's offering significant financial incentives to the Dolphins to bring Formula One to the Hard Rock Stadium. (*Id.* ¶¶ 104–05.) Also, despite Mayor Gimenez's having previously recused himself from Formula One matters, in May 2018—because his son was a paid lobbyist for the Miami Grand Prix efforts—the Mayor was, nonetheless, later personally involved in negotiating bringing the race to Miami Gardens. (*Id.* ¶¶ 104, 106.)

In evaluating the race plans, the County commission auditor issued a report, in September 2019, analyzing the potential effects of holding the Formula One races at the stadium. (*Id.* ¶ 108.) The report noted a 2013 study which stated that the noise level on a Formula One track could reach 140 decibels—comparable to the noise of a jet engine on takeoff. (*Id.* ¶ 109.) Noise at

such a level is enough to pose immediate danger to hearing. (*Id.*) The report also remarked that tires of race cars shred into tiny, invisible particles over the course of a race, producing poisonous dust. (*Id.* ¶ 110.) Noting traffic issues, the report observed that residents near the stadium could face difficulty accessing emergency services and connecting to major roadways and highways during the three weeks leading up to the races. (*Id.* ¶ 111.)

On the same day that the report was issued, County Commissioner Barbara Jordan, whose district includes Miami Gardens, hosted a forum at a local high school. (*Id.* ¶ 112.) Over 200 Miami Gardens residents attended, condemning the race plans and maintaining they were being discriminated against and treated differently as compared to more affluent communities in the County that have lower populations of racial minorities: according to the 2010 United States Census, only 7.2% of the population of downtown Miami is Black, while, in contrast, 73% of Miami Gardens' population is Black. (*Id.* ¶¶ 112, 159–60.) After the forum, Commissioner Jordan announced she was against the race's coming to the stadium, recognizing the broad opposition to it from the community. (*Id.* ¶ 114.)

In response, a couple weeks later, the Dolphins president sent a letter to the County commissioners, voicing his objection to what he perceived to be an effort "to preempt the citizens of Miami-Dade County from even having a conversation about one of the most prestigious and significant sporting events in the world." (*Id.* ¶ 116.) The next day, Commissioner Jordan added an agenda item to the next County commission meeting, proposing a resolution that would (1) require noise- and traffic-impact studies for any car races involving road closures, throughout the County; (2) require commission approval for any races in the county; and (3) prohibit road closures of any street in Miami Gardens for races. (*Id.* ¶ 117.) At the same time, she also proposed a zoning ordinance that would require the Dolphins to acquire special-events permits for any car-racing events from both Miami Gardens and the County, even if road closures were not involved, with the races' taking place only within the stadium grounds. (*Id.* ¶ 118.) These items were both set for hearing at an October 29, 2019, County commission meeting. (*Id.* ¶¶ 117–18.)

Two weeks before that meeting, however, on October 15, Formula One and the Miami Dolphins issued a joint statement, announcing they had reached an agreement in principle to host the first-ever Formula One Miami Grand Prix at Hard Rock Stadium. (*Id.* ¶ 119.) Part of the agreement indicated that the race would occur annually, beginning in 2021, and that County approval was required. (*Id.* ¶ 120.) A week after that announcement, public records show Mayor Gimenez met with Ross—owner of both the Dolphins and the stadium. (*Id.* ¶ 121.)

Just a couple days after that meeting, Miami Gardens' city council, at a meeting on October 23, unanimously adopted a resolution formally objecting to the proposed race, citing concerns about unsafe air quality, dangerous noise levels, and traffic congestion. (*Id.* ¶¶ 122, 128.) The city's vice mayor condemned the Dolphins' failure to engage the community and its leaders about the race plans before moving forward. (*Id.* ¶ 125.) A city memo, in support of the resolution, complained, among other things, that "[t]oo often corporate America focuses on profit over people's lives." (*Id.* ¶ 127.)

Following that city council meeting, and just a day before the county commission meeting scheduled for October 29—where Commissioner Jordan's car-racing-related resolution and ordinance were scheduled for discussion and votes—Mayor Gimenez sought to formally rescind his prior recusal of participating in any Formula One matters. (*Id.* ¶¶ 91, 130.) The next day, Mayor Gimenez threatened to veto both of Commissioner Jordan's proposals to restrict racing in Miami Gardens. (*Id.* ¶ 130.)

Close to one-hundred Miami Gardens residents attended the October 29 commission meeting to express their opposition to Formula One racing in their neighborhood. (*Id.* ¶ 132.) Various residents and city leaders voiced their concerns about the myriad negative impacts the racing would have on Miami Gardens: "catastrophic health impacts"—namely, hearing damage and air pollution; and disruption to their daily lives—namely, not being able to access their homes during races; unacceptably high noise levels; and extreme traffic congestion. (*Id.* ¶¶ 132–39.) The Miami Gardens residents and community leaders also highlighted the unprecedented outcry from the Miami Gardens residents; the Dolphins' lack of effort to engage them in the process; the community's historical lack of representation in and influence on the County; and the apparent double standard between the Defendants' response to the downtown Miami residents' opposition to the race as compared to, in contrast, the Defendants' disregard of the Miami Gardens residents' similar outcry. (*Id.* ¶¶ 132–33, 136, 138.)

Ultimately, Commissioner Jordan's proposed resolution to require impact studies and commission approval for any car races in the County and to prohibit road closures for races through residential streets in Miami Gardens passed by a vote of eight to five. (*Id.* ¶ 140.) The first reading of her proposed zoning ordinance, requiring the Dolphins to get a special-events permit from both Miami Gardens and the County for car racing, even if confined to stadium grounds, passed by a vote of seven to six. (*Id.*)

During the three weeks following the votes, the Dolphins spent over $40,000 on social media ads, targeting County residents. (*Id.* ¶ 142.) The ads criticized each County commissioner, by name, who voted in favor of

Commissioner Jordan's items. (*Id.*) The ad highlighted $400 million in economic impact for the area, including 35,000 hotel-room rentals and 4,000 new jobs. (*Id.*)

In the midst of the advertising blitz, Mayor Gimenez vetoed the resolution—only his fourth ever veto by that point in his tenure—prohibiting street closures in Miami Gardens and requiring impact studies for any proposed race closures in other parts of the County. (*Id.* ¶¶ 143, 145.) The Mayor expressed his disagreement with the County auditor's report regarding noise and hearing damage. (*Id.* ¶ 144.) He also explained that he felt it was "premature to attempt to block an event of the magnitude of Formula One outright," wanting his office to have "more time to continue this dialogue with all parties." (*Id.* ¶ 145.)

At the next meeting, on November 19, Commissioner Jordan introduced a veto override. (*Id.*) On the day of the meeting, Mayor Gimenez tweeted, urging the commissioners to sustain his veto, to "buy[] three to six months so that the parties involved can continue to work toward a solution for []Miami Gardens, Stephen Ross, and the []Miami[ ]Dolphins, as well as racing fans." (*Id.* ¶ 146.) Commissioner Jordan's attempt to override the veto failed. (*Id.* ¶ 147.)

Months later, on January 22, 2020, the County commission was scheduled to vote on a second hearing of Commission Jordan's proposed zoning ordinance, which would have required special-events permits from both Miami Gardens and the County for any car racing, even if confined to stadium grounds. (*Id.* ¶ 148.) Hours before the vote was to take place, however, the Dolphins and Formula One issued a press release, announcing changes to the proposed track design and race schedule. (*Id.* ¶ 150.) The change confined the race to stadium grounds—eliminating the need for any formal street closures—and delaying the start of any racing until 3:00 pm on the Friday of the race weekend. (*Id.*) Because of the last-minute changes, the vote was delayed. (*Id.*)

In the meantime, during the period in which the commission was considering the vote on the second reading of the ordinance, Ross offered free Super Bowl tickets, valued at $3,000 each, to any commissioner who would attend a ceremony supporting the stadium. (*Id.* ¶ 151). At least one commissioner took him up on the offer. (*Id.*) Also, while Mayor Gimenez was publicly threatening to veto any action impinging on Formula One racing in Miami Gardens, he too accepted two hard-to-come-by Super Bowl tickets from Ross, worth $8000. (*Id.* ¶ 152.) Mayor Gimenez later reimbursed Ross for one of the tickets. (*Id.*)

The second reading of Commissioner Jordan's proposed ordinance was held before the County commission on February 19. (*Id.* ¶ 154.) Over one-hundred Miami Gardens residents attended the meeting but none were allowed

to speak. (*Id.*) The ordinance failed to pass, by a vote of six to six. (*Id.* ¶ 155.) Commissioner Jose Diaz, who voted against the ordinance, defended his position: "We have to look at the greater good of all areas." (*Id.* ¶ 156.) Indeed, as the Plaintiffs themselves describe it, "[o]nce again, the wellbeing and voice of the residents of Miami Gardens was suppressed in favor of the economic benefit to non-Miami Gardens businesses and residents, including the County itself." (*Id.* ¶ 157.)

### D. Summary of Impacts on the Miami Gardens Community

Among the harms the Plaintiffs expect as a result of the contemplated Formula One races are: extremely disruptive noise; hearing damage; interference with activities at about eighteen houses of worship within a 2.5 mile radius of the stadium; air pollution; neighborhood traffic jams and blocked roads; lengthy delays; and overcrowding of public transportation. (*Id.* ¶¶ 161–183.)

## 2. Legal Standard

### A. Standing

Because the question of Article III standing implicates subject-matter jurisdiction, it must be addressed as a threshold matter prior to the merits of any underlying claims. *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1250 (11th Cir. 2015). Indeed, standing generally must be present at the inception of the lawsuit. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.5 (1992). Article III of the U.S. Constitution grants federal courts judicial power to decide only actual "Cases" and "Controversies." U.S. Const. Art. III § 2. The doctrine of standing is a "core component" of this fundamental limitation that "determin[es] the power of the court to entertain the suit." *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1264–65 (11th Cir. 2011) (quoting *Lujan*, 504 U.S. at 560; *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). The "irreducible constitutional minimum" of standing under Article III consists of three elements: (1) the plaintiff must have suffered an actual or imminent injury, or a concrete "invasion of a legally protected interest"; (2) that injury must have been caused by the defendant's complained-of actions; and (3) the plaintiff's injury or threat of injury must likely be redressable by a favorable court decision. *Lujan*, 504 U.S. at 560–61; *see also Hollywood Mobile Estates Ltd.*, 641 F.3d at 1265 (same).

### B. Failure to State a Claim

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must dismiss a plaintiff's claims if he fails to nudge his "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *See Id.* at 555. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

### 3. Analysis

### A. The Plaintiffs have standing and this action is ripe for adjudication.

The Defendants argue the Plaintiffs lack standing because their claims are purely conjectural and speculative. (Defs.' Mot. at 8–10.) The Defendants further maintain the homeowner-association plaintiffs also lack standing for the separate reason that they have not alleged a matter of common interest to their members. The Court finds both arguments unavailing.

### (1) Standing and Ripeness

First, the Court finds the Plaintiffs have sufficiently alleged, as required by Article III of the U.S. Constitution, an "actual case or controversy." U.S. Const. Art. III § 2. To satisfy Article III's requirement, a plaintiff must allege (1) an injury in fact that is concrete and particularized as well as actual or imminent, rather than conjectural or hypothetical; (2) a causal connection between the injury and the challenged conduct; and (3) that the injury will be likely redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

"The Declaratory Judgment Act, 28 U.S.C. § 2201, echoing the 'case or controversy' requirement . . . provides that a declaratory judgment may only be issued in the case of an 'actual controversy.'" *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1284 (11th Cir. 2012) (cleaned up). For purposes of the Act, then, a plaintiff must allege facts showing there is "a substantial continuing controversy between parties having adverse legal interests." *Id.* (cleaned up). Similarly, a "party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *JW by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) (cleaned up). "Whether a future injury is likely to occur in part depends on whether the misconduct alleged is authorized by or part of a government policy." *Id.* That is, "[w]hen alleged misconduct is authorized or part of a policy, it is significantly more likely that the injury will occur again." *Id.* (cleaned up). And so, to establish standing, plaintiffs "must assert a reasonable expectation that the injury they have suffered will continue or will be repeated in the future" as a result of the challenged conduct. *Malowney v. Fed. Collection Deposit Group*, 193 F.3d 1342, 1347 (11th Cir. 1999).

The Defendants contend that the "Plaintiffs' conjecture about the 'potential impacts' of a 'proposed' event is devoid of the necessary concreteness, immediacy, and reality" to establish standing. (Defs.' Mot. at 8.) They also insist the Plaintiffs' claims are not ripe "because they are supported by nothing more than speculation about effects that allegedly *may* result from a race that has never occurred and for which the ultimate sound impacts are undetermined." (*Id.*(emphasis in original).) The Court disagrees.

First, the Court finds the Defendants' focus on just the noise issues raised misplaced. The noise issues the Plaintiffs anticipate from the racing events are but one piece of the Plaintiffs' concerns. They have also alleged the races will bring air pollution, the nuisance of road closures and traffic congestion, depreciation of property values, restricted or delayed access for

emergency vehicles, and overcrowding of neighborhood public transportation. (Compl. ¶¶ 8–11, 14–16, 95, 133, 135, 137, 162, 180, 182.) Thus, even if the Plaintiffs' concerns about the noise levels produced by the race were insufficient to establish standing, the Defendants completely ignore all the other injuries the Plaintiffs describe in their complaint: injuries that the Court finds go beyond the hypothetical and conjectural and which are concrete and particularized.

Second, the Plaintiffs' characterization of the Miami Grand Prix's coming to the stadium as merely "proposed" and purely speculative is at odds with the Plaintiffs' allegations. (Defs.' Mot. at 8.) To the contrary, the Plaintiffs allege, with no equivocation, that the "Dolphins have negotiated and entered into an agreement with some or all of the other defendants . . . to host the 'Miami Grand Prix,' an annual multi-day spectator racing event in and around the Hard Rock Stadium and on stadium property." (Compl. ¶ 21.) Further, the Plaintiffs allege that not only has the "County publicly supported the Miami Grand Prix," but it has also "issued permits for construction required to stage the race" (*id.* ¶ 22) as well as approved the race's being held in Miami Gardens (*id.* ¶¶ 25–26). The Plaintiffs' concerns, then, are not merely hypothetical musings about "what ifs" for a race that, as the Defendants describe it, "*may*" occur; instead, the Plaintiffs allegations set forth facts showing they have a reasonable expectation that they will suffer concrete injuries, from an event sanctioned by the County and effected by existing agreements among several other entities.

In short, the Court is not persuaded by the Defendants' arguments that the Plaintiffs have failed to allege standing. Instead, the Court finds the Plaintiffs have adequately alleged a reasonable expectation of concrete and particularized injuries, occasioned by the conduct of the Defendants, and which injuries would be likely redressed by a favorable decision from this Court. The Plaintiffs have, thus, alleged standing.

### (2) Standing of the Homeowners' Associations

The Court is also not convinced by the Defendants' argument that the homeowner-association Plaintiffs separately lack standing. (Defs.' Mot. at 10–11.) The Defendants complain that the associations have not alleged "a matter of 'common interest' to their members," as that is defined by Florida Statute. (*Id.* at 10.) They also criticize the Plaintiffs' failure to plead anything about the racial identities of the association members or their addresses—which the Defendants say is necessary so that the event's noise impact on them can be evaluated. (*Id.* at 11.) The Court does not find these points compelling.

Under Florida Statutes section 720.303, an "association may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all members concerning matters of common interest to the members." Fla. Stat. §

720.303(1). By way of example, the statute describes "matters of common interest" as "including, but not limited to, the common areas; . . . improvements for which the association is responsible; mechanical, electrical, or plumbing elements . . . for which the association is responsible; representations of the developer pertaining to any . . . commonly used facility; and protesting ad valorem taxes . . . ." The Defendants argue that the focus of the Plaintiffs' complaint has nothing to do with the types of common interests listed in the statute. But the Defendants fail to explain why this provision applies to the associations who are named as plaintiffs in this action. Under the statute, a homeowners' association is defined as a "Florida corporation responsible for the operation of a community . . . in which the voting membership is made up of parcel owners . . . and in which membership is a mandatory condition of parcel ownership, and which is authorized to impose assessments that, if unpaid, may become a lien on the parcel." Fla. Stat. § 720.301(9). Importantly, the definition "does not include a community development district or other similar special taxing district created pursuant to statute." *Id.* As an initial matter, then, the Court is not persuaded by the Defendants that the plaintiff associations must satisfy the requirements of this statute to establish standing.

Further, the Court finds the homeowner-association Plaintiffs have otherwise sufficiently alleged standing. In order to do so, the associations "must allege three conditions: (i) their members suffered an actual injury for which they would otherwise have standing to sue in their own right; (ii) the interests the association seeks to protect are germane to its purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Lake Lucerne Civic Ass'n, Inc. v. Dolphin Stadium Corp.*, 801 F. Supp. 684, 690 (S.D. Fla. 1992) (Highsmith, J.) (cleaned up) (quoting *Pennell v. City of San Jose,* 485 U.S. 1, 7 & n. 3 (1988)). As set forth above, the Court has already concluded the members of the association have satisfied the injury prong for pursuing injunctive and declaratory relief. Further, the associations each seek to protect their members from the injuries alleged by the individual plaintiffs. And there does not appear to be any dispute that protecting their members from harms that detract from their quality of life would be germane to such associations' purpose. Lastly, there is no indication that either the claims asserted or the relief requested would require the participation of individual members in the lawsuit: their participation is not required for the Court to assess whether declaratory or injunctive relief is appropriate or not. *See Lake Lucerne*, 801 F. Supp. at 691 (finding the association plaintiffs—the same three association plaintiffs in this case—to "have standing to assert claims on behalf of their members in seeking injunctive relief because the participation of individual members of the plaintiff

associations is not required in assessing whether an injunction is appropriate or not"). Accordingly, the Court is not persuaded by the Defendants' challenge to the associations' standing here.

**B. The Plaintiffs have failed to state an equal-protection claim.**

In count one, the Plaintiffs allege the County violated their rights under the Equal Protection Clause, in violation of § 1983, by treating their community differently than the downtown Miami community. Their claim hinges on their contention that "the two proposed race locations, Bayfront Park in Downtown Miami and Hard Rock Stadium in Miami Gardens, are similarly situated in all material respects." (Pls.' Resp. at 11.) Secondarily, the Plaintiffs maintain they have sufficiently alleged that the Defendants treated the Plaintiffs differently for the purposes of discriminating against them. (*Id.* at 11–12.) In support of dismissal, on the other hand, the Defendants point out that the Plaintiffs have not alleged facts showing that (1) the locations are similarly situated in all material respects or (2) any discriminatory motive that can be ascribed to the County. (Defs.' Mot. at 13–14.) After careful review, the Court agrees with the Defendants on both points.

To begin with, the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006) ("[T]he Equal Protection Clause requires government entities to treat similarly situated people alike."). Stated another way, "different treatment of dissimilarly situated persons does not violate the equal protection clause." *Campbell*, 434 F.3d at 1314 (cleaned up). To prevail on an equal protection claim, a plaintiff must show (1) that it was treated differently from other, similarly situated entities, and (2) that the defendant treated the plaintiff differently for the purposes of discriminating against the plaintiff. *Id.* The other similarly situated entities—or comparators—must be alike in all material respects. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019). "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. In other words, "a plaintiff and [its] comparators must be sufficiently similar, in an objective sense," such "that they cannot reasonably be distinguished." *Id.* (cleaned up).

As to the first element, the Plaintiffs focus on the following similarities between the two sites in their response: both locations would allow for global racing events; holding the race at either location would drive economic value to Miami-Dade County and South Florida; regardless of where the race is held, it will bring extreme noise, air pollution, and traffic to residential areas; those effects would cause similar harm to the residents' health as well as deprive both

communities of quiet enjoyment of their property; and both locations were considered or authorized by the same parties—Formula One, the Dolphins, Stephen Ross, the County, and Mayor Gimenez. (Pls.' Resp. at 11.) The Plaintiffs' list of similarities is notable, however, for the differences they omit.

Importantly, the Plaintiffs fail to acknowledge that holding the race at the stadium in Miami Gardens, as opposed to downtown, will "eliminat[e] the need for a formal street closure." (Compl. ¶ 150.) In stark contrast, were the event to be held near Bayfront Park, the race would take place "in and around . . . residences in [d]owntown, Bayfront Park, and Biscayne Boulevard," "through [d]owntown Miami in Bayfront Park and the Port of Miami near the city's restaurants, shops, and residential districts." (*Id.* ¶¶ 87, 98.) Also distinguishing is that the Hard Rock site has already been zoned "to allow racing on stadium property." (*Id.* ¶ 148.) Additionally significant is the complaint's description of Miami's urban downtown Miami as being "heavily populated residential communities" (*id.* ¶¶ 93, 95), as compared to the area around the stadium's being described as made up of "single family homes and some small businesses" (*id.* ¶ 122). Lastly, the Plaintiffs relay that Ross, the owner of the exclusive franchising rights to Formula One races in South Florida, also owns the stadium in Miami Gardens. (*Id.* ¶ 85.) Since the Plaintiffs describe Ross as being "actively involved in strategizing, planning, and lobbying to bring Formula One to Miami," Ross's ownership of a stadium in one neighborhood, and not another, is another significant differentiating feature between the two sites. Considered together, the Court finds these differences material, allowing the two sites to be readily and reasonably distinguished. Accordingly, the Plaintiffs' allegations fail to set forth facts showing that the two sites are "similarly situated."

The Plaintiffs' argument that they have also sufficiently alleged the County's discriminatory intent is equally problematic. In the face of the Defendants' motion to dismiss, the Plaintiffs maintain that "evidence of substantial disparate impact, a history of discriminatory official actions, departures from the norms, and the history of the decision establish a clear pattern of discrimination." (Pls.' Resp. at 12 (cleaned up).) The Defendants, on the other hand, contend the Plaintiffs' factual allegations actually establish that the County was driven only by race-neutral political or economic motivations. The Defendants further point out that all the Plaintiffs' allegations of discriminatory motive are conclusory, unsupported by any actual facts. (Defs. Mot. at 14; Defs.' Reply at 6–8.) The Court agrees with the Defendants.

In order to allege an equal-protection claim, a plaintiff must set forth facts showing not only a racially disproportionate impact, but a racially discriminatory intent or purpose as well. *Vill. of Arlington Heights v. Metro. Hous.*

*Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.") A discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). To survive Rule 12(b)(6) scrutiny, then, a complaint must contain plausible allegations that racial discrimination motivated the County's action.

While direct evidence of a discriminatory purpose is often absent, the Eleventh Circuit has set out several factors that are probative of whether such a purpose can be inferred:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1322 (11th Cir. 2021). In attempting to show that they have set forth plausible allegations of the County's discriminatory intent, the Plaintiffs point to over one-hundred-and-fifty paragraphs in their complaint, specifically arguing they have set forth facts relevant to the first, second, third, and fourth factors. The Court is not convinced.

The allegations in the complaint do not amount to a plausible showing that the County specifically targeted Miami Gardens because it wanted to inflict the harms associated with the event specifically on Black residents. While it is certainly plausible that the harms alleged will disproportionately impact Black residents, simply by virtue of the fact that 73% of Miami Gardens' population is Black, that alone is not enough to show discriminatory intent. *Arlington Heights*, 429 U.S. at 264–65 ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact."). Despite this disparate impact, the complaint's allegations do not otherwise set forth "a clear pattern, unexplainable on grounds other than race." *Id.* at 266.

The Plaintiffs maintain their allegations of a long history of discriminatory official actions throughout the County show discriminatory intent with respect to the Miami Grand Prix. To be sure, the Plaintiffs' allegations recount a disturbing chronicle of systemic racism, starting in the 1930s, by the County. (Compl. ¶¶ 32–84.) Through racial zoning efforts, much of the County's Black population was segregated into distant areas outside Miami's city limits. (*Id.* ¶¶

33–34, 39–40, 44–45.)  The Plaintiffs identify the devasting impacts this segregation has had on these Black neighborhoods, including Miami Gardens: overcrowding; poorly built complexes; limited open spaces or recreational areas; poor municipal services, including infrequent garbage collection; overcrowded schools; violent policing; disadvantages in the criminal-justice system; lower incomes; and higher rates of poverty and homelessness. (Compl. ¶¶ 46–47, 53, 60, 80–81.) The Plaintiffs also describe the County's implementation of a discriminatory voting system that diluted the votes of Black voters in Miami Gardens. (*Id.* ¶ 72.) While the Court recognizes the devastating effect this history has had on the County's Black population, the Plaintiffs do not tether this history to the challenged County action in this case. *See Greater Birmingham Ministries*, 992 F.3d at 1324 (finding "[t]he [p]laintiffs' position . . . weakened significantly by the fact that the evidence presented in this case is largely unconnected to the passage of the actual law in question"). Further, much of the discriminatory acts and policies the Plaintiffs describe date back several decades: beginning in the 1930s (Compl. ¶¶ 32–35), with the most recent allegations of discrimination occurring over twenty-five years ago (*id.* ¶ 72–73, 78). And, notably, some of the Plaintiffs' allegations actually point to the County's shifting away from this dark past. For instance, the Plaintiffs say the County commissioned two independent studies in 1992, investigating and acknowledging racial discrimination against Black businesses in the County. (Compl. ¶ 71.) By way of another example, the Plaintiffs point out that the residents of Miami Gardens were initially discriminated against when they first tried to incorporate in 1995. (*Id.* ¶ 78.) When the residents tried again, though, in 2003, the County approved their efforts. (*Id.*) In sum, the Court does not find the Plaintiffs' allegations of the County's historical discriminatory actions and policies, set decades in the past and left untied to the current challenged action, to set forth a plausible claim of discriminatory intent with respect to the Miami Grand Prix. *See Greater Birmingham Ministries*, 992 F.3d at 1325 (cautioning that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful").

      Nor does the Court find the Plaintiffs' allegations regarding "departures from the norms" and the "history of the decision" to set forth a plausible claim of discriminatory intent. (Pls.' Resp. at 12 (citing Compl. ¶¶ 100–60).) While the referenced allegations paint a picture of possible backroom and political maneuverings (Compl. ¶ 100, 102–03, 106, 121, 125, 130), certain financial incentives—some dubious and some not (*id.* ¶¶ 104–05, 151–52, 157), and forces applying political pressure (*id.* ¶ 142, 156), not a single cited allegation would support a finding that the County approved holding the Miami Grand Prix in Miami Gardens *in order to* discriminate against its Black residents.

Indeed, many of the complaint's allegations indicate that the County's decision was driven solely by race-neutral economic and political motivations. (*E.g.*, Compl. ¶ 127 (lamenting the focus on "profit over people's lives); ¶ 142 (describing the Dolphins' aggressive social media campaign which called out the County commissioners who supported the Miami Gardens residents and referenced the $400 million economic impact at stake); ¶¶ 151–52 (at least one commissioner and Mayor Gimenez accepted Super Bowl tickets from Ross); ¶ 156 ("Jose Diaz, a County Commissioner who voted against [the Plaintiffs' preferred] proposal, explained his decision with the following statement: 'We have to look at the greater good of all areas.'"); ¶ 157 ("[T]he wellbeing and voice of the residents of Miami Gardens was suppressed in favor of the economic benefit to non-Miami Gardens businesses and residents, including the County itself.").) Notably, all the complaint's allegations regarding the County's discriminatory intent are purely conclusory and lacking any factual support. (*E.g.*, *id.* ¶ 2 ("Defendants engaged in a pattern of intentional discrimination and conspiracy against Plaintiffs on the basis of race, color, or national origin, depriving them of rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment."); ¶ 31 ("The acts and omissions of all Defendants . . . serve as the most recent example of Miami-Dade County's customs and practices that routinely . . . discriminate against the Plaintiffs."); ¶ 84 (similar); ¶ 190–194 (similar); ¶ 112 ("[O]ver 200 residents expressed their anger and frustration that . . . they were being discriminated against and treated differently than more affluent communities and other cities without such a high proportion of racial minorities.").)

And so, without allegations plausibly setting forth either a similarly situated comparator or evidence of the County's discriminatory intent, the Plaintiffs have failed to state a claim under § 1983 for violations of the Equal Protection Clause.

### C. The Plaintiffs have failed to state a claim for a conspiracy under § 1985(3).

In count two, the Plaintiffs allege a cause of action against all Defendants for a conspiracy to violate the Equal Protection Clause of the Fourteenth Amendment. The parties do not dispute that the Plaintiffs' § 1985 conspiracy claim against the private-actor defendants is predicated upon the private actors' conspiracy *with* the County. (Pls.' Resp. at 18–19; Defs.' Reply at 7 n.8.) Because the Court has already found the Plaintiffs failed to state a claim against the County for an equal-protection violation, their allegation of a conspiracy, predicated on that very dismissed claim, necessarily fails. *See Terry Properties, Inc. v. Standard Oil Co. (Ind.)*, 799 F.2d 1523, 1534 (11th Cir. 1986)

("[P]rivate actors[] may be liable for infringement of Fourteenth Amendment rights only through conspiracy with state actors in violation of 42 U.S.C. § 1985(3).); *see also United Broth. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 831 (1983) (recognizing that a § 1985(3) conspiracy to violation the Equal Protection Clause of the Fourteenth Amendment cannot be confined to solely private actors).

### 4. Conclusion

The Court sympathizes with the Plaintiffs' deep frustration with having an event of this magnitude, and all its attendant negative impacts on their quality of life, foisted upon them when their community has so thoroughly and vehemently opposed it. The Court is also acutely aware of the context in which this arises, where another community's campaign against the spectacle's taking place in their backyard was successful. The Court is, further, not unmindful of the long history of marginalization this community has suffered and continues to suffer, as alleged in the complaint. But it is not within the Court's purview to make a decision based on the wisdom, or even fairness, of the Defendants' decisions and plans. Instead, the Court is confined to determining whether the Plaintiffs are entitled to the relief they seek, under the causes of action they allege. And based on the facts alleged here, they are not.

For the reasons set forth above, the Court dismisses count one, against the County, and count two, against all Defendants. The Court **dismisses** these counts (**one and two**) **with prejudice** because the Plaintiffs have failed to state a claim under Rule 12(b)(6). Further, the Court **denies** the Plaintiffs' request for **leave to amend**, inserted as an afterthought, in the last sentence of their thirty-page opposition to the Defendants' motion to dismiss: the request is both procedurally defective and lacking in substantive support. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.*, 740 Fed. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.") (noting also that "a motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment") (cleaned up).

As set forth above, the Court also **denies as moot** the Defendants' motion asking the Court to take judicial notice of various documents (**ECF No. 34**) and **denies** both the movants' motion seeking leave to file an amici curiae brief (**ECF No. 51**) as well as the Plaintiffs' motion for leave to file a sur-reply (**ECF No. 58**).

Regarding the remainder of the Plaintiffs' complaint, which seeks relief under state law (**counts three through five**), the Court declines to exercise supplemental jurisdiction and **dismisses** those state-law claims, **without prejudice**. *Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1089 (11th Cir. 2004) ("encourag[ing] district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial"). Accordingly, the Court **grants** the Defendants motions to dismiss (**ECF No. 35**.)

The Clerk is directed to **close** this case. Any other pending motions are denied as moot.

**Done and ordered** in Miami, Florida, on July 6, 2021.

_____
Robert N. Scola, Jr.
United States District Judge